# In the United States Court of Appeals for the Sixth Circuit

NetChoice, LLC,

*Plaintiff-Appellant*,

v.

Jonathan Skrmetti, in his official capacity as the
Tennessee Attorney General & Reporter,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Tennessee, No. 3:24-cv-01191

## BRIEF OF APPELLANT NETCHOICE

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Counsel for Plaintiff-Appellant NetChoice

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

NetChoice makes the following disclosure under Sixth Circuit Rule 26.1:

**1. Is NetChoice a subsidiary or affiliate of a publicly owned corporation?**

No. NetChoice is a nonprofit trade association organized under the laws of the District of Columbia.

**2. Is there a publicly owned corporation, not a party to the appeal or an amicus, that has a financial interest in the outcome?**

None known.

/s/ *Scott A. Keller*
Scott A. Keller
*Counsel of Record for Plaintiff-Appellant*
*NetChoice*

**Page**

Table of Authorities ............................................................. v

Statement in Support of Oral Argument .......................................... xii

Introduction ....................................................................1

Statement of Jurisdiction........................................................5

Statement of Issues..............................................................5

Statement of the Case ...........................................................6

      A. Factual background .......................................................6

           1. NetChoice members' websites curate, disseminate, and enable vast amounts of speech protected by the First Amendment. .................................................6

           2. Parents already have many tools to oversee how their children use the internet. ...........................................8

      B. Tennessee House Bill 1891 (2024)..................................10

           1. Covered actors and activities. ................................10

           2. The Act's speech regulations....................................13

      C. Procedural history ....................................................15

Summary of the Argument.....................................................19

Argument .......................................................................24

    I. This Act's speech restrictions irreparably harm NetChoice's members and their users, and the district court's irreparable-harm analysis violates this Court's precedent. .............25

      A. The record contains ample evidence of irreparable harm...............................................................26

B. The district court committed multiple errors in overlooking the record evidence of irreparable harm. ...............29

    1. The district court erred by not considering the merits of NetChoice's First Amendment claims, because likelihood of success on the merits of First Amendment claims creates a presumption of irreparable harm ...............30

    2. The district court erred by concluding that irreparable First Amendment harm is not imminent. ..............................34

    3. The district court erred both by not considering First Amendment harms to NetChoice members' *users* and not considering the full scope of those harms.......................42

    4. NetChoice members' unrecoverable compliance costs constitute irreparable harm.....................................................45

II. NetChoice established the presumed irreparable injury because it is likely to succeed on the merits of its claims that the Act's speech restrictions violate the First Amendment. .............48

A. The Act's parental-consent requirement for minors to access fully protected speech violates the First Amendment.......................................................................50

    1. The Act's parental-consent requirement for minors to create accounts infringes websites' and users' rights. .........50

    2. The Act's parental-consent requirement fails any level of heightened First Amendment scrutiny.............................54

B. The Act's age-verification requirement for both minors and adults violates the First Amendment....................................59

    1. The Act's age-verification requirement to create accounts infringes websites', adults', and minors' rights. ..........................................................................59

    2. The Act's age-verification requirement fails any level of heightened First Amendment scrutiny..............................62

C. The Act's speech regulations apply only to a subset of internet websites based on content, which independently triggers and fails strict scrutiny for all the Act's speech regulations. ...................................................63

    1. The Act's central "social media company" coverage provisions are content-based, so all of the Act's challenged provisions trigger strict scrutiny for this additional reason. ...................................................63

    2. All of the Act's speech restrictions fail any form of heightened First Amendment scrutiny that could apply. ...........................................................................68

III. The remaining equitable factors support granting NetChoice a preliminary injunction. ......................................................70

Conclusion....................................................................................................73

Certificate of Compliance ........................................................................74

Certificate of Service .................................................................................75

Designation of District Court Record......................................................76

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU Fund of Mich. v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) ...................................................................31, 71

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) .................................................................63

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) .................................................................32

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) .................................................................63

*Am. Fed'n of State, Cnty. & Mun. Employees, AFL-CIO v. Soc. Sec. Admin.*,
2025 WL 1249608 (4th Cir. Apr. 30, 2025) ....................................................47

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ...................................................................49, 55

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .................................................................33

*Babbitt v. United Farm Workers Nat. Union*,
442 U.S. 289 (1979) ...................................................................29, 40

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .................................................................65

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .................................................................40

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)........................... 1, 22, 49, 51, 53, 54, 55, 56, 57, 58, 64, 69

*Brown v. Yost*,
133 F.4th 725 (6th Cir. 2025)...............................................31, 51, 52

*Chamber of Com. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010)........................................................28

*Christian Healthcare Centers, Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024)........................................35, 38, 40, 41

*Citizens United v. FEC*,
558 U.S. 310 (2010)........................................................................66

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023).................................... 2, 20, 21, 29, 36, 45, 46, 47

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) .............................5, 33, 45, 66, 67, 69

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
2025 WL 1570007 (N.D. Fla. June 3, 2025) .......................4, 28, 33, 45, 53, 56

*Connection Distrib. Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998)........................................3, 24, 30, 72

*Corral v. Cuyahoga Cnty.*,
2024 WL 4475458 (N.D. Ohio Sept. 17, 2024) ...............................................44

*Deja Vu of Nash., Inc. v. Metro. Gov't of Nash. & Davidson Cnty.*,
274 F.3d 377 (6th Cir. 2001).....................................................32, 73

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................21, 26, 34

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975)........................................................................54

vi

*FEC v. Cruz,*
    596 U.S. 289 (2022)..................................................................50

*Fischer v. Thomas,*
    52 F.4th 303 (6th Cir. 2022)....................................................32

*Free Speech Coal., Inc. v. Paxton,*
    145 S. Ct. 2291 (2025)........................ 1, 22, 50, 54, 58, 59, 60, 61, 69

*Gala v. Kavanagh,*
    2023 WL 2356025 (E.D.N.Y. Mar. 2, 2023) ...................................44

*Georgia v. President of the United States,*
    46 F.4th 1283 (11th Cir. 2022)................................................47

*Great Lakes Higher Educ. Corp. v. Cavazos,*
    698 F. Supp. 1464 (W.D. Wis. 1988) ........................................44

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010)..............................................................28, 40

*Honeyfund.com, Inc. v. Governor,*
    94 F.4th 1272 (11th Cir. 2024)................................................32

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952)................................................................8

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022)..................................................47

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995)..............................................................63

*Mich. State A. Philip Randolph Inst. v. Johnson,*
    833 F.3d 656 (6th Cir. 2016)...............................................31, 34

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)............................ 7, 8, 10, 11, 12, 22, 63

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
409 F.3d 506 (2d Cir. 2005) ................................................44

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .........................................20, 28, 36, 37

*Nationwide Paging Corp. v. Reg'l Commc'ns, Inc.*,
1992 WL 355598 (E.D.N.Y. Nov. 19, 1992) ...................44

*NetChoice v. Carr*,
2025 WL 1768621 (N.D. Ga. June 26, 2025).... 4, 33, 40, 45, 53, 56, 60, 63, 65

*NetChoice, L.L.C. v. Fitch*,
134 F.4th 799 (5th Cir. 2025) ........................................43

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ......................................56

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025) ......................4, 33

*NetChoice, LLC v. Griffin*,
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ...........33, 44, 45, 70

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025)......................4, 8, 52, 56, 60, 66

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024) ................... 5, 33, 45, 53, 60, 67, 68, 69

*NetChoice, LLC v. Yost*,
716 F. Supp. 3d 539 (S.D. Ohio 2024)................................33, 44, 45

*NetChoice, LLC v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025)......................4, 50, 52, 56, 65

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................70

*Nutrition Distrib., LLC v. Enhanced Athlete, Inc.,*
 2017 WL 5467252 (E.D. Cal. Nov. 14, 2017)...................................................44

*Obama for Am. v. Husted,*
 697 F.3d 423 (6th Cir. 2012) ............................................................................31

*Ohio v. EPA,*
 603 U.S. 279 (2024)..........................................................2, 20, 21, 25, 45, 46

*Opulent Life Church v. City of Holly Springs,*
 697 F.3d 279 (5th Cir. 2012) ............................................................................32

*Packingham v. North Carolina,*
 582 U.S. 98 (2017)......................... 1, 7, 10, 23, 50, 53, 57, 58, 59, 60, 62, 69, 71

*People of State of Ill. v. EPA,*
 621 F.2d 259 (7th Cir. 1980) ............................................................................44

*Planet Aid v. City of St. Johns,*
 782 F.3d 318 (6th Cir. 2015) ..........................................................3, 20, 31, 49

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015).........................................................................23, 64, 66, 68

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
 592 U.S. 14 (2020).........................................................................21, 26, 30, 35

*SEAT v. Paxton,*
 765 F. Supp. 3d 575 (W.D. Tex. 2025) ............................................................65

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.,*
 56 F.4th 400 (6th Cir. 2022)................................................................24, 25, 30

*Sorrell v. IMS Health, Inc.,*
 564 U.S. 552 (2011)...........................................................................................64, 69

*State of Tennessee v. Dep't of Educ.,*
 104 F.4th 577 (6th Cir. 2024) ..........................................................................47

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)................................................................35, 37

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000)....................................................................56

*Universal Life Church Monastery Storehouse v. Nabors,*
35 F.4th 1021 (6th Cir. 2022)..................................................38, 40

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
425 U.S. 748 (1976)....................................................................43

*Virginia v. Am. Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988).................................. 4, 21, 28, 38, 40, 43, 44, 57

*Vitolo v. Guzman,*
999 F.3d 353 (6th Cir. 2021) .....................................................31

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008).................................................................2, 70, 71

**Statutes**

28 U.S.C. § 1292...........................................................................5

28 U.S.C. § 1331...........................................................................5

28 U.S.C. § 1343...........................................................................5

28 U.S.C. § 1651...........................................................................5

28 U.S.C. § 2201...........................................................................5

42 U.S.C. § 1983...........................................................................5

47 U.S.C. § 153...........................................................................10

Tenn. Code § 47-18-108.................................................15, 28, 41, 42

Tenn. Code § 47-18-5702...................... 1, 10, 11, 12, 14, 23, 63, 64, 65, 66, 67, 70

Tenn. Code § 47-18-5703.................................. 1, 13, 14, 22, 39, 50, 59, 60, 67, 68

Tenn. Code § 47-18-5704.........................................................................14, 15, 68

Tenn. Code § 47-18-5705.....................................................................................15

**Other Authorities**

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.)...............33, 47

Bluesky, Our Response to Mississippi's Age Assurance Law,
    Bluesky Blog (Aug. 22, 2025), https://perma.cc/6FGB-JYFF .....................72

Dreamwidth, Create Your Dreamwidth Account,
    https://perma.cc/2LVS-AQY8............................................................2, 27, 71

Dreamwidth, Mississippi legal challenge: beginning 1 Septem-
    ber, we will need to geoblock Mississippi IPs (Aug. 26, 2025),
    https://perma.cc/M7P9-GTTJ..........................................................................72

*Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ...............11

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Although the district court's error in this case is plain, the important First Amendment and preliminary-injunction issues in this case warrant oral argument.

Tennessee House Bill 1891 ("Act") violates the First Amendment by restricting fully protected speech on "social media" websites in multiple ways. The Act targets specific websites based on their content. And it restricts users' access to, and engagement with, protected speech by requiring those websites to obtain (1) age verification for *all* users, § 47-18-5703(a)(1); and (2) parental consent for minors, § 47-18-5703(a)(2).[1] These requirements violate the First Amendment. *E.g., Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2309 (2025) ("*FSC*") ("submitting to age verification is a burden on the exercise of" the "right to access" protected speech); *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (First Amendment protects "access" to social media websites); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*").

---

[1] Statutory citations refer to the Tennessee Code. This brief refers to both "websites" and "applications," § 47-18-5702(9)(A), as "websites."

Yet the district court here erroneously denied NetChoice's motion for a preliminary injunction preventing the Act's enforcement against NetChoice's covered members. It held that NetChoice did not establish irreparable harm, without first considering the merits of NetChoice's First Amendment challenge—or the implications those irreparable harms have on "the balance of equities" and "public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

The record here contains ample evidence of real and ongoing irreparable harm. For instance, two NetChoice members have stopped allowing Tennessee minors to access their services altogether. Motion, R.42, Page ID ## 1851-52 (Nextdoor); *see* Dreamwidth, Create Your Dreamwidth Account, https://perma.cc/2LVS-AQY8. In addition, all NetChoice members must expend "unrecoverable compliance costs"—which this Court and the Supreme Court have recognized constitute irreparable harm. *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); *see Ohio v. EPA*, 603 U.S. 279, 292 (2024).

And preventing the grave irreparable harms imposed by Tennessee's restrictions on the dissemination of—and access to—speech are in the public

interest because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citation omitted). That is especially true here, where an injunction would prevent the balkanization of the internet, where people in Tennessee have less access to fully protected speech than people just one State over.

In denying NetChoice a preliminary injunction, the district court flouted this Court's instruction that "the determination of whether [plaintiff] is likely to succeed on the merits of its First Amendment claim controls the question of the validity of the preliminary injunction." *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).

The district court committed further errors. For instance, although the district court acknowledged that Defendant could enforce the Act at any time, it denied relief because NetChoice could not disprove the court's improper assumption that any enforcement (and thus injury) is not sufficiently "imminent" to justify injunctive relief. Opinion, R.78, Page ID ## 2354-59. But the "State has not suggested that the newly enacted law will not be enforced,

and [there is] no reason to assume otherwise." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). So NetChoice has "alleged an actual and well-founded fear that the law will be enforced against" its regulated members. *Id.*

Compounding its error, the district court incorrectly concluded that neither the First Amendment harms to NetChoice members' *users* nor those members' *unrecoverable compliance costs* constitute irreparable harm. Both of those conclusions ignore binding precedent.

Had the district court considered and properly balanced NetChoice's First Amendment arguments and the equities in this case, it should have agreed with multiple courts that have preliminarily or permanently enjoined enforcement of similar state laws. *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025);

*Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

This Court should reverse the district court's judgment, directing the district court to preliminarily enjoin Defendant's enforcement of the Act.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and it had authority to grant relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1651 and 2201(a). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The district court denied NetChoice's motion for preliminary injunction on June 18, 2025, Order, R.79, Page ID # 2365, and NetChoice timely filed its notice of appeal on July 18, 2025, Notice, R.83, Page ID # 2402.

## STATEMENT OF ISSUES

1. Whether the district court erred by denying NetChoice's motion for preliminary injunction, by concluding that NetChoice failed to demonstrate irreparable harm without considering whether NetChoice was likely to succeed on the merits of its First Amendment arguments (creating a

presumption of irreparable harm), the balance of the equities, or the public interest.

2. Whether the district court erred by denying NetChoice's motion for preliminary injunction, by improperly concluding that: (a) any harms are not "imminent"; (b) First Amendment harms to NetChoice members' users are not relevant to irreparable harm; and (c) unrecoverable compliance costs are not irreparable harm.

3. Whether NetChoice was entitled to a preliminary injunction blocking Defendant's enforcement of a content-based law restricting access to protected speech by imposing age-verification requirements for all users, parental-consent requirements for minor users, and requiring that content-based collection of websites to provide parental-supervision tools.

## STATEMENT OF THE CASE

### A. Factual background

#### 1. NetChoice members' websites curate, disseminate, and enable vast amounts of speech protected by the First Amendment.

NetChoice is a leading internet trade association. Cleland Decl., R.8-2, Page ID ## 60-61. Under the Act's coverage definition, the Act regulates

websites operated by the following NetChoice members: (1) Automattic (Tumblr); (2) Discord; (3) Dreamwidth; (4) Meta (Facebook, Instagram, and Threads); (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snap Inc. (Snapchat); (9) X; and (10) YouTube. Cleland Decl., R.8-2, Page ID # 67.[2] This brief refers to members with services the Act regulates as, simply, "members."

The Act regulates NetChoice members based on their shared speech-facilitating functions. It is aimed at "social media" websites that "allow users to upload content . . . to share [it] with others," where those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

As a result, members are covered if they "allow[] users to gain access to information and communicate with one another about it." *Packingham*, 582 U.S. at 107. These websites can influence how people "relate to family and friends, as well as to businesses, civic organizations, and governments."

---

[2] Automattic, Discord, and Reddit joined NetChoice after litigation began, and are included in NetChoice's First Amended Complaint (R.88)—filed after this appeal was docketed. Amended Complaint, R.88, Page ID # 2422.

*Moody*, 603 U.S. at 716. Teens (like adults) use these websites for protected expression, education, civic engagement, and plain "entertain[ment]." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

> **2. Parents already have many tools to oversee how their children use the internet.**

"[P]arents may rightly decide to regulate their child's use of social media . . . . And many tools exist to help parents with this endeavor." *Griffin*, 2025 WL 978607, at *3.

Parents can control what *devices* minors can access—and when. Cleland Decl., R.8-2, Page ID # 62. Not all devices are internet-enabled. Cleland Decl., R.8-2, Page ID # 62. And devices themselves come with many built-in parental-control options. Cleland Decl., R.8-2, Page ID # 63. Those options include the ability to lock or limit apps and features, restrict settings to limit content, limit access to only approved websites, and set overall or time-of-day and usage limits. Cleland Decl., R.8-2, Page ID # 63.

Parents also have control over the *networks* that minors use. Cleland Decl., R.8-2, Page ID ## 62-63. Wireless routers allow parents to manage which network a minor connects to, if any. Cleland Decl., R.8-2, Page ID # 63.

They also allow parents to set up rules defining which websites minors can use (and at what times). Cleland Decl., R.8-2, Page ID # 63. Many internet service providers offer similar tools. Cleland Decl., R.8-2, Page ID ## 62-63.

Parents can also control *software*. Cleland Decl., R.8-2, Page ID ## 64-66. Many web browsers offer parental controls. Cleland Decl., R.8-2, Page ID # 64. Third-party parental control software is also available for many devices. Cleland Decl., R.8-2, Page ID # 63.

Many NetChoice members have developed their own suite of parental controls and other protections for minors. Cleland Decl., R.8-2, Page ID ## 64-66. These controls supplement the resources that members spend crafting and enforcing "content-moderation" policies that aim to prevent harmful or objectionable speech from reaching users. Cleland Decl., R.8-2, Page ID # 66-67; Pai Decl., R.8-3, Page ID # 75. These members' efforts have been successful. *E.g.*, Cleland Decl., R.8-2, Page ID ## 66-67.

In addition, members' services do not permit minors younger than 13 to create accounts for accessing the services regulated by the Act. Cleland Decl., R.8-2, Page ID # 66. So "minors" in this case refers only to teenagers.

## B. Tennessee House Bill 1891 (2024)

### 1. Covered actors and activities.

The Act's speech regulations only apply to a content-based collection of "social media platform[s]" that "[e]nable[] an account holder to communicate with other account holders and users through posts." § 47-18-5702(9)(A). In other words, it regulates the kinds of "social media" websites that have First Amendment rights to curate and disseminate third-party speech, *Moody*, 603. U.S. at 719, 731; and that people have a First Amendment right to access, *Packingham*, 582 U.S. at 108.

The Act defines "[s]ocial media company" as "a person that is an interactive computer service and that provides a social media platform." § 47-18-5702(8).[3] In turn, a "social media platform" means "a website or internet application that": "(i) [a]llows a person to create an account; and (ii) [e]nables

---

[3] An "interactive computer service" is "an information service, as defined in 47 U.S.C. § 153, information system, or information access software that: (i) [p]rovides or enables access by multiple users to a computer server; and (ii) [p]rovides access to the internet," *e.g.*, websites and applications. § 47-18-5702(3).

an account holder to communicate with other account holders and users through posts." § 47-18-5702(9)(A).

The Act defines "[p]ost" to mean "content that an *account holder* makes available on a social media platform for other *account holders* and *users* to consume." § 47-18-5702(7) (emphases added). This accords with the common understanding of the term "post." *E.g.*, *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ("electronic message or information that is put on a website in order to allow many people to see it"). The Act's use of the term "posts" in these definitions, § 47-18-5702(9)(A), limits its coverage to services that *publicly* disseminate third-party speech on feeds, boards, forums, and similar webpages—whether to the general public, all registered users of the service, or to a subset of registered users.

Accordingly, the Act only regulates "social media" websites that "allow users to upload content . . . to share with others," and where those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719. This is consistent with common usage of "social media." *See id.* Such websites receive full First Amendment protection. *Id.* at 733.

The Act's coverage exclusions underscore the Act's content-based scope. For instance, the Act excludes "interactive gaming or educational entertainment" from the "[c]ontent" of "[p]ost[s]" it covers. § 47-18-5702(2)(B), (7). The Act also excludes websites with content such as "career development opportunities," "technical support," "reviewing products offered for sale," and "commenting on … reviews posted by other users." § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii).

Further exceptions obviate the need for a nuanced analysis of different "kinds of websites," identified by *Moody*, that might "fall on different sides of the constitutional line" in considering different theories. *Moody*, 603 U.S. at 718, 726. The Act excludes "email service[s]." § 47-18-5702(9)(B)(ii); *cf. Moody*, 603 U.S. at 725. The Act excludes "[o]nline shopping." § 47-18-5702(9)(B)(iv); *cf. Moody*, 603 U.S. at 725 ("online marketplace[s]"). The Act excludes "[p]eer-to-peer payment platforms." § 47-18-5702(9)(B)(viii); *cf. Moody*, 603 U.S. at 725 ("payment service[s]"). And the Act excludes websites "consist[ing] primarily of content that is … preselected by the [website]." § 47-18-5702(9)(B)(iii)(*a*); *cf. Moody*, 603 U.S. at 725 ("ride-sharing service[s]").

## 2. The Act's speech regulations.

**Age verification for *all* users. § 47-18-5703(a)(1).** The Act requires covered websites to "verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." § 47-18-5703(a)(1). The Act makes clear that age verification will require websites to collect "personally identifying information" by commanding that a "social media company or third party shall not retain personally identifying information that was used to verify age." § 47-18-5703(c).

On NetChoice members' covered services, users must have an account to access either some or all of the fully protected speech and speech-facilitating functions on the service. Cleland Decl., R.8-2, Page ID # 68; Pai Decl., R.8-3, Page ID # 73; Paolucci Decl., R.8-4, Page ID ## 86-88. Consequently, restrictions on account creation infringe *access* to protected speech.

**Parental consent for minors. § 47-18-5703(a)(2).** The Act provides that upon verifying an individual's age, "[i]f the individual is a minor, then the

social media company must verify the express parental consent for the minor to become an account holder." § 47-18-5703(a)(2)(A). A minor is any "[n]ot unemancipated" Tennessee resident who is "[k]nown or reasonably believed by" a website to be younger than 18. § 47-18-5702(4).

If the covered website does not have "the express consent of the minor's parent to allow the minor to become an account holder," then the website "shall prohibit a minor from becoming an account holder." § 47-18-5703(a)(2)(B). In addition, "[a] social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder." § 47-18-5703(b). These provisions require collection of "personally identifying information," as the Act also provides that a "social media company or third party shall not retain personally identifying information that was used to verify . . . parental consent." § 47-18-5703(c).

**Parental supervision. § 47-18-5704.** The Act requires a "social media company" to "provide a minor account holder's parent with means for the parent to supervise the minor's account," including "options for the parent to view privacy settings on the account, set daily time restrictions, and

implement breaks during which the minor cannot access the account." § 47-18-5704. These requirements will be costly to implement, especially for NetChoice's smaller members. Pai Decl., R.8-3, Page ID ## 82-83; Paolucci Decl, R.8-4, Page ID ## 94-98.

**3. Investigation, enforcement, and penalties. § 47-18-5705.** Defendant has investigative and enforcement authority over the Act. § 47-18-5705. Defendant can seek penalties including a "civil penalty of not more than one thousand dollars ($1,000) for each violation," costs, expenses, and attorney's fees. § 47-18-108(b)(3)-(4) (incorporated into Act by § 47-18-5705). A court may revoke a license authorizing a person to engage in business in Tennessee for knowing and persistent violations and may issue "a civil penalty of not more than two thousand dollars ($2,000), recoverable by the state" for each "knowing violation" of an injunction issued by the court. § 47-18-108(b)(2), (c).

**C. Procedural history**

On October 3, 2024, Plaintiff NetChoice moved for a preliminary injunction, requesting relief no later than December 31, 2024, before the Act took

effect on January 1, 2025. PI Motion, R.8, Page ID # 51. A supporting declaration from Gautham Pai at Nextdoor stated: "if HB 1891 were to go into effect, Nextdoor expects that it would have to bar users under 18." Pai Decl., R.8-3, Page ID # 82.

On October 11, the parties filed a joint motion for scheduling order to provide the court "ample time to decide the motion before the Act's [January 1, 2025] effective date." Motion, R.20, Page ID # 163. In accordance with that scheduling order, the parties completed briefing on November 19. PI Reply, R.35, Page ID # 1776. Yet, the district court did not rule on Plaintiff's motion before January 1, 2025.

As a result, NetChoice member Nextdoor barred Tennessee minors from creating accounts to access the Nextdoor service beginning January 1, 2025: "[I]ndividuals who are under the age of 18 are not permitted to create an account . . . starting on January 1, 2025, if they are residents of the State of Tennessee." Motion, R.42, Page ID ## 1851-52. Defendant would not agree to voluntarily stay enforcement of the Act. Motion, R.42, Page ID # 1851 n.1.

So NetChoice filed a motion to ascertain the status of its pending preliminary-injunction motion on January 2, 2025. Motion, R.42, Page ID # 1850. That same day, the district court ordered a status conference for January 8. Order, R.44, Page ID # 1858. At that status conference, Chief Judge Campbell informed the parties for the first time of a potential conflict. A week later, on January 15, 2025, he recused. Order, R.47, Page ID # 1868.

The next day, the case was re-assigned to Judge Richardson, and NetChoice moved for a temporary restraining order. PI/TRO Motion, R.48, Page ID # 1869. Nearly a month later, on February 14, 2025, the court denied NetChoice's request for a temporary restraining order. Order, R.58, Page ID # 1993. But the court informed the parties that "the PI Motion is very much on the front burner." Order, R.58, Page ID # 2006.

Over the next four months, the parties submitted *eight* notices of supplemental authority, all but one of which had a corresponding response. *See* Notice, R.56, Page ID # 1985; Notice, R.62, Page ID # 2015; Notice, R.63, Page ID # 2031; Notice, R.66, Page ID # 2099; Notice, R.68, Page ID # 2147; Notice, R.69, Page ID # 2201; Notice, R.75, Page ID # 2233; Notice, R.77,

Page ID # 2298. Among those notices were decisions granting NetChoice injunctions of similar laws, while concluding NetChoice's members would face irreparable harm without an injunction. *E.g.*, Notice, R.56, Page ID # 1985; Notice, R.63, Page ID # 2031; Notice, R.66, Page ID # 2099; Notice, R.68, Page ID # 2147; Notice, R.75, Page ID # 2233; Notice, R.77, Page ID # 2298. On May 15, NetChoice filed an additional motion to ascertain the status of its pending preliminary-injunction motion. Motion, R.72, Page ID # 1850.

Almost seven months after briefing concluded, on June 18, 2025, the district court denied NetChoice's preliminary injunction motion. Order, R.79, Page ID # 2365. Without addressing the merits, the balance of the equities, or the public interest, the district court denied NetChoice's motion for "fail[ure] to demonstrate that it (or indeed anyone) will suffer irreparable harm if the preliminary injunction is not granted." Opinion, R. 78, Page ID # 2348 (internal footnote omitted). Specifically, the court concluded that there was not a sufficiently imminent threat of enforcement to cause irreparable harm, that harms to NetChoice's members' users cannot qualify as irreparable harm,

and that NetChoice members' unrecoverable compliance costs are not irreparable harms either. Opinion, R. 78, Page ID ## 2354-62.

In the month that followed the district court's denial of NetChoice's motion, the parties attempted to negotiate an agreed-upon case management order that could have obviated the need for this appeal. The parties could not reach an agreement. Defendant continues to refuse to stay enforcement of the Act against NetChoice's members while this case proceeds to final judgment. This timely appeal followed.

## SUMMARY OF THE ARGUMENT

**I.** NetChoice established irreparable harm, including based on its likelihood of success on the merits of its First Amendment claims, the unrecoverable compliance costs its covered members face, and the infringements on users' free-speech rights.

**A.** The record here contains unrebutted evidence of irreparable harm.

NetChoice's covered members currently face the "Hobson's choice" of either violating the Act and "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying the law during the pendency of

the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). In the face of that choice, NetChoice member Nextdoor has stopped permitting Tennessee minors to access Nextdoor. Motion, R.42, Page ID ## 1851-52.

In addition, all NetChoice covered members likewise must expend unrecoverable compliance costs to implement the Act's unconstitutional speech restrictions. These "unrecoverable compliance costs" are irreparable harms to covered websites under binding precedent. *Biden*, 57 F.4th at 556; *see Ohio*, 603 U.S. at 292 (same). One member has stated that the compliance burdens are "far in excess of our available budget." Paolucci Decl., R.8-4, Page ID # 98.

**B.** The district court's contrary conclusion is flawed for multiple reasons.

First, the district court erred by failing to even consider NetChoice's First Amendment arguments, because "the determination of whether [plaintiff] is likely to succeed on the merits of its First Amendment claim controls the question of the validity of the preliminary injunction." *Planet Aid*, 782 F.3d at 323. The Supreme Court has held for nearly half a century that the "loss

of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (per curiam)). And here, those First Amendment injuries have occurred and remain ongoing.

But the district court erroneously concluded that any enforcement (and thus injury) is not sufficiently "imminent" to justify injunctive relief. Opinion, R.78, Page ID ## 2354-59. That is wrong. NetChoice has "alleged an actual and well-founded fear that the law will be enforced against" its covered members because Defendant "has not suggested that the newly enacted law will not be enforced," and contrary to the district court's order, there is "no reason to assume otherwise." *Am. Booksellers*, 484 U.S. at 393.

In addition, the Court must consider the harms to NetChoice members' *users* from the Act's speech restrictions. *See id.* at 392-93. And "unrecoverable compliance costs" are irreparable harms to covered websites under binding precedent. *Biden*, 57 F.4th at 556; *see Ohio*, 603 U.S. at 292 (same).

**II.** NetChoice is likely to prevail on the merits of its claims that the Act's parental-consent, age-verification, and parental-supervision requirements are content-based restrictions of speech failing strict scrutiny.

**A.** The Act restricts minors' access to fully protected speech by requiring websites to secure parental consent before permitting minors to create accounts. § 47-18-5703(a)(2). This violates Supreme Court precedent, which holds that the government cannot require minors to obtain their "parents' prior consent" to engage in protected speech. *Brown*, 564 U.S. at 795 n.3.

**B.** The Act impedes *all* users' access—minors and adults—to covered websites by requiring users to "verify the[ir] age[s]" to become "account holder[s]" and access protected speech on covered websites. § 47-18-5703(a)(1). Yet *FSC* held that "submitting to age verification is a burden on the exercise of" the "right to access speech" protected by the First Amendment. 145 S. Ct. at 2309. That is particularly true here, where the covered websites disseminate "staggering" amounts of speech that is protected both as to adults and minors. *Moody*, 603 U.S. at 719.

**C.** The Act targets websites for regulation based on content, which is an independent reason to subject all of the Act's speech restrictions to strict First Amendment scrutiny. The Act selects covered websites for regulation based on the "subject matter" disseminated and thus their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted). For example, Act excludes many websites because of their content—such as "[o]nline shopping," "career development opportunities," "technical support," "reviewing products offered for sale," "commenting on . . . reviews posted by other users," and "like[s]" or "comment[s]" on "[p]eer-to-peer payment platform[]" transactions. § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii). The Act also exempts websites that "consist[] primarily of content that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is . . . generated by account holders." § 47-18-5702(9)(B)(iii)(*a*).

And the Act's speech restrictions do not satisfy even intermediate First Amendment scrutiny—let alone strict scrutiny—because they are not "[1] narrowly tailored [2] to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (cleaned up). There is no evidence in the record

that justifies the Act's breadth or the burdens it imposes on adults' and minors' access to the vast amount of fully protected speech on regulated websites.

**III.** The remaining equitable factors favor NetChoice. Preventing the First Amendment harms to NetChoice's members and their users is in the public interest because it "is always in the public interest to prevent the violation of a party's constitutional rights." *Connection*, 154 F.3d at 288 (citation omitted). Moreover, preventing the balkanization of the internet and ensuring that NetChoice's members continue to disseminate fully protected speech is also plainly in the public interest.

**ARGUMENT**

The district court violated this Court's precedent and abused its discretion in failing to grant NetChoice a preliminary injunction. This Court "review[s] a district court's preliminary injunction decision for abuse of discretion," with legal conclusions reviewed de novo. *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022). NetChoice is entitled to a preliminary injunction because it can demonstrate: (1) "likelihood

of success on the merits"; (2) "irreparable harm in the absence of the injunction"; (3) "the balance of equities favors" NetChoice; and (4) "the public interest favors an injunction." *Id.* (citation omitted). And even if "both sides ha[d] strong arguments with respect to the latter three . . . factors," the fact that NetChoice "is likely to prevail at the end of this litigation" is controlling. *Ohio*, 603 U.S. at 291-92.

Put otherwise, in "this case, as in many First Amendment cases, the key inquiry is the first one: Who is likely to prevail on the constitutional claim?" *Sisters for Life*, 56 F.4th at 403 (citation omitted).

## I. This Act's speech restrictions irreparably harm NetChoice's members and their users, and the district court's irreparable-harm analysis violates this Court's precedent.

The district court erred by concluding that NetChoice failed to demonstrate irreparable harm. The undisputed facts demonstrate that First Amendment harm is real and ongoing, as some NetChoice members have stopped allowing Tennessee minors to access their services. In any event, the district court's irreparable-harm analysis was flawed in other respects, each warranting reversal.

### A. The record contains ample evidence of irreparable harm.

The uncontested record evidence demonstrates that NetChoice members face two kinds of irreparable harm from the Act's enforcement: (1) First Amendment harms; and (2) unrecoverable compliance costs.

*First Amendment harms.* NetChoice members face present and ongoing First Amendment harms.

One NetChoice member—Nextdoor—stopped disseminating fully protected speech to minors in Tennessee because the Act took effect without an injunction. As a result, both Nextdoor *and* Tennessee minors who would like to use Nextdoor have suffered—and continue to suffer—the First Amendment harms that this Court's precedent presumes. *See infra* pp.30-34. This "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Cuomo*, 592 U.S. at 19 (quoting *Elrod*, 427 U.S. at 373).

This harm will persist unless and until a court issues an order enjoining enforcement of the Act. And these harms are irreparable: When NetChoice prevails on the merits in this case, Nextdoor will not be able to go back in time to provide minor users in Tennessee access to information about the

Spring 2025 performances at the local community theater that those minors missed. Nor will those minors be able to *engage in* the time-sensitive speech that they missed, or advertise their summer 2025 landscaping services. Those are quintessential First Amendment irreparable harms.

The district court almost entirely ignored that Nextdoor has stopped disseminating speech to Tennessee minors. It relegated to a footnote the fact that Nextdoor's speech had essentially been censored, without crediting those impositions on speech as irreparable harm. *See* Opinion, R.78, Page ID ## 2358-59 n.24.

Since this case went on appeal, NetChoice member Dreamwidth announced: "Tennessee law requires us to verify parental permission for any new user under 18. We don't have the resources to do that, so we can't let people from TN under 18 join." Dreamwidth, Create Your Dreamwidth Account, https://perma.cc/2LVS-AQY8. So minors in Tennessee no longer can create accounts to share their creative writing on Dreamwidth.

Besides Dreamwidth and Nextdoor, *all* regulated NetChoice members are "faced with a Hobson's choice: continually violate the [Tennessee] law

and expose themselves to potentially huge liability; or . . . suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales*, 504 U.S. at 381; *see Uthmeier*, 2025 WL 1570007, at *19. Here, covered NetChoice members can: (1) comply with the Act's unconstitutional speech restrictions (while expending unrecoverable funds, *see infra* p.29); or (2) risk enforcement of an unconstitutional law backed by per-violation penalties, *see* § 47-18-108(b)(3). So "[b]oth compliance and non-compliance" with the Act would "injure" NetChoice's covered "members." *Chamber of Com. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010)

That enforcement risk is real and hangs over members' heads to this day. "The State has not suggested that the newly enacted law will not be enforced, and [there is] no reason to assume otherwise." *Am. Booksellers*, 484 U.S. at 393. Indeed, Defendant has repeatedly refused to disavow enforcement of the Act for even limited periods. So NetChoice has "alleged an actual and well-founded fear that the law will be enforced against" its members. *Id.*; *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) ("*HLP*") ("The Government has not argued to this Court that plaintiffs will not be prosecuted if

they do what they say they wish to do."); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) ("[T]he State has not disavowed any intention of invoking the criminal penalty provision[.]").

*Unrecoverable compliance costs.* The uncontested record evidence demonstrates that this Act would also require each NetChoice covered member to adopt age-verification, parental-consent, and parental-supervision systems—at great expense. Pai Decl., R.8-3, Page ID ## 81-83; Paolucci Decl., R.8-4, Page ID # 92. One member has stated that the compliance burdens are "far in excess of our available budget." Paolucci Decl., R.8-4, Page ID # 98; *see* Paolucci Decl., R.8-4, Page ID ## 89, 92-93. These compliance costs are not recoverable because the State has sovereign immunity. *Biden*, 57 F.4th at 556. The district court therefore was wrong to say that "Plaintiff has not shown that a preliminary injunction would . . . affect the existence or the liquidity of any member." Opinion, R.78, Page ID # 2362.

## B. The district court committed multiple errors in overlooking the record evidence of irreparable harm.

The district court erred by failing to even consider NetChoice's likelihood of success on the merits of its First Amendment claims, which creates

a presumption of irreparable harm sufficient for granting a preliminary injunction. *See infra* Part II. Furthermore, the district court imported and misapplied tests from other doctrines and ignored the very real—and undisputed—irreparable harms demonstrated in this case.

> 1. **The district court erred by not considering the merits of NetChoice's First Amendment claims, because likelihood of success on the merits of First Amendment claims creates a presumption of irreparable harm.**

Here, "[b]ecause the [Act] likely violates the First Amendment, applying it" to NetChoice's members "would irreparably injure them." *Sisters for Life*, 56 F.4th at 408; *see Cuomo*, 592 U.S. at 19 ("There can be no question that the challenged restrictions, if enforced, will cause irreparable harm" due to the "loss of First Amendment freedoms" (citation omitted)).

Evaluating likelihood of success on the merits of First Amendment claims is so important that this Court has said that "questions of harm to the parties . . . generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation." *Connection*, 154 F.3d at 288. The Court has repeated similar directives multiple times:

- "[T]he determination of whether [the plaintiff] is likely to succeed on the merits of its First Amendment claim controls the question of the validity of the preliminary injunction." *Planet Aid*, 782 F.3d at 323;

- "Because the [plaintiff] is likely to succeed on its constitutional claims, there is no issue as to the existence of the remaining preliminary injunction factors." *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) (citation omitted);

- "[W]hen constitutional rights are threatened or impaired, *irreparable injury is presumed*." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (citation omitted); *accord Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (same; citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012));

- "In First Amendment cases, the remaining stay factors usually fall in line with the party who demonstrates a likelihood of success on the merits." *Brown v. Yost*, 133 F.4th 725, 737 (6th Cir. 2025) (stay posture);

- "[I]n First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?" *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (stay posture);

- "In First Amendment cases," "the first factor [of likelihood of success on the merits] will often be determinative." *Deja Vu of Nash., Inc. v. Metro. Gov't of Nash. & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted).

This Court's precedent is consistent with the law of other Circuits, which likewise hold that likelihood of success on the merits of First Amendment claims and irreparable harm cannot be disentangled. *E.g.*, *Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) ("likelihood of success on the merits" means "the remaining requirements necessarily follow"); *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) ("Because Plaintiffs have a colorable First Amendment claim, they have demonstrated that they likely will suffer irreparable harm."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("[Plaintiff]

has satisfied the irreparable-harm requirement because it has alleged viola-tions of its First Amendment and RLUIPA rights."); *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is in-volved, most courts hold that no further showing of irreparable injury is necessary." (citation omitted)); *see* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (same; citing cases from Second, Third, and Seventh Circuits).

That is why every other case to have considered similar preliminary-injunction motions challenging similar laws has concluded that when NetChoice establishes a likelihood of success on the merits of its First Amendment challenges, this necessarily constitutes irreparable harm. *E.g.*, *Carr*, 2025 WL 1768621, at *20-21; *Uthmeier*, 2025 WL 1570007, at *19; *Bonta*, 770 F. Supp. 3d at 1215; *Paxton*, 747 F. Supp. 3d at 1043; *Reyes*, 748 F. Supp. 3d at 1130; *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 561 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

Accordingly, the district court's irreparable-harm analysis should have begun with at least a presumption of irreparable harm based on NetChoice's

meritorious First Amendment arguments. *See infra* Part II. But because the district court skipped over NetChoice's likelihood of success entirely, its entire irreparable-harm analysis was fatally flawed.

> **2.** **The district court erred by concluding that irreparable First Amendment harm is not imminent.**

The district court's central error was its conclusion that no harm alleged by NetChoice is sufficiently "imminent" to qualify as irreparable harm. Opinion, R.78, Page ID ## 2354-59. This conclusion flouts the undisputed facts in this case, while misstating and misapplying the proper legal standards.

As an initial matter, the district court's emphasis on the "imminence" is contrary to this Court's and the Supreme Court's focus on whether there is a "threat[]" of First Amendment harm—where "irreparable injury" is "presumed." *Mich. State*, 833 F.3d at 669 (citation omitted); *see Elrod*, 427 U.S. at 373 ("First Amendment interests were . . . threatened"). All that is required is a "threat[]" that constitutional rights will be infringed for "irreparable injury" to be "presumed." *Mich. State*, 833 F.3d at 669 (citation omitted). Instead of asking whether enforcement of the Act is "imminent," the district

court should have focused on the harms that would have resulted if the "challenged restrictions" were "enforced." *Cuomo*, 592 U.S. at 19 ("There can be no question that the challenged restrictions, if enforced, will cause irreparable harm.").

More generally, "where threatened action by *government* is concerned, [courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (cleaned up; citation omitted); *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (similar). The district court's analysis would turn that principle on its head. If left uncorrected, the district court's analysis could frustrate *all* litigants' ability to secure preliminary-injunctive relief in pre-enforcement cases.

To reach its contrary conclusion, the district court made multiple errors violating this Court's precedent.

First, the district court suggested in a footnote that an unconstitutional law cannot objectively chill speech if private entities are purportedly not complying with the unlawful mandates. Opinion, R.78, Page ID ## 2358-59

n.24. The district court cited no precedent for this proposition. As explained above, simply putting private entities to the "Hobson's choice" of either "obeying" an unconstitutional law or "expos[ing] themselves to potentially huge liability" is *itself* irreparable injury justifying pre-enforcement relief. *Morales*, 504 U.S. at 381. As this Court has said, a "'Plaintiff[] need not 'subject [itself] to the very framework [it] say[s]' is unlawful." *Biden*, 57 F.4th at 556. And that is just as true for standing as for preliminary injunctions. *See id.* (affirming preliminary injunction).

Second, the district court incorrectly seemed to suggest that a First Amendment litigant can *never* show irreparable injury in a *pre*-enforcement posture, reasoning that the government must actually enforce the law—or expressly threaten to enforce a law against a particular person—before a litigant can establish irreparable harm. Specifically, the district court concluded that the Defendant's enforcement of the Act relies on what the district court called two "contingencies" diminishing the imminence of irreparable harm: "Plaintiff's members would be subject to enforcement of the Act prior to the conclusion of litigation only [1] *if* Defendant makes a policy

decision to enforce the Act prior to the termination of the instant litiga-

tion . . . , and [2] if Defendant then actually institutes a legal proceeding

against one or more of Plaintiff's members while this litigation is proceed-

ing." Opinion, R.78, Page ID # 2357. These "contingencies" are facts that will

be present in most, if not all, pre-enforcement cases. So this holding would

mean litigants can never obtain preliminary injunctions in *pre*-enforcement

challenges. That flies in the face of countless cases for decades granting pre-

enforcement preliminary injunctions—especially when First Amendment

free-speech rights are chilled. *See Driehaus*, 573 U.S. at 159-61 (collecting cases

dating to 1970s).

Nor can these so-called "contingencies" change the fact that NetChoice's

covered members are *currently* "faced with a Hobson's choice" of complying

with the Act's unconstitutional speech restrictions or risking liability. *Mo-*

*rales*, 504 U.S. at 381. When the "State has not suggested that the newly

enacted law will not be enforced, and [there is] no reason to assume other-

wise," a pre-enforcement plaintiff has "alleged an actual and well-founded

fear that the law will be enforced against" it. *Am. Booksellers*, 484 U.S. at 393. The district court's analysis flouts this binding Supreme Court precedent.

Third, the district court misapplied this Court's precedent for "whether a threat of enforcement is sufficiently credible to support a claim for pre-enforcement prospective relief." *Nessel*, 117 F.4th at 848; *see* Opinion, R.78, Page ID # 2355. This analysis is generally used to determine whether a plaintiff has *standing* to bring a pre-enforcement lawsuit. *Nessel*, 117 F.4th at 848. And it focuses on whether "fear of prosecution is *plausible*." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022) (emphasis added). But the district court used it to determine whether any irreparable injury in this case is "imminent." Opinion, R.78, Page ID ## 2355-56. Assuming for the sake of argument this analysis applies here, all four *Nessel* factors either favor NetChoice or do not favor either party and thus cannot diminish irreparable harm.

Primarily, Defendant has consistently "refus[ed] to disavow enforcement of the challenged statute against" NetChoice's covered members. *Nessel*, 117 F.4th at 848 (citation omitted). On January 2 after the Act took

effect, Defendant told the district court that: "NetChoice is right that 'the Act is now in effect.' And Defendant will not agree to 'stay enforcement' of this valid statute passed by Tennessee's elected representatives." Opp. to Motion, R.43, Page ID # 1856 (citations omitted).

Moreover, Defendant went one step further and publicly stated that it believed NetChoice members are not actively complying with the Act's requirements:

> NetChoice discusses only NextDoor, which apparently amended its terms of service to ban Tennessee minors from creating new accounts. See Mot.2-3. Even that action doesn't comply with the Act: It doesn't implement a process to "verify the age" of new account holders, §47-18-5703(a)(1). . . . As for NetChoice's other members, NetChoice is silent. It thus concedes what's become public: That these members have not come into compliance with Tennessee's law.

Opp. to Motion, R.43, Page ID ## 1855-56 (citation and emphasis omitted).

But the district court responded to Defendant's veiled threats of enforcement by saying, "although it is true that the record does not reflect Defendant disavowing enforcement of the Act until the conclusion of this litigation, it also does not reflect Defendant *refusing* to disavow enforcement of the Act until the conclusion of this litigation." Opinion, R.78, Page ID

# 2356; *see* Opinion, R.78, Page ID # 2358 n.23 ("it is enough if there is an *absence of an affirmative reflection* of actual or threatened enforcement").

The district court therefore reversed the burden, which requires *governmental* officials to "provide[] clear assurances that they will *not* prosecute" pre-enforcement plaintiffs. *Nabors*, 35 F.4th at 1035; *see HLP*, 561 U.S. at 16; *Babbitt*, 442 U.S. at 302; *Book People, Inc. v. Wong*, 91 F.4th 318, 330 (5th Cir. 2024) ("we assume that Plaintiffs face a credible threat of enforcement because the State has provided no 'compelling contrary evidence'" (citation omitted)); *Carr*, 2025 WL 1768621, at *21. NetChoice has thus "alleged an actual and well-founded fear that the law will be enforced against" its members. *Am. Booksellers*, 484 U.S. at 393.

The risk that Defendant will enforce the law is underlined by Defendant's "history of past enforcement against the plaintiffs or others"—another consideration under *Nessel*, 117 F.4th at 848 (citation omitted). As NetChoice told the district court, Defendant has sued at least one NetChoice member under other state law, asserting similar theories about harms to minors that

this Act purports to address. *See* Reply Brief, R.45, Page ID # 1861 (citing Complaint, R.1, Page ID # 6).

The district court, by contrast, relied too heavily on the fact that Defendant had not sued NetChoice members under *this Act* already or sent "enforcement warning letters." *Nessel*, 117 F.4th at 848 (citation omitted); Opinion, R.78, Page ID # 2356. That is because NetChoice sued and moved for a preliminary injunction *before the Act took effect*. *See supra* pp.15-16. NetChoice diligently seeking pre-enforcement review of a newly enacted law cannot negate irreparable harm.

The district court also erroneously concluded that "the Court does not perceive any attribute of the Act that makes its enforcement relatively easy or likely." Opinion, R.78, Page ID # 2356; *cf. Nessel*, 117 F.4th at 848. All Defendant needs to do to is decide to sue—or investigate—and then do so. Those considerations will be present in *every* pre-enforcement lawsuit. Even the 10-day notice requirement under Tennessee law before enforcement actions is not mandatory. § 47-18-108(a)(2). If Defendant concludes the "purposes" of the law "will be substantially impaired by delay in instituting

legal proceedings," then he does not have to provide any advance notice.

§ 47-18-108(a)(2)-(3).

> **3. The district court erred both by not considering First Amendment harms to NetChoice members' *users* and not considering the full scope of those harms.**

The district court further erred by concluding that "irreparable harm to Plaintiff's members' users" does not qualify "as 'irreparable harm' sufficient to satisfy the irreparable-harm requirement for a preliminary injunction." Opinion, R.78, Page ID # 2354. In addition, the district court considered only users' "*self*-censorship," and not restrictions on users' *access* to fully protected speech. Opinion, R.78, Page ID # 2354.[4]

Although NetChoice does not rely solely on harms to members' users, the First Amendment harms those users will face independently suffice in this First Amendment challenge. In the unique "First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or

---

[4] At a minimum, the harms to users count in the balance of the equities, as the district court correctly recognized. Opinion, R.78, Page ID # 2354 & n.22.

assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Am. Booksellers*, 484 U.S. at 392-93 (cleaned up); *see NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025) ("[I]t is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least when the violation of those rights adversely affects the platform."). This rule applies both to standing and irreparable harm.

That is because covered websites' rights and users' rights are two sides of the same coin. The websites seek to vindicate their right to disseminate user-generated speech, and users have a right to access and publish that same speech. *E.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.").

Unsurprisingly, therefore, multiple district courts in similar challenges to "social media" regulations have concluded that harms to users' rights

qualify as irreparable harms in lawsuits brought by NetChoice. *E.g.*, *Yost*, 716 F. Supp. 3d at 561; *Griffin*, 2023 WL 5660155, at *21.

Notably, none of the cases cited by either Defendant or the district court considered claims where the harms to third parties were *First Amendment* harms.[5] So none of those cases address the unique First Amendment relationship between the harms to those that disseminate speech and those who would read or view that protected expression. *E.g.*, *Am. Booksellers*, 484 U.S. at 392-93.

Had the district court properly considered the First Amendment merits and the harms to users, it would have recognized that users' harms include

---

[5] *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506 (2d Cir. 2005) (employment discrimination); *Corral v. Cuyahoga Cnty.*, 2024 WL 4475458, at *1 (N.D. Ohio Sept. 17, 2024) (Fifth and Sixth Amendments); *Gala v. Kavanagh*, 2023 WL 2356025, at *1 (E.D.N.Y. Mar. 2, 2023) (public-employment dispute); *Nutrition Distrib., LLC v. Enhanced Athlete, Inc.*, 2017 WL 5467252, at *1 (E.D. Cal. Nov. 14, 2017) (Lanham Act violations); *Nationwide Paging Corp. v. Reg'l Commc'ns, Inc.*, 1992 WL 355598, at *2 (E.D.N.Y. Nov. 19, 1992) (commercial dispute); *People of State of Ill. v. EPA*, 621 F.2d 259, 260 (7th Cir. 1980) (Administrative Procedure Act challenge); *Great Lakes Higher Educ. Corp. v. Cavazos*, 698 F. Supp. 1464, 1465 (W.D. Wis. 1988) (withheld payments under federal law).

restrictions on their *access to fully protected speech*—not merely "*self*-censorship." Opinion, R.78, Page ID # 2359. This, too, establishes First Amendment irreparable harm.

### 4. NetChoice members' unrecoverable compliance costs constitute irreparable harm.

The Supreme Court has recognized that "nonrecoverable" compliance costs constitute irreparable harm. *Ohio*, 603 U.S. at 292 (citation omitted). This Court has held the same thing in upholding a preliminary injunction of an executive order requiring federal contractors to mandate masks and COVID-19 vaccines: "The plaintiffs are also likely to incur unrecoverable compliance costs in the absence of a preliminary injunction." *Biden*, 57 F.4th at 556. Many other courts therefore have credited NetChoice members' unrecoverable compliance costs as irreparable harm. *E.g.*, *Carr*, 2025 WL 1768621, at *20; *Uthmeier*, 2025 WL 1570007, at *19; *Reyes*, 748 F. Supp. 3d at 1130; *Paxton*, 747 F. Supp. 3d at 1043; *Yost*, 716 F. Supp. 3d at 561; *Griffin*, 2023 WL 5660155, at *21.

The district court disagreed that both Supreme Court and Sixth Circuit precedent hold that unrecoverable compliance costs constitute irreparable

harm. *See* Opinion, R.78, Page ID ## 2359-62. That is wrong. *See Ohio*, 603 U.S. at 292; *Biden*, 57 F.4th at 556. Regardless, the district court's rationale is not entirely clear. The district court therefore seemed to conclude that courts can only consider unrecoverable compliance costs when a litigant has demonstrated that they are so large that they threaten a business's existence (which, again, they *do* here) or some other form of irreparable harm. Specifically, the district court first concluded that *Biden* treated the preliminary injunction "standard as involving *factors*," and "under this approach, . . . irreparable harm is not just a requirement but also a factor that (if it exists at all) is balanced against the other factors considering the nature and extent of the irreparable harm." Opinion, R.78, Page ID # 2360. And then the district court said "if irreparable injury does exist" on some *other* basis, "then the court should consider the full extent of the injury or injuries to the plaintiffs from the conduct complained of," such as compliance costs. Opinion, R.78, Page ID ## 2360-61 (emphasis omitted) (citation omitted).

But that is not what *Biden* said. Rather, *Biden* held that "plaintiffs are also likely to incur unrecoverable compliance costs in the absence of a

preliminary injunction." 57 F.4th at 556. And it expressly contrasted its hold-

ing of irreparable harm with other "circuits [that] have held that compliance

costs do not qualify as irreparable harm." *Id.* (collecting cases); *see* Wright &

Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (discussing *Biden* as "stating that

unrecoverable compliance costs can constitute irreparable harm"). In this

Court's "view, the peculiarity and size of a harm affects its weight in the

equitable balance, *not whether it should enter the calculus at all*." *Biden*, 57 F.4th

at 556 (emphasis added). Sixth Circuit cases since *Biden* have recognized that

"unrecoverable compliance costs in the absence of a preliminary injunction"

are irreparable harms. *State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613

(6th Cir. 2024) (citation omitted). And *Biden* is consistent with the caselaw of

some other Circuits. *E.g.*, *Am. Fed'n of State, Cnty. & Mun. Employees, AFL-

CIO v. Soc. Sec. Admin.*, 2025 WL 1249608, at *62 (4th Cir. Apr. 30, 2025); *Lou-

isiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022); *Georgia v. President of the

United States*, 46 F.4th 1283, 1302 (11th Cir. 2022).

Further undermining the district court's rationale, it relied on multiple

(often out-of-Circuit) cases that predate both this Court's and the Supreme

Court's latest pronouncements recognizing that unrecoverable compliance costs are irreparable injuries. Opinion, R.78, Page ID ## 2361-62.

Even if the district court correctly interpreted *Biden* to require some other irreparable harm in addition to unrecoverable compliance costs (it did not), that simply points back at the district court's failure to consider the merits of NetChoice's claims. *See supra* pp.30-34. Had the district court properly credited NetChoice's First Amendment harms, then the district court also should have credited NetChoice members' unrecoverable compliance costs.

## II. NetChoice established the presumed irreparable injury because it is likely to succeed on the merits of its claims that the Act's speech restrictions violate the First Amendment.

The district court's failure to consider the merits of NetChoice's First Amendment claims is especially erroneous given the Act's grave First Amendment flaws, which themselves create irreparable injury. The Act's age-verification, parental-consent, and parental-supervision provisions all independently trigger and fail First Amendment strict scrutiny. And "the determination of whether" NetChoice "is likely to succeed on the merits of

its First Amendment claim controls the question of the validity of the preliminary injunction." *Planet Aid*, 782 F.3d at 323.

To satisfy the strict scrutiny, Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (cleaned up) ("*AFP*"). Defendant cannot carry his burden. To have any chance of satisfying First Amendment scrutiny by restricting speech, the State must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799. Moreover, the problem identified must be in need of a *governmental* solution, as opposed to a *private* one.

In any event, as the Act is both "seriously underinclusive" and "seriously overinclusive" to serve any legitimate governmental interest. *Id.* at 805. The "overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Id.*

Even if strict scrutiny did not apply, governmental restrictions on "access to" social media websites are "enough" to raise—at minimum—intermediate First Amendment scrutiny. *Packingham*, 582 U.S. at 105-06; *see FSC*, 145 S. Ct. at 2317. The Act cannot satisfy intermediate scrutiny either, because it is not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted). Under either form of scrutiny, "[w]hen[ever] the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

A. **The Act's parental-consent requirement for minors to access fully protected speech violates the First Amendment.**

1. **The Act's parental-consent requirement for minors to create accounts infringes websites' and users' rights.**

The Act violates the First Amendment by requiring minors to secure "express parental consent" to "become an account holder," and thus access or contribute towards the enormous amount of fully protected speech on covered "social media" websites. § 47-18-5703(a)(2); *see Yost*, 778 F. Supp. 3d at 955 ("laws that require parental consent for children to access

constitutionally protected, non-obscene content are subject to strict scrutiny"). The Act's requirements are akin to the government requiring bookstores, theaters, and video game arcades—and *only* similar companies dedicated to disseminating protected speech—to verify parental consent before allowing minors to receive protected speech. Such laws limit both websites' dissemination of speech and minors' ability to engage in speech activities.

The Supreme Court has held that minors have the "right to speak or be spoken to," and governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3.

*Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors, while permitting minors to play such games with parental consent. *See id.* at 802. After all, "minors are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up). Although "a State possesses legitimate power to protect children from harm, [] that does not include a free-floating power to restrict the ideas to which children may be

exposed. Speech that is n[ot] obscene as to youths . . . cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable.'" *Id.* at 794-95 (cleaned up). Conditioning minors' ability to receive and share protected speech on first securing parental consent is impermissible, whether that speech is "political rall[ies]," "religious" services, or content the State disfavors. *Id.* at 795 n.3. As the Supreme Court explained, there is no "precedent for state control, uninvited by parents, over a child's speech." *Id.*

Since *Brown*, the lower courts have consistently enjoined parental-consent requirements for minors to access social media. Courts have recognized the reality that social media is a prime outlet for minors' fully protected speech. For instance, "[m]inors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them." *Griffin*, 2025 WL 978607, *13. Parental-consent laws in both Arkansas and Ohio have been permanently enjoined. *Id.* at *8, *17; *Yost*, 778 F. Supp. 3d at 959. Similar requirements are preliminarily

enjoined in Georgia, *Carr*, 2025 WL 1768621, at *13, *22; Florida, *Uthmeier*, 2025 WL 1570007, *15, *21; and Utah, *Reyes*, 748 F. Supp. 3d at 1126 & n.135, 1134.

This Act's materially identical parental-consent requirement violates the First Amendment for the same reasons. It would impose an unconstitutional hurdle for minors to access protected speech, and outright prohibit access for some minors. Under the Act, minors would need to secure parental consent before, *e.g.*, discussing their faith in religious forums, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos" on Facebook, looking for work around the neighborhood on Nextdoor, or learning how to solve math problems on YouTube. *Packingham*, 582 U.S. at 104. In other words, minors who wish to discuss their religious or political views on covered websites could not do so unless their parents consent, *i.e.*, the Act improperly "impose[s] governmental authority, . . . subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

2. **The Act's parental-consent requirement fails any level of heightened First Amendment scrutiny.**

Because the Act's parental-consent requirement "target[s] . . . fully protected speech," it triggers and fails "[s]trict scrutiny"—which, "as a practical matter, [] is fatal in fact absent truly extraordinary circumstances." *FSC*, 145 S. Ct. at 2310. In any event, the Act's requirement for parental consent is "invalid" under any standard of heightened First Amendment scrutiny. *Brown*, 564 U.S. at 795 n.3.

To start, the State cannot establish a sufficient governmental interest. The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech unless parents first affirmatively consent. *Id.* at 802. *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* Accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). This case

presents no such circumstances. And not all minors "have parents who *care* whether" they access covered websites. *Id.* at 804.

Even if that were a permissible governmental interest, however, the Act does not further it. The Act does not account for the difficulty of verifying a parent-child relationship to process parental consent. And "[d]isputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly . . . , and unfortunately common." Paolucci Decl., R.8-4, Page ID # 94. These difficulties are compounded when, for example, families are nontraditional (*e.g.*, foster families), families have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights are terminated. *See* Cleland Decl., R.8-2, Page ID # 69; Paolucci Decl., R.8-4, Page ID ## 93-94.

Regardless, the Act's parental-consent requirement is not the "least restrictive" way to accomplish any legitimate governmental ends. *AFP*, 594 U.S. at 607 (citation omitted). Uncontested record evidence here demonstrates that parents already have many options to oversee their children

online. *See supra* pp.8-9. Courts nationwide have agreed. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Carr*, 2025 WL 1768621, at \*18; *Uthmeier*, 2025 WL 1570007, at \*18; *Yost*, 778 F. Supp. 3d at 956-57; *Griffin*, 2025 WL 978607, at \*14. Tennessee could give "parents the information needed to engage in active supervision" over internet access. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). These private tools are better suited to provide parents with ongoing oversight over their minor children's online activities, compared to a one-time parental consent requirement. And "[i]t is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Id.* at 824.

In addition, members' *self-regulation* is extensive, as covered websites already engage in content moderation and provide parental controls and other tools. *See supra* p.9. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention, even if the government does not believe those efforts are perfect in all cases. *Brown*, 564 U.S. at 803 & n.9 (crediting video game industry's self-regulation).

Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Id.* at 803. The "government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9.

The Act's parental-consent requirements have yet more tailoring flaws. They are not "narrowly tailored" for purposes of intermediate scrutiny—let alone the least restrictive means for strict scrutiny. *Packingham*, 582 U.S. at 105-06 (citation omitted). Respondent has not proffered *any* evidence justifying impeding minors' access to billions of pieces of fully protected speech across the member websites here—to say nothing of the many more websites the Act regulates. At bottom, the Act would require minors to secure parental consent to watch documentaries on YouTube, post their artwork on Instagram, submit their fan fiction to Dreamwidth, or debate politics on Facebook—in addition to myriad other protected speech activities. Worse, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. The Act unlawfully requires parental

consent for all minors at every developmental stage—from websites' youngest users to 17-year-olds.

As a result, the burden on protected speech here is not "incidental"; the restriction on minors' access to speech is the entire point of the law. *FSC*, 145 S. Ct. at 2317. So the Act "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted).

The State certainly has not provided "a direct causal link between" access to all of the regulated websites and harms to minors. *Brown*, 564 U.S. at 799. The Act's blunderbuss approach to regulating online speech is an insurmountable tailoring flaw. Even if covered websites were genuinely "dangerous," it is unclear why the State would allow minors to access them "so long as one parent . . . says it's OK." *Id.* at 802. Muzzling speech dissemination to minors on certain covered websites that minors are otherwise free to experience elsewhere "is not how one addresses a serious social problem." *Id.* Likewise, it makes no sense to require parental consent only for *new*

account holders while allowing minors who are *existing* account holders to access the same content on the same covered websites without consent.

**B. The Act's age-verification requirement for both minors and adults violates the First Amendment.**

**1. The Act's age-verification requirement to create accounts infringes websites', adults', and minors' rights.**

The Act also violates the First Amendment by requiring *all* new users— minors and adults alike—to "verify the[ir] age[s]" before they can become "account holder[s]" and access protected speech on covered websites. § 47-18-5703(a)(1). In other words, the Act burdens threshold access to "what for many are the principal sources for knowing current events, . . . and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. This is akin to stationing government-mandated clerks at every bookstore and theater to check identification before citizens can access books, movies, or even join conversations.

*FSC* squarely held that "submitting to age verification is a burden on the exercise of" the "right to access speech" protected by the First Amendment. 145 S. Ct. at 2309. Government-mandated "age verification necessarily"

"burden[s]" that right. *Id.* at 2316. That is especially true here, where users would need to provide documentation that displays "personally identifying information," § 47-18-5703(c), before accessing "the most powerful mechanisms available to a private citizen to make his or her voice heard," *Packingham*, 582 U.S. at 107. That is why every court to have considered the issue on the merits has enjoined enforcement of similar age-verification requirements to access "social media." *E.g., Carr*, 2025 WL 1768621, at *13-14; *Griffin*, 2025 WL 978607, at *8-10; *Reyes*, 748 F. Supp. 3d at 1129 & n.169.

Here too, the Act's age-verification requirement would impose an impermissible hurdle for all users to access and exchange protected speech. The record reflects that even asking for users' ages can deter them from creating accounts—let alone asking for documentation. *See* Pai Decl., R.8-3, Page ID ## 77-80; Paolucci Decl., R.8-4, Page ID ## 89-92. For instance, one Nextdoor user responded to a request for birthdate by saying: "You do not need my birthday and I will not give it to you." Pai Decl., R.8-3, Page ID # 78 (italics omitted). Other users have responded similarly to requests for some kind of

proof of age: "Are you kidding me? You think I'm gonna send you my license or any personal ID." Pai Decl., R.8-3, Page ID # 78 (italics omitted).

The Supreme Court's recent decision in *FSC* supports NetChoice, and certainly does not permit Tennessee to require age verification to access fully protected speech for adults and minors. *FSC*'s holding was cabined to age-verification mechanisms used to restrict access to "pornography." 145 S. Ct. at 2313. It held that adults could lack the First Amendment right to avoid age verification to access pornography speech "obscene to minors" (in contrast to fully protected speech for adults *and* minors), because this unique speech category "is unprotected to the extent the State seeks only to verify age." *Id.* at 2309. And even then, age-verification laws in that unique context still triggered intermediate scrutiny because they "burden" adults' rights. *Id.* In contrast, because the Act at issue here "direct[ly] target[s]" a staggering amount of "*fully protected speech*" for minors and adults alike, it is subject to (and fails) strict scrutiny. *Id.* at 2310 (emphasis added). This Act thus presents far different issues from pornography laws, as *FSC* recognized would be the case. *Id.* at 2308 n.7.

## 2. The Act's age-verification requirement fails any level of heightened First Amendment scrutiny.

Age verification is only a means to effectuate the Act's other unlawful age-based restrictions, like the parental-consent requirements. Because those other provisions are unlawful, age-verification serves no valid governmental interest.

Besides, the Act is overbroad because it would require adults and minors alike to provide personally identifying information to access all manner of fully protected speech. To discuss the latest proposal in Congress, see family members' latest vacation photos, or view college lectures on covered websites, adults (and minors) would need to verify their age—often across multiple websites. This would deter adults from accessing the websites, as undisputed record evidence shows. *See supra* pp.60-61. As a result, it "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted). Nothing in the record justifies impeding threshold access to countless pieces of fully protected speech on the websites at issue.

The Act also would "all but kill anonymous speech online," by "requir[ing] . . . website visitors [to] forgo the anonymity otherwise available on the internet," which "would undoubtedly chill speech—and, likely, would disproportionately chill speech on the most controversial issues." *Carr*, 2025 WL 1768621, at *15 (citation omitted); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101-02 (2d Cir. 2003). That burdens the First Amendment right of speakers to "remain anonymous." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995).

**C. The Act's speech regulations apply only to a subset of internet websites based on content, which independently triggers and fails strict scrutiny for all the Act's speech regulations.**

**1. The Act's central "social media company" coverage provisions are content-based, so all of the Act's challenged provisions trigger strict scrutiny for this additional reason.**

All of the Act's regulations restricting how covered websites exercise their right to present curated protected speech, *Moody*, 603 U.S. at 716-17, and how NetChoice's members' users access and participate in protected speech, also trigger strict scrutiny because they rely on a content-based "social media company" coverage definition, § 47-18-5702(8).

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government" satisfies "strict scrutiny." *Reed*, 576 U.S. at 163-64.

The Act's central coverage definition is facially content-based, rendering all of the Act's operative provisions content-based and thus subject to strict scrutiny as well. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as [] content-based bans." (citation omitted)). Specifically, the Act selects covered websites for regulation based on the "subject matter" disseminated and thus their "content." *Reed*, 576 U.S. at 163. For example, the Act excludes websites to the extent their users are "post[ing]" about "interactive gaming" and "educational entertainment." § 47-18-5702(2)(B). The Act also exempts websites that "consist[] primarily of content that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is . . . generated by

account holders." § 47-18-5702(9)(B)(iii)(*a*). Further, the Act excludes many websites because of their content—such as "[o]nline shopping," "career development opportunities," "technical support," "reviewing products offered for sale," "commenting on . . . reviews posted by other users," and "like[s]" or "comment[s]" on "[p]eer-to-peer payment platform[]" transactions. § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii).

"That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions for speech regulations trigger strict scrutiny). Other courts have concluded that similar coverage provisions in similar laws are content-based and trigger strict scrutiny. *SEAT v. Paxton*, 765 F. Supp. 3d 575, 592 (W.D. Tex. 2025) ("The elevation of . . . provider-generated content over user-generated content is a content-based regulation."); *see Yost*, 778 F. Supp. 3d at 953-54 ("[C]overed websites' choices about whether and how to disseminate user-generated expression convey a message about the type of community the platform seeks to foster. . . . The exceptions . . . for product review websites . . . are also content based." (citation omitted)); *Carr*, 2025

WL 1768621, at *11-12; *Griffin*, 2025 WL 978607, at *9; *Paxton*, 747 F. Supp. 3d at 1032. Under the Act, websites that focus on state-preferred topics—such as "interactive gaming" and "educational entertainment," § 47-18-5702(2)(B)—may serve minors without regulation. And users can access those websites without state-imposed hurdles. But covered websites are subjected to onerous regulations based on the content on their services. So are their users. Although a 17-year-old may freely discuss local tutoring opportunities on a website "primarily" devoted to "career development opportunities," § 47-18-5702(9)(B)(v), she cannot discuss that same issue on Nextdoor without parental consent. The Act's burdens are quintessentially content-based, so they are "presumptively unconstitutional." *Reed*, 576 U.S. at 163-64.

The Act's coverage provisions are also speaker-based. Laws that "distinguish[] among different speakers" are "all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

Here, the Act regulates "social media" websites but contains exceptions for "[o]nline shopping," "career development," "technical support,"

"interactive gaming," "educational entertainment," and "peer-to-peer pay-ment" websites. §47-18-5702(2)(B), (9)(B)(iv)-(v), (vii)-(viii). The Act also favors "provider-generated content over user-generated content." *Paxton*, 747 F. Supp. 3d at 1032. It exempts websites that "consist[] primarily of con-tent that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is . . . generated by account holders," §47-18-5702(9)(B)(iii)(*a*), even if those websites also post or create their own content (as many websites do). Thus, while minors can freely access websites like NYPost.com or CNN.com to view an article about a particular politician's posts on X, they cannot access those same posts on X without jumping through the Act's age-verification and parental-consent restrictions.

Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act that regulates speech. *See Reyes*, 48 F. Supp. 3d at 1120 ("the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition"). The Act's age-verification require-ment, §47-18-5703(a)(1), relies on this definition to select which websites

adults and minors must provide personal information to access. The Act's parental-consent requirement, § 47-18-5703(a)(2), relies on this definition to select which websites minors must obtain parental consent to access. And the Act's parental-supervision requirement, § 47-18-5704, is a "[g]overnment regulation of speech" that imposes legal duties on covered websites for disseminating speech of a certain type of "content." *Reed*, 576 U.S. at 163. For this reason, each of these provisions triggers (and fails) strict scrutiny.

## 2. All of the Act's speech restrictions fail any form of heightened First Amendment scrutiny that could apply.

Even assuming for the sake of argument that Tennessee could establish a sufficient governmental interest (it cannot), several tailoring flaws pervade the Act's coverage.

The Act's central coverage definition is vastly overinclusive, ignoring a wealth of private alternatives. *See supra* pp.8-9. It targets many websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 48 F. Supp. 3d at 1129 n.169. The Act does not purport to identify or limit itself to websites that are particularly harmful to minors or even particularly likely to be accessed by minors. *E.g.*, Pai Decl., R.8-3, Page ID ## 76-77; Paolucci Decl., R.8-

4, Page ID # 88. And for the websites it regulates, the Act restricts users' access to *all* speech on those websites, including core protected speech.

Even under intermediate scrutiny, the Act "burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted); *see FSC*, 145 S. Ct. at 2317. It indiscriminately regulates all social media websites, without proof that *any* of them are harmful—let alone *all* of them. And it indiscriminately restricts access to *all* of the protected expression on those websites.

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central coverage definition and its many exclusions create pervasive gaps in the regulatory regime the State is attempting to create. *Sorrell*, 564 U.S. at 573 (governmental speech regulation requires "coherent policy"); *see, e.g.*, *Reyes*, 748 F. Supp. 3d at 1128; *Paxton*, 747 F. Supp. 3d at 1038. If the State is attempting to provide parents greater control over their minor children's online activity or prevent minors' exposure to purported harmful content, it makes no sense to limit coverage to websites that do not qualify

for one of numerous ill-defined statutory exceptions, such as "interactive gaming." § 47-18-5702(2)(B), (9)(B); *see Griffin*, 2023 WL 5660155, at *18.

Nor is the Act tailored to address any particular interactions by minors that the State may deem harmful. For example, the Act restricts minor users from interacting with individuals on Instagram without parental consent but not from interacting with the same individuals while gaming on Roblox. § 47-18-5702(2)(B). The Act restricts users from networking with individuals on X without verifying their age but not from networking with those same individuals on LinkedIn. § 47-18-5702(9)(B)(v). Examples abound for all the Act's other exceptions. If anything, NetChoice's member websites are among the websites most likely to engage in content moderation and provide parents tools to oversee their minor children online.

## III. The remaining equitable factors support granting NetChoice a preliminary injunction.

The district court also erred by not analyzing "the balance of equities and consideration of the public interest." *Winter*, 555 U.S. at 32. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here too, because NetChoice "is likely to succeed on its

constitutional claims, there is no issue as to the existence of the remaining preliminary injunction factors." *Livingston*, 796 F.3d at 649 (citation omitted).

The "balance of equities" and "public interest" weigh heavily in NetChoice's favor. *Winter*, 555 U.S. at 32. Laws like the Act here threaten to balkanize the internet. The websites regulated by the Act are many people's "principal sources for knowing current events . . . and otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Yet, if allowed to be enforced, Tennessee's Act—and other laws like it— would restrict the kinds of speech that people in Tennessee can engage in and with.

For example, minors in Tennessee will lack access to speech that their peers around the country can access. NetChoice member Nextdoor has stopped allowing minors to create accounts on its service. Motion, R.42, Page ID ## 1851-52. The same is true of Dreamwidth. Dreamwidth, Create Your Dreamwidth Account, https://perma.cc/2LVS-AQY8. Moreover, strict compliance with the Act would require Tennessee minors to secure parental

consent before engaging in political speech on X, among myriad other protected activities.

Even more dramatically, both minors and *adults* in Tennessee may lose access to certain services altogether. In response to the Fifth Circuit staying a preliminary injunction of similar age-verification and parental-consent requirements, NetChoice member Dreamwidth announced that it will "block access to Dreamwidth from all IP addresses that geolocate to Mississippi." Dreamwidth, Mississippi legal challenge: beginning 1 September, we will need to geoblock Mississippi IPs (Aug. 26, 2025), https://perma.cc/M7P9-GTTJ (emphasis omitted). Beyond NetChoice members, one of the fastest-growing social media services in the country (Bluesky) likewise announced that it will "block access from Mississippi IP addresses." Bluesky, Our Response to Mississippi's Age Assurance Law, Bluesky Blog (Aug. 22, 2025), https://perma.cc/6FGB-JYFF.

Preventing these grave First Amendment harms necessarily serves the public interest, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection*, 154 F.3d at 288 (citation

omitted). On the other side of the ledger, "no substantial harm to others can be said to inhere in [the] enjoinment" of an unconstitutional law. *Deja Vu*, 274 F.3d at 400.

## CONCLUSION

This Court should reverse the district court's judgment, directing the district court to preliminarily enjoin Defendant's enforcement of the Act.

Dated: September 3, 2025                    Respectfully submitted,

                                            */s/ Scott A. Keller*
                                            Scott A. Keller
Jared B. Magnuson                           Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP                    Jeremy Evan Maltz
3280 Peachtree Road NE                      LEHOTSKY KELLER COHN LLP
Atlanta, GA 30305                           200 Massachusetts Ave. NW, Suite 700
(512) 693-8350                              Washington, DC 20001
                                            (512) 693-8350
Joshua P. Morrow                            scott@lkcfirm.com
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350

Counsel for Plaintiff-Appellant NetChoice

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(g) because it contains 12,869 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller

**CERTIFICATE OF SERVICE**

I certify that on September 3, 2025, this brief was served via CM/ECF on

all registered counsel and transmitted to the Clerk of the Court.

*/s/ Scott A. Keller*
Scott A. Keller

## DESIGNATION OF DISTRICT COURT RECORD

Appellant NetChoice designates the following filings from the District

Court's electronic records under Sixth Circuit Rule 30(g):

| Date Filed | R.No.; Page ID # | Description of Document |
|---|---|---|
| October 3, 2024 | R.1; Page ID ## 1-32 | NetChoice's Complaint for Declaratory and Injunctive Relief |
| October 3, 2024 | R.8; Page ID ## 51-52 | NetChoice's Motion for Preliminary Injunction |
| October 3, 2024 | R.8-2; Page ID ## 59-70 | Declaration of Bartlett Cleland (NetChoice) |
| October 3, 2024 | R.8-3; Page ID ## 71-83 | Declaration of Gautham Pai (Nextdoor) |
| October 3, 2024 | R.8-4; Page ID ## 84-99 | Declaration of Denise Paolucci (Dreamwidth) |
| October 3, 2024 | R.9; Page ID ## 100-30 | NetChoice's Memorandum in Support of Motion for Preliminary Injunction |
| October 16, 2024 | R.23; Page ID # 175 | Order Granting Joint Motion for Scheduling Order |
| January 2, 2025 | R.42; Page ID ## 1850-54 | NetChoice's Motion to Ascertain Status |
| January 3, 2025 | R.43; Page ID ## 1855-57 | Defendant's Opposition to Motion to Ascertain Status |
| January 7, 2025 | R.45; Page ID ## 1859-63 | NetChoice's Reply in Support of Motion to Ascertain Status |
| January 15, 2025 | R.47; Page ID # 1868 | Order of Recusal |

| January 16, 2025 | R.48; Page ID ## 1869-74 | NetChoice's Motion for Temporary Restraining Order and Renewed Motion for Preliminary Injunction |
|---|---|---|
| February 14, 2025 | R.58; Page ID ## 1993-2006 | Order Denying Temporary Restraining Order |
| June 18, 2025 | R.78; Page ID ## 2337-64 | Memorandum Opinion of Court |
| June 18, 2025 | R.79; Page ID # 2365 | Order Denying Preliminary Injunction |