No. 25-5660

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

NETCHOICE, LLC,

*Plaintiff-Appellant,*

v.

JONATHAN SKRMETTI, in his official capacity as the
Tennessee Attorney General and Reporter,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:24-cv-01191

## APPELLEE'S BRIEF

Thomas McCarthy
Cameron T. Norris
Tiffany H. Bates
Nicholas B. Venable
CONSOVOY MCCARTHY, PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

Adam K. Mortara
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154

Jonathan Skrmetti
  *Attorney General & Reporter*
J. Matthew Rice
  *Solicitor General*
Harrison Gray Kilgore
  *Senior Assistant Attorney General*
Matthew D. Cloutier
  *Assistant Solicitor General*
Walker Anderson
  *Honors Fellow*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-6026
Matt.Rice@ag.tn.gov

# TABLE OF CONTENTS

Statement Regarding Oral Argument ....................................................xii

Statement of the Issues..........................................................................xiii

Introduction ...............................................................................................1

Statement of the Case ...............................................................................5

    A.   Factual Background. ..................................................................5

        1.   Social media is devastating children................................5

        2.   Tennessee acts to protect kids......................................10

    B.   Procedural Background .........................................................13

Summary of the Argument .....................................................................14

Argument...................................................................................................17

I.   The District Court Did Not Abuse Its Discretion by Denying Extraordinary Relief with No Imminent, Irreparable Harm. .........18

    A.   NetChoice failed to identify an imminent injury......................18

    B.   NetChoice's contrary arguments fail.......................................24

II.   NetChoice Fails to Show a Likelihood of Success............................33

    A.   Age verification and parental consent (§5703(a)(1)-(2)) ...........33

        1.   Social-media platforms. .....................................................34

        2.   Future social-media users. .................................................54

    B.   Parental supervision (§5704).................................................61

III.   The Court Should Not Grant NetChoice Relief—And Certainly Not the Overbroad Relief Requested. .............................................63

    A.   The district court should balance the relevant injunction factors in the first instance......................................................64

    B.   The remaining preliminary-injunction factors weigh in the State's favor. ..........................................................................65

    C.   Any injunctive relief must be carefully tailored. ......................66

Conclusion ...............................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAPS v. FDA,*
13 F.4th 531 (6th Cir. 2021) .................................................. 55, 56, 67

*AHA v. Harris,*
625 F.2d 1328 (7th Cir. 1980) ............................................................ 30

*Alario v. Knudsen,*
704 F.Supp.3d 1061 (D. Mont. 2023) ............................................... 57

*Am. Dairy Queen v. Brown-Port Co.,*
621 F.2d 255 (7th Cir. 1980) ............................................................ 23

*Amato v. Wilentz,*
952 F.2d 742 (3d Cir. 1991) .............................................................. 57

*Arcara v. Cloud Books,*
478 U.S. 697 (1986) ......................................................................... 37

*Arizona Christian Sch. Tuition Org. v. Winn,*
563 U.S. 125 (2011) ......................................................................... 56

*Barnes v. Glen Theatre,*
501 U.S. 560 (1991) ......................................................................... 44

*Barr v. AAPC,*
591 U.S. 610 (2020) ......................................................................... 67

*Blount Pride v. Desmond,*
690 F.Supp.3d 796 (E.D. Tenn. 2023) .............................................. 29

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) .................................................................. *passim*

*Buchholz v. Meyer Njus Tanick,*
946 F.3d 855 (6th Cir. 2020) ............................................................ 62

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................... 67

*CCIA v. Paxton,*
747 F.Supp.3d 1011 (W.D. Tex. 2024) ................................. 63

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .............................................. 25

*Christian Healthcare Ctrs. v. Nessel,*
117 F.4th 826 (6th Cir. 2024) ........................................ 21, 64

*City of Austin v. Reagan Nat'l Advert. of Austin,*
596 U.S. 61 (2022) ................................................... 41, 42, 43

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) ............................................................. 45

*City of Renton v. Playtime Theatres,*
475 U.S. 41 (1986) ......................................................... 45, 50

*Clementine Co. v. Adams,*
74 F.4th 77 (2d Cir. 2023) ................................................... 39

*Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta,*
219 F.3d 1301 (11th Cir. 2000) ............................................ 51

*Connection Distrib. Co. v. Holder,*
557 F.3d 321 (6th Cir. 2009) ......................................... 47, 67

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019) ...................................... *passim*

*Daunt v. Benson,*
956 F.3d 396 (6th Cir. 2020) ............................................... 44

*Davis v. Colerain Twp.,*
51 F.4th 164 (6th Cir. 2022) ............................................... 28

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
108 F.4th 194 (3d Cir. 2024) ...................................... *passim*

*Doe v. Lee*,
  137 F.4th 569 (6th Cir. 2025) .............................................................5

*eBay v. MercExchange*,
  547 U.S. 388 (2006)...........................................................................64

*Edgar v. MITE*,
  457 U.S. 624 (1982)...........................................................................29

*Enchant Christmas Light Maze & Mkt. v. Glowco*,
  958 F.3d 532 (6th Cir. 2020).................................................. 17, 32, 33

*EOG Res. v. Lucky Land Mgmt.*,
  134 F.4th 868 (6th Cir. 2025) .....................................................*passim*

*Ex parte Young*,
  209 U.S. 123 (1908)...........................................................................58

*Fischer v. Thomas*,
  78 F.4th 864 (6th Cir. 2023) .......................................................*passim*

*Fox v. Saginaw Cnty.*,
  67 F.4th 284 (6th Cir. 2023) .............................................................55

*Free Speech Coal. v. Att'y Gen.*,
  974 F.3d 408 (3d Cir. 2020) ..............................................................67

*Free Speech Coal. v. Colmenero*,
  689 F.Supp.3d 373 (W.D. Tex. 2023)...................................................56

*Free Speech Coal. v. Paxton*,
  145 S.Ct. 2291 (2025)................................................................*passim*

*Garlock v. United Seal*,
  404 F.2d 256 (6th Cir. 1968)..............................................................18

*Gavitt v. Born*,
  835 F.3d 623 (6th Cir. 2016)..............................................................24

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)...........................................................................46

*Google v. Hood,*
    822 F.3d 212 (5th Cir. 2016) ............................................................ 25

*Harris v. Evans,*
    20 F.3d 1118 (11th Cir. 1994) .......................................................... 57

*Higuchi Int'l v. Autoliv ASP,*
    103 F.4th 400 (6th Cir. 2024) .......................................................... 17

*Hohe v. Casey,*
    868 F.2d 69 (3d Cir. 1989) ............................................................... 25

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) .......................................................................... 55

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.,*
    753 F.Supp.3d 849 (N.D. Cal. 2024) ............................................... 9

*Indigo Room v. City of Fort Myers,*
    710 F.3d 1294 (11th Cir. 2013) ....................................................... 39

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) .................................................................... 56, 57

*Kuhn v. Washtenaw Cnty.,*
    709 F.3d 612 (6th Cir. 2013) ........................................................... 61

*L.W. v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ..................................................... *passim*

*League of Women Voters v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) ........................................................... 27

*Lexington H-L Servs. v. Lexington-Fayette Urb. Cnty. Gov't,*
    879 F.3d 224 (6th Cir. 2018) ........................................................... 51

*Lichtenstein v. Hargett,*
    83 F.4th 575 (6th Cir. 2023) ..................................................... *passim*

*Lindke v. Freed,*
    601 U.S. 187 (2024) .......................................................................... 57

*M.H. ex rel. C.H. v. Omegle.com*,
  122 F.4th 1266 (11th Cir. 2024) ......................................................... 65

*Masterpiece Cakeshop v. Colo. Civil Rts. Comm'n*,
  584 U.S. 617 (2018) ............................................................................. 35

*McCoy v. BATFE*,
  140 F.4th 568 (4th Cir. 2025) ....................................................... 40, 46

*McKay v. Federspiel*,
  823 F.3d 862 (6th Cir. 2016) .................................................. 21, 22, 28

*McLemore v. Gumucio*,
  2025 WL 2319119 (6th Cir. Aug. 12, 2025) .................................. 37, 40

*Mich. A. Phillip Randolph Inst. v. Johnson*,
  833 F.3d 656 (6th Cir. 2016) .............................................................. 26

*Moms for Liberty v. Wilson Cnty. Bd. of Educ.*,
  2025 WL 2599923 (6th Cir. Sept. 9, 2025) ................................. *passim*

*Moody v. NetChoice*,
  603 U.S. 707 (2024) ................................................................... *passim*

*NAACP v. Town of E. Haven*,
  70 F.3d 219 (2d Cir. 1995) .................................................................. 23

*NetChoice v. Bonta*,
  2025 WL 2600007 (9th Cir. Sept. 9, 2025) ................................. *passim*

*NetChoice v. Fitch*,
  145 S.Ct. 2658 (2025) ....................................................... 1, 18, 33, 66

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................................ 65

*NIFLA v. Becerra*,
  585 U.S. 755 (2018) ...................................................................... 37, 62

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................ 65

*NRA v. Bondi,*
  133 F.4th 1108 (11th Cir. 2025) .................................................. 40, 48

*Nutrition Distrib. v. Enhanced Athlete,*
  2017 WL 5467252 (E.D. Cal. Nov. 14, 2017) ...................................... 23

*Pavia v. NCAA,*
  2025 WL 2787816 (6th Cir. Oct. 1, 2025) ........................................ 20

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ............................................................. 31

*Phillips v. DeWine,*
  841 F.3d 405 (6th Cir. 2016) .................................................... 57

*Planet Aid v. City of St. Johns,*
  782 F.3d 318 (6th Cir. 2015) .................................................... 27

*Planet Aid v. City of St. Johns,*
  2014 WL 11309765 (W.D. Mich. May 20, 2014) ..................................... 27

*Powers v. Ohio,*
  499 U.S. 400 (1991) ............................................................. 56

*Prime Media v. Brentwood,*
  485 F.3d 343 (6th Cir. 2007) .................................................... 61

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ............................................................. 39

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) .............................................................. 25

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ............................................... 35, 36, 38, 39

*Sable Commc'ns v. FCC,*
  492 U.S. 115 (1989) ............................................................. 46

*Satellite Broad. & Comm'ns Ass'n v. FCC,*
  275 F.3d 337 (4th Cir. 2001) .................................................... 48

*Schall v. Martin,*
   467 U.S. 253 (1984) ................................................................ 40, 46

*Sec'y of State v. Joseph H. Munson Co.,*
   467 U.S. 947 (1984) ................................................................ 57, 58

*Speech First v. Schlissel,*
   939 F.3d 756 (6th Cir. 2019) .................................................. 64, 66

*St. Marys Foundry v. Emps. Ins.,*
   332 F.3d 989 (6th Cir. 2003) .......................................................... 64

*Stryker Emp. Co. v. Abbas,*
   60 F.4th 372 (6th Cir. 2023) .......................................................... 18

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ........................................................ 22, 27, 28

*Taylor v. City of Saginaw,*
   11 F.4th 483 (6th Cir. 2021) .......................................................... 64

*Tennessee v. Meta Platforms,*
   No 23-1364-IV (Tenn. Ch. Davidson Cnty.) ................................. 57

*Thompson v. DeWine,*
   976 F.3d 610 (6th Cir. 2020) .......................................................... 66

*TikTok v. Garland,*
   604 U.S. 56 (2025) ......................................................................... 43

*Towerco 2013 v. Berlin Twp. Bd. of Trs.,*
   110 F.4th 870 (6th Cir. 2024) ........................................................ 31

*Triplett Grille v. Akron,*
   40 F.3d 129 (6th Cir. 1994) ........................................................... 45

*Trump v. Boyle,*
   145 S.Ct. 2653 (2025) ............................................................... 1, 18

*Trump v. CASA,*
   606 U.S. 831 (2025) ........................................................ 58, 66, 67

*Turner Broad. Sys. v. FCC,*
512 U.S. 622 (1994) ........................................................ 15, 42, 43, 44

*United States v. Hansen,*
599 U.S. 762 (2023) .................................................................. 53

*United States v. O'Brien,*
391 U.S. 367 (1968) .................................................................. 61

*Vidal v. Elster,*
602 U.S. 286 (2024) ............................................................ 40, 41

*Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988) .................................................................. 56

*Virginia v. Hicks,*
539 U.S. 113 (2003) .................................................................. 52

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) .................................................................. 45

*WCI v. Ohio Dep't of Pub. Safety,*
18 F.4th 509 (6th Cir. 2021) .................................................. 58

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) .................................................................. 58

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ............................................................ 49, 50

*Winter v. NRDC,*
555 U.S. 7 (2008) .................................................................. 17

*Yakus v. United States,*
321 U.S. 414 (1944) .................................................................. 64

*Zillow v. Miller,*
126 F.4th 445 (6th Cir. 2025) .......................................... 42, 43, 44

## Statutes

15 U.S.C. §6502 ................................................................. 30, 54

42 U.S.C. §1983 ................................................................. 31, 55

Tenn. Code Ann. §1-3-110 ............................................... 67

Tenn. Code Ann. §47-18-108(a)(2) ................................. 19, 20

Tenn. Code Ann. §47-18-108(b)(2) ................................. 12

Tenn. Code Ann. §47-18-108(c) ....................................... 12

Tenn. Code Ann. §47-18-5701 .......................................... 67

Tenn. Code Ann. §47-18-5702(1) ..................................... 11, 54

Tenn. Code Ann. §47-18-5702(7) ..................................... 10

Tenn. Code Ann. §47-18-5702(8) ..................................... 10, 41

Tenn. Code Ann. §47-18-5702(9)(A) ................................. 10, 42

Tenn. Code Ann. §47-18-5702(9)(B)(iii)(a) ..................... 43

Tenn. Code Ann. §47-18-5703(a) ...................................... 12

Tenn. Code Ann. §47-18-5703(a)(1) ................................. *passim*

Tenn. Code Ann. §47-18-5703(a)(2) ................................. *passim*

Tenn. Code Ann. §47-18-5703(a)(2)(A) ............................ 39

Tenn. Code Ann. §47-18-5703(b) ...................................... 11

Tenn. Code Ann. §47-18-5703(c) ...................................... 11

Tenn. Code Ann. §47-18-5704 ................................................ 12, 18, 61, 62

Tenn. Code Ann. §47-18-5705(a)(2) ........................................................ 12

Tenn. Code Ann. §62-38-305 .................................................................... 47

Tenn. Code Ann. §68-120-101 .................................................................. 37

## Other Authorities

*Instagram Teen Accounts*,
  perma.cc/P6UJ-MA8V ......................................................................... 49

*Introducing New Ways to Verify Age on Instagram*,
  perma.cc/BAR9-2LAQ ......................................................................... 30

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
  104 Va. L. Rev. 933 (2018) ................................................................ 29

Library of Congress, *Get Your Library Card*,
  perma.cc/FM77-DJBY ......................................................................... 47

Restatement (Second) of Contracts §14 (1981) ...................................... 40

*Transcript*, Tech Policy Press (Jan. 7, 2025),
  perma.cc/DKA3-U2SJ) .......................................................................... 9

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee Jonathan Skrmetti respectfully requests oral argument.  Along with *NetChoice v. Yost*, No. 25-3371, this appeal raises important questions about the constitutionality of a state statute that protects children from the harms of social-media use.

## STATEMENT OF THE ISSUES

This case involves a Tennessee law that protects children from the harms of social media.  The district court declined to enjoin the law.  The issues presented are:

I.    Whether the district court abused its discretion by denying extraordinary relief based on the lack of imminent, irreparable harm.

II.   Whether the district court should be affirmed on the alternative ground that NetChoice failed to show a likelihood of success on its facial challenge.

III.  Whether, even assuming irreparable harm and likely success, the Court should remand for the district court to balance the remaining preliminary-injunction factors.

## INTRODUCTION

Less than two months ago, NetChoice asked the Supreme Court to stop Mississippi's social-media law from taking effect. The Supreme Court said no. *NetChoice v. Fitch*, 145 S.Ct. 2658 (2025). This Court should say no too. The interim *Fitch* order "informs" how this Court should view the district court's "exercise [of] its equitable discretion" in this "like case[]." *Trump v. Boyle*, 145 S.Ct. 2653, 2654 (2025). And that order confirms what the district court found below: NetChoice cannot justify the suspension of Tennessee's democratically enacted effort to protect kids from the predations of social media.

In recent years, children's constant access to social media has fueled a crisis. Social media has devastated kids' mental health, stunted their development, and exposed them to pornography and sexual predators, with little to no parental oversight. All the while, social-media platforms profit from minors' use of their platforms through contracts granting them rights over account holders' personal information.

Seeing these profound harms affect a generation of children, Tennessee's elected representatives took action. The legislature considered the research, received input from regulated parties (including

1

NetChoice), and weighed different policy solutions. With broad bipartisan support, the legislature then passed the Protecting Children from Social Media Act ("the Act") and joined the growing list of States (and nations) protecting kids through common-sense regulations of social media. The Act requires age verification and parental consent before minors may enter contracts to create social-media accounts. The Act also requires platforms to provide basic parental-supervision tools, like access to privacy settings and the ability to set daily time restrictions. These modest measures foster parental involvement and curb social media's potent harms.

Even though "nothing" in Supreme Court precedent "puts regulation of NetChoice's members off-limits," *Moody v. NetChoice*, 603 U.S. 707, 740 (2024), NetChoice thinks virtually any regulation of social-media websites creates a First Amendment issue—one that should be resolved on a truncated record no less. But no drastic, emergency intervention is needed here: The Act has been in force for nearly a year, the Attorney General has taken no steps to enforce it, and state law requires him to give social-media companies notice before any enforcement occurs. Hence why the district court reasonably denied what's supposed to be

"drastic" relief, while instructing NetChoice to "file another" preliminary-injunction motion "if Defendant threatens or institutes enforcement actions pending the outcome of this litigation."  Opinion, R.78, 2363.[1]  That's a textbook exercise of discretion—not an abuse of it.

In any event, this Court should reject NetChoice's attempt to use the First Amendment to *Lochner*-ize the internet.  "The Supreme Court has never applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it conveys"—even when those laws "impose[] incidental burdens on speech."  *Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023) (quotations omitted).  The Act's conduct-based restrictions here do not impose *any* incidental burden on social-media companies' speech—let alone a content-based burden.  That means rational-basis review applies.  But even assuming a content-based burden, *Free Speech Coalition v. Paxton* makes clear that, at most, intermediate scrutiny applies.  145 S.Ct. 2291 (2025).

NetChoice's attempt to assert the rights of children who might want to use its members' social-media websites in the future fares no better.

---

[1] All record pincites refer to the "Page ID" numbers in the ECF file stamps for No. 3:24-cv-01191 (M.D. Tenn.).

Standing problems abound: No caselaw supports what is essentially *fourth*-party standing—associational standing stacked on top of third-party standing to represent the rights of children without their parents' consent. And merits problems abound, too: NetChoice wields *Brown v. Entertainment Merchants Association* like a trump card. 564 U.S. 786 (2011). But the Act regulates contracting *without* barring any person from accessing any speech. NetChoice's reality-blinking claim (at 57) that Tennessee minors must "secure parental consent to watch documentaries on YouTube" proves the point. The Act allows minors to watch YouTube; if YouTube limits some documentaries to account holders, that's a *private* burden on access imposed by YouTube—not a *governmental* burden imposed by Tennessee.

Even under heightened scrutiny, the Act passes constitutional review. Growing evidence of the social-media-driven increase in childhood depression, suicide, and sexual abuse justifies—perhaps *requires*—the legislature's targeted measures to protect kids' health, safety, and welfare. So NetChoice fails to prove *any* unconstitutional application of the Act, and certainly hasn't given this Court what it needs to conduct the

facial "inquiry into how [the Act] works in *all* of its applications." *Moody*, 603 U.S. at 744 (emphasis added).

As the Supreme Court has recognized, "government actors" are "better positioned than courts to respond to the emerging challenges social-media entities pose." *Id.* at 716. This Court should hesitate before *facially* invalidating attempts to address those challenges—lest its equitable relief create "irreparable injustice" for the thousands of children harmed on social media every day. *Doe v. Lee*, 137 F.4th 569, 579 (6th Cir. 2025). The Court should affirm.

## STATEMENT OF THE CASE

### A. Factual Background.

#### 1. Social media is devastating children.

As an "ultra-social, cultural species," humans "socially absorb … much of our routines, habits, and customs." Kaliebe Decl., R.28, 229. For millennia, children and adolescents developed their interests and personal identities through "playtime within natural settings," interaction with peers, and "adult-guided group activities, such as sports, the arts, military, or religious traditions." *Id.* at 231. But today, life is different. For many adolescents, social media has "displaced … in-person socializing, schoolwork, sleep, sports, reading, and other hobbies." *Id.* at 233.

Mountains of research confirm this development harms young people. *Id.* at 228, 253-54; Haidt Excerpt, R.30-15, 478-508; Surgeon General Report, R.30-14, 452, 454-55.

This shift to virtual socialization is no accident. Social media is "addictive" by design. Kaliebe Decl., R.28, 235. The platforms "use every trick in the psychologists' tool kit to hook users." Haidt Excerpt, R.30-15, 487. Between 2010 and 2015, the "amount of time teenagers spent on social media increased dramatically"; and by 2021, "high school girls spent about 4 hours per day using social media." Kaliebe Decl., R.28, 233. The fact that 95% of 13-to-17-year-olds now have access to smartphones only compounds these effects. *Id.* at 232.

This society-wide shift to online engagement has warped social development. Among its many drawbacks, social media "intensifies demand for likes, comments, streaks, and re-tweets"; "increases status rewards for photos, videos, and text"; and "allows for lurking, bullying, and anonymous hostilities." *Id.* at 231-32. The consequences for minors have been dire. Social media stunts "[d]eveloping brains," reducing kids' attention spans and reinforcing their addiction to social media's instant gratification. *Id.* at 234, 251-52. And it disrupts kids' sleep, which is

"linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behavior." *Id.* at 238.

This largescale brain rewiring has produced "a dramatic increase in teen mental illness." *Id.* at 236. Between 2010 and 2022, the rate of major depressive disorders *more than doubled* among teens. *Id.* Around that same time, reports of anxiety, loneliness, and negative self-image spiked. *Id.* at 243-48, 252-54. As adolescents' mental health has declined, "suicide incidents" have risen. *Id.* at 237. Between 2007 and 2021, suicide rates for children and young adults increased by 62%. *Id.* And since 2010, emergency-department admissions for self-harm have increased 281% among 10-to-14-year-old girls. *Id.* at 238. "A 2019 systematic review showed an association between heavy social-media or internet use and suicide attempts." *Id.* The Surgeon General, too, recently reported that "social media" has catalyzed youth suicides. Surgeon General Report, R.30-14, 456.

Exacerbating the harm, social media is a potent cyberbullying tool. Kaliebe Decl., R.28, 242-43. Individuals can easily and anonymously "create fake accounts to impersonate or otherwise humiliate" victims by "posting   unauthorized   photographs   (*e.g.*,   nudes)   or   repeated

7

harassment." *Id.* at 242. This "disinhibition" coupled with teens' "less-developed mentalization abilities and frontal lobes make it more difficult for them to register the harm done by their posts or empathize with those who may be injured." *Id.* For cyberbullying victims, though, the harms are very real. Victims experience "increased depressive affect, anxiety, loneliness, decreased self-esteem, fewer friendships, decreased trust, decreased school attachment, more hopelessness/powerlessness, increased suicidal ideation/behavior, and increased physical symptoms." *Id.*

All these effects make social media—already rife with pornography, *id.* at 228—a prime hunting ground for sexual predators. LEO Decl., R.27, 213. These predators target "immature, less experienced, and more susceptible early adolescents to create a relationship that leads to an in-person meeting," often culminating in "rape." Kaliebe Decl., R.28, 241. The Surgeon General has recognized social media as a powerful tool to lure, groom, sextort, and otherwise victimize kids. Surgeon General Report, R.30-14, 457; *see* LEO Decl., R.27, 213-15; Janssen Decl., R.31, 871-72. It is even "used in the recruitment of at-risk young people" for sex trafficking. Kaliebe Decl., R.28, 240. As Meta CEO Mark Zuckerberg recently acknowledged, there's "a lot of legitimately bad stuff" on social

8

media, including "child exploitation." *Transcript*, Tech Policy Press (Jan. 7, 2025), perma.cc/DKA3-U2SJ.

The market is failing to give parents effective tools to protect against these harms. Social-media companies profit by ensnaring account holders, including children, in complex contracts that let the platforms track them and sell their data. Janssen Decl., R.31, 869-72; R.30-31 to R.30-39 (contracts). The extent of those profits "depend[s] on increasing engagement, advertising, and data mining." Kaliebe Decl., R.28, 235. This creates a "financial incentive to keep users on devices and create new desires for products or services." *Id.* Because fewer eyeballs mean less profits, the companies have little interest in offering tools to moderate minors' access to their platforms. Post Article, R.30-25, 602-04. What few tools they do offer miss harmful content and give parents false confidence that their children are safe online. *E.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 753 F.Supp.3d 849, 869-70 (N.D. Cal. 2024); Allen Decl., R.29, 281-84; Kaliebe Decl., R.28, 254-57.

## 2.    Tennessee acts to protect kids.

Faced with this crisis, Tennessee refused to sacrifice its children to corporate profits.  After several months of debates and hearings, the General Assembly crafted legislation that protects minors while imposing minimal burdens on social-media companies.  The result—the Protecting Children from Social Media Act—passed by bipartisan supermajorities in both houses.  A growing list of States (ranging from California and New York to Florida and Texas) have adopted similar measures.  As have foreign nations like Germany and France.

Relevant here, the Act regulates "[s]ocial media compan[ies]" with platforms that "[a]llow[] a person to create an account" and "[e]nable[] an account holder to communicate with other account holders and users through posts."  Tenn. Code Ann. §47-18-5702(8), (9)(A); *id.* §5702(7), (2) (defining "post" and "content").  The Act does not cover websites that "primarily" provide "career development opportunities," "email service[s]," "[o]nline shopping," "cloud storage or cloud computing services," or certain "[p]eer-to-peer payment platforms."  *Id.* §5702(9)(B)(iv)-(viii).

The Act requires three things:  age verification, parental consent, and parental supervision.  Social-media companies must "verify the age

of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." *Id.* §5703(a)(1). Age-verification technology is "widely used by thousands of sellers and their consumers on a daily basis around the world in various contexts." Allen Decl., R.29, 274. The Act lets social-media companies decide how to comply with the age-verification requirement, but it protects privacy by prohibiting them from "retain[ing] personally identifying information." Tenn. Code Ann. §47-18-5703(c).

If the age-verification process reveals that an individual opening an account is reasonably believed to be a minor, the Act requires the "express consent of the minor's parent" before the account can be opened. *Id.* §5703(a)(2). In addition, social-media companies "shall allow a parent to revoke consent for a minor to become or continue as an account holder." *Id.* §5703(b). As with age verification, the company cannot retain "personally identifying information … used to verify … parental consent." *Id.* §5703(c). The age-verification and parental-consent provisions apply only to the creation of new accounts after January 1, 2025. *Id.* §5702(1).

11

Finally, social-media companies must empower parents to supervise, modify, or revoke their child's account. *Id.* §5704. Companies are free to develop various means of facilitating this parental control. But they must allow parents "to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account." *Id.*

Enforcement of the Act falls to the Tennessee Attorney General. If he believes a company is violating the Act and "that proceedings would be in the public interest," he may "[c]onduct an investigation" and "[b]ring an action" for injunctive relief and civil monetary penalties. *Id.* §5705(a). In cases of "knowing and persistent violations," a court may "enter an order temporarily or permanently revoking a license or certificate authorizing that person to engage in business in this state." *Id.* §47-18-108(b)(2); *id.* §47-18-5705(a)(2). If a social-media company fails to comply with that order, it risks civil penalties plus "any other appropriate relief." *Id.* §47-18-108(c). No criminal penalties are available.

The Act became effective on January 1, 2025. Yet still today, none of the major social-media companies have adopted any form of parental consent. NetChoice Br. 27-29; Mot. Resp., R.43, 1855-56. And many

major social-media companies have not enabled the required parent-supervision controls either. NetChoice Br. 27-29. The Attorney General has initiated no enforcement action.

### B.    Procedural Background

NetChoice—a trade organization whose members include the largest social-media platforms—opposed Tennessee's efforts to protect children. NetChoice lobbied against the Act and urged the Governor to veto it. Veto Request, R.30-40, 828-33. When its lobbying blitz failed, NetChoice sued on behalf of its members, including Google (YouTube), Meta (Facebook and Instagram), Pinterest, Snapchat, and X. Compl., R.1, 5.

NetChoice's complaint—filed five months after Tennessee enacted the Act—alleged that the Act violates the First Amendment and the void-for-vagueness doctrine. NetChoice also sought a preliminary injunction, resting its argument almost entirely on the merits and devoting just one page to the other factors. Prelim. Inj. Br., R.9.

The district court denied the motion, concluding that NetChoice had not "met the heavy burden required" for preliminary relief. Opinion, R.78, 2363. The court took no "position on the merits," *id.*, but found that

NetChoice had "failed to demonstrate that it (or indeed anyone) w[ould] suffer irreparable harm" without preliminary relief. *Id.* at 2348. NetChoice had instead established, at most, a "*possibility*" that the Act would be enforced before the conclusion of this litigation. *Id.* at 2357. With no "imminent and irreparable injury," the court reasoned, "there's no need to grant relief *now* as opposed to the end of the lawsuit." *Id.* at 2349 (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)). The court stressed, though, that if the State sought to enforce the law during the pendency of the litigation, NetChoice could then renew its motion for preliminary relief. *Id.* at 2363.

NetChoice had 30 days to take an interlocutory appeal. On the thirtieth day, it finally did.

## SUMMARY OF THE ARGUMENT

**I.** The district court did not abuse its discretion by denying extraordinary relief because NetChoice proved no imminent injury. The Act requires ten days' notice before enforcement. And General Skrmetti has given no notice—to anyone. After nearly a year of non-enforcement, NetChoice's sudden need for relief falls flat, particularly given the district court's invitation to return "if Defendant threatens or institutes

14

enforcement actions." Opinion, R.78, 2363. NetChoice cannot conjure a First Amendment exception to the imminence requirement. And NetChoice's threadbare claims of unrecoverable compliance costs are neither proven nor irreparable.

**II.** NetChoice cannot establish a likelihood of success on its facial First Amendment challenge.

The age-verification and parental-consent provisions (§5703(a)(1)-(2)) pass constitutional muster. NetChoice identifies no speech by its members, the social-media companies, that either provision infringes. And the Act is content-neutral because it turns on "the manner in which" content is "transmit[ted]," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 645 (1994)—not the *message* conveyed. So rational-basis review applies. At worst, the Act gets *Paxton*-style intermediate scrutiny, which it satisfies. The State furthers important interests in protecting children from unfair contracting practices, sexual exploitation, and devastating mental-health effects; and the Act advances those interests without needless speech burdens. Even assuming some unconstitutional applications, NetChoice fails to establish *facial* invalidity.

NetChoice's attempt to assert the rights of prospective users fails. No case law allows NetChoice to stack associational standing on top of third-party standing, and NetChoice doesn't satisfy the third-party standing requirements anyway. NetChoice cannot get around sovereign immunity for similar reasons.

NetChoice forfeited any challenge to the parental-supervision provision (§5704) by failing to adequately address it in its opening brief (or below). And this Court is in no position to resolve the distinct standing and merits issues raised by that provision.

**III.** If this Court disagrees, it should remand—not usurp the district court's discretion by entering a preliminary injunction itself. The district court never passed on the remaining equitable factors, and this Court need not take the first crack. Remand would also allow the district court to tailor any relief and conduct the necessary severability analysis. In any event, the remaining factors justify the denial of preliminary relief. The Court ought not sacrifice Tennessee children to spare billion-dollar corporations from speculative First Amendment harms and unproven compliance costs. Doing so cannot be reconciled with the Supreme Court's recent decision in *Fitch*.

16

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy." *Enchant Christmas Light Maze & Mkt. v. Glowco*, 958 F.3d 532, 539 (6th Cir. 2020) (quotations omitted). It's reserved "only for cases where [immediate intervention] is necessary to preserve the status quo until trial." *Higuchi Int'l v. Autoliv ASP*, 103 F.4th 400, 404 (6th Cir. 2024) (quotations omitted). And despite lax practices in recent years, injunctions remain "the exception, rather than the rule." *Id.*

To obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Glowco*, 958 F.3d at 535-36 (quotations omitted); *EOG Res. v. Lucky Land Mgmt.*, 134 F.4th 868, 885 (6th Cir. 2025) (holding that all four factors are "prerequisite[s]"). Even then, because "[a]n injunction is a matter of equitable discretion," a district court retains broad latitude to deny or limit relief as appropriate. *Winter v. NRDC*, 555 U.S. 7, 32 (2008).

17

This Court reviews that equitable decision only for "abuse of discretion." *Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023). NetChoice cannot show an abuse of discretion here. Indeed, faced with nearly identical arguments from NetChoice, the Supreme Court allowed Mississippi's similar law to remain in effect. *Fitch*, 145 S.Ct. at 2658. The same result should follow in this case. *Boyle*, 145 S.Ct. at 2654.

## I. The District Court Did Not Abuse Its Discretion by Denying Extraordinary Relief with No Imminent, Irreparable Harm.

NetChoice failed to carry its "burden of establishing a clear case of irreparable injury." *Garlock v. United Seal*, 404 F.2d 256, 257 (6th Cir. 1968). So the district court denied relief, while leaving the door open for a renewed motion if circumstances change. That's a classic *exercise* of discretion, not an abuse. NetChoice's contrary position reimagines "preliminary injunctions" as "shortcuts to a final merits decision." *EOG*, 134 F.4th at 885. It also ignores the record.

### A. NetChoice failed to identify an imminent injury.

"[T]he existence of an irreparable injury is mandatory." *D.T.*, 942 F.3d at 327. And that injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* (quotations omitted). Imminence means

plaintiffs must prove "some irreparable harm will take place without the court's immediate intervention." *EOG*, 134 F.4th at 883.

This imminence requirement is foundational for preliminary injunctions: "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327. The "time pressures" associated with a preliminary injunction "limit adversarial testing," forcing courts to "prejudge the merits" with only an "initial sketch" of arguments, evidence, and legal issues. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200, 202-03 (3d Cir. 2024). These limitations require courts to deny preliminary relief unless it's necessary to "prevent[] irreversible mischief during the litigation." *EOG*, 134 F.4th at 885.

That's not this case. No immediate relief is required because no immediate enforcement is possible. By statute, the Attorney General must "give notice to the person against whom proceedings are contemplated and give such person an opportunity to present reasons why such proceedings should not be instituted" at least "ten (10) days before instituting legal proceedings." Tenn. Code Ann. §47-18-108(a)(2). That notice requirement dooms NetChoice's demand for immediate relief. If the

Attorney General gives notice to a NetChoice member, there's an obvious solution:  engage in the state-mandated process, or accept the district court's invitation to "file another motion for preliminary injunction." Opinion, R.78, 2363.

Seeking to avoid this conclusion, NetChoice stresses that notice is not always "mandatory."  NetChoice Br. 41-42.  True, the Attorney General can forgo notice if he determines in writing that "the 'purposes' of the law 'will be substantially impaired by delay in instituting legal proceedings.'"  *Id.* (quoting Tenn. Code Ann. §47-18-108(a)(2)).  But here, where the Attorney General has already declined to initiate an action for nearly a *year*, it's hard to see how he could justify skipping the notice period.  And General Skrmetti disavows any intention of skipping the notice period for NetChoice's identified members. *Pavia v. NCAA*, 2025 WL 2787816, at *4 (6th Cir. Oct. 1, 2025) (noting that "[i]t is standard practice to accept a party's representations to the court as parameters for decision.").  NetChoice's members thus need no "immediate intervention." *EOG*, 134 F.4th at 883.

Even setting aside the notice requirement, NetChoice cannot establish irreparable harm based on the mere possibility of enforcement.  This

Court doesn't assume that every breach of a law will be prosecuted. *McKay v. Federspiel*, 823 F.3d 862, 868-70 (6th Cir. 2016). Instead, to assess pre-enforcement standing, the Court determines whether some "indication of *imminent* enforcement" exists through a holistic, four-part framework—the "*McKay* factors." *Id.* at 869. As the district court recognized, "an injury-in-fact is not identical to [an] irreparable injury." Opinion, R.78, 2355. But *McKay*'s considerations for determining whether a "threatened injury is certainly impending," 823 F.3d at 867 (quotations omitted), can be "instructive in determining whether an alleged injury is … certain and immediate." Opinion, R.78, 2355-56 (quotations omitted). That is, if NetChoice cannot show an "indication of *imminent* enforcement" sufficient to "establish an injury-in-fact for pre-enforcement standing" under *McKay*, 823 F.3d at 868-69 (emphasis added), then it necessarily cannot establish a "certain and immediate" irreparable injury for a preliminary injunction, *D.T.*, 942 F.3d at 327.

None of the *McKay* factors favor NetChoice. One, NetChoice points to no "history of past enforcement *of the [challenged] statute*" over the year it's been in effect, *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (emphasis added)—instead gesturing to prior

enforcement of "*other* state law[s]," NetChoice Br. 40 (emphasis added). Two, the Attorney General has sent no enforcement letters to any social-media company. *Moms for Liberty v. Wilson Cnty. Bd. of Educ.*, 2025 WL 2599923, at *7 (6th Cir. Sept. 9, 2025). NetChoice claims that's because it "sued and moved for a preliminary injunction *before the Act took effect*." NetChoice Br. 41. But no injunction ever issued, the law came into effect, and no threat letters ever came. Three, the Act doesn't allow "any member of the public to initiate an enforcement action," only the Attorney General, *McKay*, 823 F.3d at 869—limiting the "universe of potential" enforcers to a "state official[] … constrained by … ethical obligations," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). Four, the record "does not reflect Defendant *refusing* to disavow enforcement … until the conclusion of this litigation." Opinion, R.78, 2356; *Moms*, 2025 WL 2599923, at *7, *9. It reflects a history of non-enforcement with no explicit or implicit threats of imminent action.

None of this is hypothetical. As the district court found, "[t]he Act has now been in effect since January 1 of this year and yet the record does not reflect that an enforcement action has been instituted or even threatened." Opinion, R.78, 2357. Meta hasn't complied with the Act.

Nor has Snapchat, X, YouTube, or any other major social-media company. Yet the Attorney General has brought no enforcement action. So how are these companies—and their users—suffering an immediate First Amendment harm?

NetChoice's lengthy discussion (at 42-45) of harms to members' users misses the mark. NetChoice members are largely failing to comply with the Act, so their users' experience on these websites is unchanged. Regardless, the "irreparable harm" requirement mandates an imminent violation of *the movant's own rights*. *E.g.*, *Am. Dairy Queen v. Brown-Port Co.*, 621 F.2d 255, 259 n.4 (7th Cir. 1980); *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). "While it may be appropriate to consider [user harm] in weighing public interest concerns, the Court may not consider it in the irreparable harm analysis." *Nutrition Distrib. v. Enhanced Athlete*, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017). NetChoice proved no harm to specific users of any platform anyway, other than weak evidence about Nextdoor and Dreamwidth. NetChoice Br. 29. And any harm to would-be users of Nextdoor and Dreamwidth—not exactly hot apps for 13-to-17-year-olds—is a blip in the public-interest calculus. *Infra* 65-66.

23

Put simply, after nearly a year of non-enforcement and with a ten-day notice requirement, NetChoice's cries of urgency ring hollow. And they are belied by NetChoice's conduct: waiting until the eleventh hour to seek a preliminary injunction, seeking no interim relief from this Court, and appealing only on the last day. Because NetChoice's "chill isn't immediate," *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) (quotations omitted), the district court properly denied injunctive relief, while allowing NetChoice to renew its motion "if Defendant threatens or institutes enforcement actions." Opinion, R.78, 2363. That approach tracks this Court's precedent. *E.g.*, *Fischer*, 78 F.4th at 868. And even if this Court might have assessed irreparable harm differently than the district court, review here is for abuse of discretion. That forgiving standard asks only whether the district court's analysis "was sound and supported by the record." *Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016). It was.

## B.    NetChoice's contrary arguments fail.

**1.  *First Amendment Harms*.**  NetChoice cannot establish an imminent First Amendment harm. So it argues (at 34-35) that there is no imminence requirement. It says (at 30-34) all that matters is the merits,

because the "likelihood of success" and "irreparable harm" inquiries "cannot be disentangled" in First Amendment cases.  Logic and precedent say otherwise, including a binding precedent issued less than a week after NetChoice filed its brief.  *Moms*, 2025 WL 2599923, at *8-9.

The mere "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).  While "[t]he loss of First Amendment freedoms ... unquestionably constitutes irreparable injury," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quotations omitted), movants "must show that their First Amendment interests are either threatened or in fact being impaired at the time relief is sought," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (quotations omitted).  NetChoice's bare "assertion of First Amendment rights does not automatically require a finding of irreparable injury," *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989), or somehow "collapse[]" the preliminary injunction factors into one, *Del. State*, 108 F.4th at 202.  Without imminence, there is no "need to grant relief *now*"—and thus no basis for preliminary relief.  *Moms*, 2025 WL 2599923, at *8 (quoting *D.T.*, 942 F.3d at 327).

25

NetChoice's suggestion that courts should not "ask[] whether enforcement of the Act is 'imminent'" makes no sense. NetChoice Br. 34-35 (citing language from cases where imminence wasn't at issue). What if a law's effective date is ten years out? There, plaintiffs aren't likely to suffer harm until after final judgment, yet NetChoice thinks a preliminary injunction should issue. That position defies a mountain of Sixth Circuit precedent requiring imminence. *See, e.g.*, *Moms*, 2025 WL 2599923, at *9; *Fischer*, 78 F.4th at 868-69; *EOG*, 134 F.4th at 883. If the "chill isn't immediate," then injunctive relief should be denied—typically with the option to "renew the[] request for preliminary relief" when enforcement becomes imminent, *Fischer*, 78 F.4th at 868, which is *exactly* what the district court did here, Opinion, R.78, 2363.

None of the cases in NetChoice's bulleted list (at 31-32) say otherwise. *Michigan A. Phillip Randolph Institute v. Johnson* is inapposite— it is neither a First Amendment case nor an appeal from the denial of a preliminary injunction. 833 F.3d 656 (6th Cir. 2016). And in the rest of

the cases, speech interests were *currently* or *imminently* being impaired.[2]
*Johnson*, *Fischer*, and *Yost*, for example, were election-law challenges
brought on the eve of an election.  Unlike this case, those cases presented
a uniquely imminent, irreparable-injury problem because "once the elec-
tion occurs, there can be no do-over and no redress."  *League of Women
Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).  Nothing in
these cases undercuts this Court's clear conclusion that district courts
can "begin—and end—with" irreparable harm when no "immediate" in-
jury exists.  *Fischer*, 78 F.4th at 868.  A district court, in other words, "is
well within its province to deny a preliminary injunction based solely on
the lack of an irreparable injury," including in "First Amendment" cases.
*Moms*, 2025 WL 2599923 at *9 (quotations omitted).

Citing *Driehaus*, NetChoice claims (at 35-36) that requiring immi-
nence "could frustrate *all* litigants' ability to secure preliminary-injunc-
tive relief in pre-enforcement cases" and would mean "a First Amend-
ment litigant can never show irreparable injury in a *pre*-enforcement

---

[2] *Planet Aid v. City of St. Johns* is also inapposite because the city waived
any argument on the other *Winter* factors. 2014 WL 11309765, at *5
(W.D. Mich. May 20, 2014).  So this Court decided the case exclusively on
the merits. 782 F.3d 318, 323 (6th Cir. 2015).

posture." Not true. Read in full, *Driehaus* agrees that any "threatened injury" must be "certainly impending." 573 U.S. at 158 (quotations omitted). In fact, *Driehaus*'s "certainly impending" requirement undergirds the *McKay* inquiry into whether an "indication of *imminent* enforcement" exists—the inquiry the district court performed. *McKay*, 823 F.3d at 868 (emphasis added) (citing and quoting *Driehaus*); Opinion, R.78, 2355-56.

Nor can NetChoice rest its imminence argument on General Skrmetti's supposed "refus[al] to disavow enforcement." NetChoice Br. 38-39. For one, refusal to disavow "is just one data point among many on the question whether a credible threat of enforcement exists." *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022). For two, contra NetChoice's contentions, the plaintiff bears the burden to prove a refusal to disavow, not "government officials"—under both the standing test, *Moms*, 2025 WL 2599923, at *7, and the preliminary-injunction standard, *cf. id.* at *9-10. For three, the contention that "Defendant has … refused to disavow enforcement of the Act for even limited periods" after NetChoice sued is misleading, at best. *See, e.g.*, TRO Opp'n, R.54, 1972 (representing that there is "zero" chance of enforcement during the P.I. stage). For four, the State has disavowed enforcement—and here again

28

disavows enforcement—without ten-days' notice.  That assurance elimi-
nates any need for immediate relief.

Finally, NetChoice complains (at 37) that its members "'face[] … a
Hobson's choice' of complying with the Act's unconstitutional speech re-
strictions or risking liability."  But the members have made their choice—
they chose noncompliance and the risk of liability.  Any harm from that
choice is not imminent, as explained.  Plus, a preliminary injunction
couldn't save social-media companies from the "risk[]" of liability anyway.
Even if it were granted, a *preliminary* injunction cannot shield them from
liability on a *"retrospective* basis."  *Blount Pride v. Desmond*, 690
F.Supp.3d 796, 807-08 (E.D. Tenn. 2023).  A preliminary injunction
doesn't "grant immunity for actions taken in reliance on the court's [in-
terlocutory] decision" if it is later dissolved on appeal or after trial.  *Edgar
v. MITE*, 457 U.S. 624, 651-52 (1982) (Stevens, J., concurring); *Blount
Pride*, 690 F.Supp.3d at 807-08.  Social-media companies would thus still
"risk[] liability," NetChoice Br. 37, if they failed to comply with Tennes-
see's law while a preliminary injunction was in place.  Jonathan F. Mitch-
ell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 938-42, 986-1000

(2018).  So the risk of liability is not an irreparable harm that will be "suffer[ed] without an injunction."  *Fischer*, 78 F.4th at 868.

**2.  *Compliance Costs.***  NetChoice also cannot claim compliance costs as irreparable harm.

To start, NetChoice cannot prove compliance costs for *non*-compliant social-media companies.  A vague statement from "[o]ne member" hardly qualifies as a clear showing that "each NetChoice covered member" would face "great expense."  NetChoice Br. 29.  And there's a reason NetChoice presented no proof:  The "complained of costs should already have been incurred."  *AHA v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980).  Some platforms admit as much for the parental-supervision portion of Tennessee's law.  NetChoice Br. 9.  And the other platforms likely spent the resources needed for age verification and parental consent already—because they are prepared to comply with other States' laws, because they comply with other countries' laws, or because federal law imposes age-based restrictions.  Allen Decl., R.29, 284-86; *Introducing New Ways to Verify Age on Instagram*, perma.cc/BAR9-2LAQ (age verification internationally since 2023); 15 U.S.C. §6502.  It's hard to see how NetChoice could claim that significant compliance costs exist, while

social-media companies have, for decades, complied with federal law by imposing age-restrictions on children under the age of 13. *See, e.g.,* NextDoor Member Agreement, R.30-37, 788 (requiring "parental or guardian consent … if you are under 13 *pursuant to COPPA*"); Dreamwidth Terms, R.30-38, 800 (limiting website "to individuals who are at least 13 years old").

Even if NetChoice had proven costs, it cannot prove irreparability. Generally, "mere economic loss does not constitute irreparable injury, because it is compensable by damages" after trial. *Towerco 2013 v. Berlin Twp. Bd. of Trs.*, 110 F.4th 870, 889 (6th Cir. 2024) (cleaned up). Though NetChoice cites cases where this rule doesn't apply because *federal* officials cannot be sued for damages, NetChoice Br. 29, 45-47, it cites no controlling authority applying that rule to *state* officials. And while Tennessee would welcome a holding that its officials can never be held liable for damages under §1983 in First Amendment cases, that's not the law.

So if NetChoice wants to proceed on its theory of unrecoverable compliance costs, it must first concede that Tennessee's officials enjoy qualified immunity—*i.e.*, that no "clearly established" law prohibits enforcement of the Act. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

31

NetChoice then needs to explain how, despite there being no "clearly established" law, it has made the "clear showing" on the merits needed to obtain a preliminary injunction. *Glowco*, 958 F.3d at 539 (cleaned up). And it then must reconcile that with *L.W.*'s statement that when a plaintiff seeks to "extend the constitutional guarantees to new territory," "the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *L.W. v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023). If that needle can be threaded, NetChoice hasn't done it.

\*        \*        \*

NetChoice's members "may have some apprehension over some potential enforcement action at some point in the future." Opinion, R.78, 2357. But on the facts here—where state law mandates a ten-day notice period and the record shows ten months of non-enforcement—the district court did not abuse its discretion by declining to grant relief and, instead, prompting NetChoice to "file another motion" "if Defendant threatens or institutes enforcement actions pending the outcome of this litigation." *Id.* at 2363. That cautious exercise of discretion is precisely what this Court and the Supreme Court have implored district courts to do. *E.g.*, *Fischer*,

32

78 F.4th at 868; *Fitch*, 145 S.Ct. at 2658. Reversing here would usurp the district court's discretion, not police it.

## II.    NetChoice Fails to Show a Likelihood of Success.

Even if NetChoice could establish irreparable harm, its failure to show a "likelihood of success on the merits" proves "fatal to [its] quest for a preliminary injunction." *Glowco*, 958 F.3d at 539 (cleaned up). NetChoice chose to litigate this appeal raising only a facial First Amendment challenge. NetChoice Br. 48-50, 64, 67.[3] That choice "comes at a cost." *Moody*, 603 U.S. at 723. "Even in the First Amendment context, facial challenges are disfavored" and "hard to win." *Id.* at 723, 744. And this case is not the rare exception. The Court can affirm on this alternative ground.

### A.    Age verification and parental consent (§5703(a)(1)-(2)).

NetChoice is unlikely to succeed in its facial challenge to the Act's age-verification and parental-consent provisions, Tenn. Code Ann. §47-18-5703(a)(1)-(2). Indeed, NetChoice struggles to settle on a theory of *whose* rights and injuries are even at issue. Sometimes NetChoice

---

[3] Below, NetChoice raised as-applied First Amendment claims and a void-for-vagueness challenge. Because NetChoice did not press those claims in its opening brief, this Court should not reach them.

33

appears to assert the First Amendment rights of its members, the social-media companies. *E.g.*, NetChoice Br. 26. Other times, it seeks to vicariously assert the harms of its members' prospective users, the adults and children who will want to use social-media platforms. *Id.* at 50-51. And other times still, it blurs the distinction. *Id.* at 43.

Disaggregating these rights elucidates the weakness of NetChoice's position. For social-media companies, the age-verification and parental-consent provisions do not burden any protected speech. And even if they did, they would do so only incidentally, triggering less exacting scrutiny that the Act readily satisfies. For future users, NetChoice presses novel theories of standing that cannot support relief in this posture. And even if NetChoice somehow could assert its members' non-users' rights, *Paxton*-style intermediate scrutiny is the most that would apply, and the Act satisfies it.

### 1. Social-media platforms.

NetChoice fails to clearly show that the Act's age-verification and parental-consent requirements facially violate the First Amendment rights of social-media platforms. Those requirements do not infringe on any speech right of NetChoice's *members*—the social-media companies.

34

Even assuming a First Amendment burden, heightened scrutiny would not apply. And, even under heightened scrutiny, the Act passes constitutional review. Finally, NetChoice fails to carry the heavy burden required to support *facial* invalidation.

**a.** ***The Act's conduct-based restriction calls for rational-basis review—or at most, intermediate scrutiny***. The First Amendment bars States "from 'abridging' oral … or written expression." *Lichtenstein*, 83 F.4th at 582. Whether and how those safeguards extend to conduct has lots of precedent, but a less-than-obvious framework. The caselaw appears to distinguish between three types of restrictions: (1) restrictions on inherently expressive conduct, (2) restrictions on non-expressive conduct that impose an incidental, content-based burden on speech, and (3) restrictions on non-expressive conduct that pose a non-content-based burden on speech.

For "inherently expressive" conduct, the First Amendment provides some protection. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006). Exactly what constitutes "expressive conduct" is a subject of much debate. *Masterpiece Cakeshop v. Colo. Civil Rts. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring in part) (collecting cases). But generally, the

conduct must at least "[be] intend[ed] to express a particularized message," and there must be a "high likelihood" that the audience "will understand [that] message." *Lichtenstein*, 83 F.4th at 594 (cleaned up). Even when conduct satisfies these requirements, though, regulations of expressive conduct are subject to intermediate scrutiny under the *O'Brien* test. *FAIR*, 547 U.S. at 66.

For restrictions on non-expressive conduct that impose an incidental "content-based burden" on speech, intermediate scrutiny similarly applies. *Paxton*, 145 S.Ct. at 2311. In *Paxton*, for example, the State's age-verification requirement did not "directly regulate … protected speech" but did impose a "content-based burden on adults' access to speech." *Id.* Though content-based, the burden was "only incidental to the statute's regulation of activity that is not protected by the First Amendment," so the Court applied intermediate scrutiny. *Id.* at 2309.

Finally, for restrictions on non-expressive conduct that impose an incidental, non-content-based burden on speech, rational-basis review applies. Nearly every restriction of conduct imposes *some* incidental speech burden. "Ordinary speed limits might increase the time it takes speakers to travel in between venues." *Lichtenstein*, 83 F.4th at 587.

Building-occupation limits cap a speaker's audience size. Tenn. Code Ann. §68-120-101. Sales tax makes it costlier to buy and sell books. Neither this Court, nor the Supreme Court, has ever "applied exacting free-speech scrutiny to laws that bar conduct based on the harm that the conduct causes apart from the message it conveys"—even when a "ban on conduct imposes incidental burdens on speech." *Lichtenstein*, 83 F.4th at 583 (quotations omitted). Rather, the Court has been clear that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *NIFLA v. Becerra*, 585 U.S. 755, 769 (2018) (quotations omitted). So States are free to impose rational "economic regulations without creating constitutional problems"—lest the courts *Lochner*-ize commercial regulation through the First Amendment. *Arcara v. Cloud Books*, 478 U.S. 697, 704 (1986) (quotation omitted); *see also McLemore v. Gumucio*, 2025 WL 2319119, at *3 (6th Cir. Aug. 12, 2025).

Here, the Act's age-verification and parental-consent requirements regulate non-expressive conduct. Age verification is an "activity that is not protected by the First Amendment." *Paxton*, 145 S.Ct. at 2309. And the parental-consent requirement likewise dictates what social-media

37

companies must "*do*" rather than "what they may or may not *say*." *FAIR*, 547 U.S. at 60. Tennessee's law does not restrict any social-media companies' "oral" or "written expression." *Lichtenstein*, 83 F.4th at 582. Nor has NetChoice argued that the act of creating an account for a minor is somehow expressive. So the real questions here are whether the Act incidentally burdens the free-speech rights of social-media platforms at all, and whether that burden is content-based.

**i.** The Act's regulation of non-expressive conduct imposes *no* burden on *social-media platforms'* speech rights—let alone a content-based one. The age-verification and parental-consent requirements do not interfere with any platform's expressive judgment or "protected editorial discretion." *Moody*, 603 U.S. at 725. Nor do they dictate what speech a platform must host. *Id.* at 728.

Rather than claim its members are speaking, NetChoice argues its members serve a "speech-facilitating function[]" and thereby enjoy the "right to disseminate user-generated speech" to kids. NetChoice Br. 7, 43 (citing *Moody*, 603 U.S. at 719). That's like a saloon claiming it has a First Amendment interest in admitting minors because patrons sometimes "discuss their religious or political views" while drinking beers.

38

NetChoice Br. 53; *but see Indigo Room v. City of Fort Myers*, 710 F.3d 1294, 1299-1300 (11th Cir. 2013). Unsurprisingly, the Supreme Court rejects that argument. Merely "hosting third-party speech" doesn't confer First Amendment protection unless the host is "itself engaged in expression." *Moody*, 603 U.S. at 731; *see FAIR*, 547 U.S. at 64.

Contra NetChoice's suggestion (at 50-51), nothing in §5703(a) prevents platforms from disseminating speech. It only limits their ability to *contract* with minors—i.e., to trap minors in "account holder" agreements without their parents' consent. Tenn. Code Ann. §47-18-5703(a)(2)(A).[4] Social-media companies can (and often do) allow non-account holders to access their platforms. And nothing prevents these companies from disseminating their speech—all of it—to anyone. While these companies might prefer to disseminate their speech to users under contract, the First Amendment doesn't "guarantee" them their preferred, or "ideal[,]" conditions for doing so." *Clementine Co. v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (quotations omitted); *accord Roberts v. U.S. Jaycees*, 468 U.S.

---

[4] For example, X's terms of service allow account creation "only if you agree to form a binding contract with [X] and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services." X Terms, R.30-34, at 715.

609, 634 (1984) (O'Connor, J., concurring) (noting that the First Amendment doesn't guarantee businesses "a right to choose" their "customers … without restraint from the State").  Tennessee's law allows access to social-media websites; it regulates only the creation of accounts with minors.

Social-media companies have no First Amendment right to contract with minors (let alone without their parents' consent).  "Children, by definition, are not assumed to have the capacity to take care of themselves." *Schall v. Martin*, 467 U.S. 253, 265 (1984).  The founding-era "infancy doctrine" reflects this judgment.  *McCoy v. BATFE*, 140 F.4th 568, 575 (4th Cir. 2025).  That doctrine made it "almost *impossible* for children to form *any* contracts." *NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (en banc) (quotation omitted).  To this day, States restrict minor's ability to contract.  Restatement (Second) of Contracts §14 (1981).

Restrictions on contracting with minors have "coexisted with the First Amendment" throughout this nation's history without posing "constitutional concern." *Vidal v. Elster*, 602 U.S. 286, 295-96 (2024).  That "history and tradition establish[es]" that the Act "does not violate the First Amendment." *McLemore*, 2025 WL 2319119, at *6 (Bush J.,

concurring) (quoting *Vidal*, 602 U.S. at 310); *accord Paxton*, 145 S.Ct. at 2303 (looking to "[h]istory, tradition, and precedent"). At minimum, NetChoice's push to break from this tradition confirms that it "seek[s] to extend the constitutional guarantees to new territory," making a preliminary injunction inappropriate. *L.W.*, 83 F.4th at 471.

**ii.** Even assuming that Tennessee's law imposes some incidental burden on social-media companies' speech, the burden is not content-based. NetChoice claims (at 63-66) that the law applies "a content-based 'social media company' coverage definition" and imposes impermissible "speaker-based" restrictions. That's wrong.

The Act's definition of "social media company" is content-neutral because it doesn't turn on any "topic discussed" or "idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 73-74 (2022) (quotations omitted). As defined by the Act, a "social media company" is an "interactive computer service" that "provides a social media platform." Tenn. Code Ann. §47-18-5702(8). "Social media platform," in turn, is defined as a "website or internet application" that "[e]nables

an account holder to communicate with other account holders and users through posts." *Id.* §5702(9)(A).[5]

That definition of social-media platform is "agnostic as to content." *Austin*, 596 U.S. at 69. There's no need to "evaluate the topic or message of any speech to determine" whether the Act applies. *Zillow v. Miller*, 126 F.4th 445, 460 (6th Cir. 2025). The focus is on "the manner in which speakers transmit their messages to viewers, and not upon the messages they carry." *Turner*, 512 U.S. at 645. NetChoice itself proves this point. A minor, it says (at 67), can view articles about a "politician's posts" on CNN.com, but "cannot access those same posts on X." That just confirms the Act isn't focused on content, but on "the manner in which" that content is "transmit[ted]." *Turner*, 512 U.S. at 645. Indeed, the hypothetical minor accesses the "exact same speech"; the "only meaningful difference" is the "location." *Zillow*, 126 F.4th at 460.

The Act's so-called "exclusions" change nothing. NetChoice Br. 64-66. Many aren't exclusions at all; they just fall outside the definition of

---

[5] Texas's law in *Moody* defined "social media platform" similarly. 603 U.S. at 721 & n.2. If NetChoice were right that this definition makes "all of the Act's regulations" content-based and subject to strict scrutiny, NetChoice Br. 63, then why didn't the Supreme Court embrace NetChoice's facial challenge?

a social-media platform. And for any true carveout, there's no constitutional problem. True, "an exception can render a statute content-based to the extent it requires consideration of the topic or subject matter of the speech." *Zillow*, 126 F.4th at 462. But the exclusions here require no such consideration. Take the provider-generated-content exclusion in §47-18-5702(9)(B)(iii)(a). That exclusion does not turn on *what* the provider-generated content is; it turns on how the website "function[s]." *Austin*, 596 U.S. at 74. The same goes for the other exclusions: Broadband and email services, online shopping, career-development sites, cloud storage, tech support, and peer-to-peer payment platforms. These platforms differ from Facebook, YouTube, or X in "the manner in which" they "transmit" content, *Turner*, 512 U.S. at 645, not "the topic or subject matter of the speech," *Zillow*, 126 F.4th at 462. Put otherwise, social-media companies "cannot avoid or mitigate the effects of the Act by altering their speech," *TikTok v. Garland*, 604 U.S. 56, 71 (2025) (quotations omitted); they would have to alter *how* they transmit the speech.

NetChoice's speaker-discrimination argument (at 66-67) fails for similar reasons. Speaker distinctions do not "demand strict scrutiny" unless "they reflect the Government's preference for[,] … or aversion to[,]"

43

what "speakers have to say." *Turner*, 512 U.S. at 658. But NetChoice hasn't shown that the Act's speaker-based distinctions (if any) "embed[] any content preference." *Zillow*, 126 F.4th at 462.

**iii.** Finally, even if the age-verification and parental-consent requirements impose a content-based incidental burden, that still calls for only intermediate scrutiny. *Paxton* dictates as much. There, the State's age-verification requirement had "an incidental effect on protected speech" and imposed a "content-based burden on adults' access to speech." *Paxton*, 145 S.Ct. at 2306, 2311. But because that "incidental burden" stemmed from a permissible regulation of something the First Amendment does not protect (non-expressive conduct), intermediate scrutiny applied. *Id.* The same goes here.

Even before *Paxton*, the Court's secondary-effects doctrine would have called for intermediate scrutiny. Under that doctrine, "the government [can] accord differential treatment to a content-defined subclass of speech [if] that subclass [i]s associated with specific 'secondary effects' of the speech." *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020). The Act addresses several well-recognized secondary effects. The prevention of "sexual assault" qualifies. *Barnes v. Glen Theatre*, 501 U.S. 560, 583

(1991) (Souter, J., concurring in judgment); *see Triplett Grille v. Akron*, 40 F.3d 129, 134 (6th Cir. 1994) (noting Justice Souter's *Barnes* concurrence controls). As does the protection of children, *City of Renton v. Playtime Theatres*, 475 U.S. 41, 51 (1986), and the prevention of detrimental health effects, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296 (2000). That the Act targets and curbs secondary effects provides more support for applying nothing more than intermediate scrutiny.

**b.** ***The Act passes constitutional review.*** The Act satisfies intermediate scrutiny. A statute survives intermediate scrutiny when it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Paxton*, 145 S.Ct. at 2317 (quotations omitted). The statute "need not be the least restrictive ... means of" serving the State's interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Nor does its validity "'turn on [the Court's] agreement with the [legislature] concerning the most appropriate method for promoting [those] interests.'" *Id*. at 800 (cleaned up). The Act "readily satisfies" this standard. *Paxton*, 145 S.Ct. at 2317.

First, the Act "undoubtedly advances important governmental interests unrelated to the suppression of free speech." *Id.* (quotations omitted). Tennessee has a longstanding—and historically supported—interest in "preserving and promoting the welfare" of children, *Schall*, 467 U.S. at 263 (quotation omitted), by protecting them from being taken advantage of through contracts, *McCoy*, 140 F.4th at 577. It also has an undisputed interest in safeguarding children's "physical and psychological well-being." *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989). Everyone agrees that child predators frequent social media. *Supra* 8-9. And the evidence of devastating health effects on children continues to grow—as do the number of suicides. *Supra* 7. While NetChoice half-heartedly disputes the extent of these effects on children, NetChoice Br. 69, States enjoy "wide discretion to pass legislation in areas where there is medical and scientific uncertainty"—even in heightened-review cases. *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

NetChoice's attempts to undercut these interests fall flat. NetChoice claims that, even if these are "permissible government interest[s]," the Act does not "further" them because it "does not account for the difficulty of verifying a parent-child relationship to process parental

consent"—pointing to nontraditional families, surname issues, etc. NetChoice Br. 55. But ordinarily, it's not hard. Janssen Decl., R.31, 869. Children need parental consent to get a library card, *e.g.*, Library of Congress*, Get Your Library Card*, perma.cc/FM77-DJBY, or a body piercing, Tenn. Code Ann. §62-38-305. Practical solutions to atypical situations can and do exist, Janssen Decl., R.31, 869, and challenges to the application of a law in those situations are better left for future as-applied claims, *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 340-41 (6th Cir. 2009) (en banc); *see Moody*, 603 U.S. at 795-96 (Alito, J., concurring). Outlier scenarios do not mean that the law fails to further its stated purpose.

NetChoice also claims that the State "does not have a compelling interest" because "parents already have many options to oversee their children online" and the "government does not have a compelling interest in each marginal percentage point by which its goals are advanced." NetChoice Br. 55-57. That argument ignores the State's interest in regulating contracting with minors. *Supra* 40, 46. And it grossly downplays the State's interest in protecting kids from predators and other devastating harms. The nation has tried alternative "options" for years. Social media is still fostering child exploitation and worse. States need not

47

accept the failed status quo.  NetChoice's flippant assertion (at 54) that "the State cannot establish a sufficient government interest" grossly downplays the harms being suffered by young people.

Second, the Act doesn't "burden substantially more speech than necessary to further [the State's] interests." *Paxton*, 145 S.Ct. at 2317 (quotations omitted).  The State proffered multiple interests.  And so long as the Act is sufficiently tailored for *any one of them*, it survives review. *Satellite Broad. & Comm'ns Ass'n v. FCC*, 275 F.3d 337, 356, 366 (4th Cir. 2001).  Here, the Act is justified on multiple, independent grounds.

Start with the State's interest in protecting children in contracting. As discussed above (at 40), American law has always recognized that minors "lack[] the judgment and discretion to enter contracts." *Bondi*, 133 F.4th at 1118.  And while social-media companies attempt to ensnare children in ever-longer and more complex user agreements, Tennessee's law relies on precisely the same sort of "parent[al] consent" that has always served as the first line of defense in protecting kids from being exploited.  *Id.*

NetChoice claims "it makes no sense to require parental consent only for *new* account holders while [exempting] minors who are *existing*

account holders." NetChoice Br. 58-59. But it makes perfect sense to avoid the negation of existing contracts and the concomitant challenges of implementing that change. What "makes no sense," NetChoice Br. 58, is NetChoice's suggestion that the State "burden[ed] substantially more speech than necessary" by burdening *less* "speech." *Paxton*, 145 S.Ct. at 2317. In any event, a "State need not address all aspects of a problem in one fell swoop." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015).

Nor can NetChoice show that the Act "burden[s] substantially more speech than necessary to further" the State's interest in protecting children from child predators. *Paxton*, 145 S.Ct. at 2317 (quotations omitted). Parental consent facilitates proactive "parental awareness and involvement with children's use of social media," which is key to stopping many risky interactions. LEO Decl., R.27, 216. That awareness—paired with the Act's parental-supervision provision—also prompts parents to make safety-promoting adjustments to the child's settings, such as limiting who can view the child's profile or send them a message. *Id.*; *see Instagram Teen Accounts*, perma.cc/P6UJ-MA8V. And most importantly, these controls are easier for parents to use and harder for kids to circumvent. Allen Decl., R.29, 282-83; Kaliebe Decl, R.28, 255-57. Surely if the

First Amendment allows the State to incidentally burden speech to protect kids from adult movies, *Renton*, 475 U.S. at 52, it allows the State to protect kids from online predators.

Third, and finally, Tennessee has an "interest in protecting minors' mental health." *NetChoice v. Bonta*, 2025 WL 2600007, at *9 (9th Cir. Sept. 9, 2025). Through its focus on account creation, the Act specifically targets social media's most addictive and destructive characteristics. Kaliebe Decl., R.28, 252; Surgeon General Report, R.30-14, 454. And the Act's definitions support this narrow focus by governing platforms with these uniquely addictive features without regulating the content they contain. *Supra* 41-43.

NetChoice claims the law is ill-tailored for not being *broad* enough. But while NetChoice insists (at 70) that Tennessee's *exclusion* of LinkedIn renders the Act *underinclusive*, it elsewhere cited Ohio's *inclusion* of LinkedIn as a reason why its law was *overinclusive*. PI Rep. Br., *NetChoice v. Yost*, No. 2:24-cv-00047, Dkt. 29, at 16 (S.D. Ohio 2025). It is wrong in both cases. Setting aside the fact that there is no epidemic of teenagers addicted to LinkedIn, Tennessee need not solve everything that endangers kids in one fell swoop. *Williams-Yulee*, 575 U.S. at 449.

The Act "leave[s] open ample alternative channels for communication." *Lexington H-L Servs. v. Lexington-Fayette Urb. Cnty. Gov't*, 879 F.3d 224, 228 (6th Cir. 2018). Everyone—minors and adults—remains free to express or access any message they desire and may even use social-media platforms to do so if the platforms allow access without account creation. The government "can satisfy the requirement that alternative channels of communication remain open … even if those channels" aren't the ones the plaintiff "would prefer." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1319 (11th Cir. 2000) (quotations omitted); *Lexington*, 879 F.3d at 234 (similar).

The Act also mitigates any burden by leaving ample avenues for compliance. It doesn't require any specific age-verification or parental-consent method. And as the record reflects, age-verification and parental-consent tools are easy to find and implement. Allen Decl., R.29, 276-80, 284-85. After all, federal law and many European countries now require age verification, and enterprising developers have responded with inexpensive tools that protect users' privacy. *Id.* at 279-80.

The bottom line: The Act's age-verification and parental-consent provisions survive constitutional review.

**c.** ***No Facial Invalidity***.  Even assuming some unconstitutional applications of §5703(a)(1)-(2) exist, NetChoice nowhere demonstrated, "from the text of the law and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up).

To succeed on its facial challenge, NetChoice must show that the "law's unconstitutional applications *substantially outweigh* its constitutional ones." *Moody*, 603 U.S. at 724 (emphasis added).  In conducting that analysis, "neither parties nor courts can disregard the requisite inquiry into how a law works in *all of its applications*." *Id.* at 744 (emphasis added).  NetChoice fails to perform that "daunting, if not impossible, task." *Id.* at 745 (Barrett, J., concurring).

NetChoice commits the same error that frustrated its lower-court win in *Moody*:  It "focuse[s]" on certain "applications" while "disregard[ing] the requisite inquiry into how [the Act] works in all of its applications." *Id.* at 744; *accord Bonta*, 2025 WL 2600007, at *12-14.  Nowhere does NetChoice "carefully parse … how the regulated activities *actually function*," *Moody*, 603 U.S. at 749 (Jackson, J., concurring), or conduct the "fact intensive" inquiry into how each platform operates, *id.* at 747 (Barrett, J., concurring).  NetChoice doesn't even establish that its own

members engage in "protected editorial discretion," *id.* at 725-726[6]—let alone "evaluate the full scope of the law's coverage" and "weigh" the constitutional applications against the unconstitutional ones, *id.* at 744; *see also Bonta*, 2025 WL 2600007, at *13-14.

Beyond that, NetChoice ignores a litany of obviously lawful applications of the age-verification and parental-consent provisions.  For example, social-media companies owned or controlled by foreigners who have no First Amendment rights—like NetChoice's former member, Tik-Tok, *Moody*, 603 U.S. at 747 (Barrett, J., concurring); social-media platforms that host users' pornographic content without verifying users' age—like Sharesome and ManyVids; and users who do not use social media for protected expression—like adults engaging in speech incident to crime, *United States v. Hansen*, 599 U.S. 762, 783 (2023).  Not to mention, NetChoice conceded below that the Act is constitutional for minors under

---

[6] That question cannot be assumed away.  One member, Dreamwidth, "do[es] not offer any algorithmic sorting or display of user timelines that adjusts the display of content based on a prediction that a particular user will be more or less interested in a particular piece of content."  Paolucci Decl., R.8-4, 86.  Dreamwidth thus acts as a "passive receptacle of third-party speech" and does not engage in protected editorial expression itself.  *Moody*, 603 U.S. at 782 (Alito, J., concurring in the judgment) (cleaned up).

the age of 13, *see* P.I. Reply, R.35, 1793 n.10—a concession supported by the absence of challenges to COPPA, 15 U.S.C. §6502.

Put simply, NetChoice fails to conduct the requisite inquiry into "how [the Act] works in all of its applications." *Moody*, 603 U.S. at 744. And it fails to show the Act's "unconstitutional applications *substantially outweigh* its constitutional ones." *Id.* at 724 (emphasis added). Those failures are "fatal" to NetChoice's facial challenge. *Bonta*, 2025 WL 2600007, at *12.

### 2.    Future social-media users.

NetChoice's attempt to assert the rights of future users, none of whom are members of NetChoice, likewise fails—on standing and the merits.

**a. *Standing*.** NetChoice lacks standing to assert the rights of its members' "users." *E.g.*, NetChoice Br. 42-44. The first problem is that NetChoice isn't asserting the rights of "users." The age-verification and parental-consent provisions are prospective: Because the Act governs accounts "created on or after January 1, 2025," its provisions do not affect individuals who already had accounts before 2025. Tenn. Code Ann. §47-18-5702(1). So NetChoice is really asserting the constitutional rights of

*non*-users who might later become users. NetChoice thinks its members can use third-party standing to assert the rights of these future users, and then NetChoice can use associational standing to assert the rights of its members asserting the rights of these third parties.

But NetChoice cannot "double stack[]" exceptions to the rule that parties must assert their own rights. *AAPS v. FDA*, 13 F.4th 531, 547 (6th Cir. 2021) (cleaned up). Stacking associational standing on third-party standing would let the rights of third parties be asserted by private associations who have "no injury of their own," something the law forbids. *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013). NetChoice cites no "history" for what is essentially *fourth*-party standing. *Fox v. Saginaw Cnty.*, 67 F.4th 284, 298 (6th Cir. 2023). And the text of §1983, NetChoice's only cause of action, limits the cause of action to "the party injured." 42 U.S.C. §1983. While traditional associational standing arguably gets around this problem (because the injured party is present as a member of the association), allowing associations to sue on behalf of *non*-members recreates it. At a minimum, this Court has never approved double stacking,

*AAPS*, 13 F.4th at 547, so NetChoice can't make the "clear showing" needed for a preliminary injunction, *L.W.*, 83 F.4th at 471.[7]

Second, even conflating NetChoice with its members, the platforms lack third-party standing to represent future users. Third-party standing is rare and not available in the "ordinary course." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). Asserting a third-party's rights requires "two additional showings" beyond the ordinary three-part standing test: (1) a "'close' relationship with the person who possesses the right," and (2) a demonstration that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers*, 499 U.S. at 411).

Here, no "hindrance" prevents a platform's adult users from asserting their own rights. *Id.* The Act doesn't "punish[]" any user conduct,

---

[7] This double stacking was not presented in *Virginia v. American Booksellers Association*, since the plaintiffs there included individual "Virginia bookstores." 484 U.S. 383, 389 n.3 (1988). Nor was it presented in *Brown*, where the associations asserted the rights of their actual members. 564 U.S. at 789-90. Nor was it presented in *Paxton,* where the coalition asserted the rights of its actual members. *Free Speech Coal. v. Colmenero*, 689 F.Supp.3d 373, 382-83, 385-87 (W.D. Tex. 2023). And regardless, "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

*Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984), and individuals who want access to social media can, and often do, sue on their own, *e.g.*, *Alario v. Knudsen*, 704 F.Supp.3d 1061 (D. Mont. 2023); *Lindke v. Freed*, 601 U.S. 187 (2024). Nor do social-media platforms have a "close relationship" with users. *Kowalski*, 543 U.S. at 130. No platform can have a *close* relationship with millions. And there's "no relationship at all" with prospective users, who aren't even users yet. *Id.* at 131. These platforms, whose goal is to maximize profits, also have "conflicts" of interest that "strongly counsel against third party standing." *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991); *see Harris v. Evans*, 20 F.3d 1118, 1124 & n.10, 1123 & n.7 (11th Cir. 1994) (en banc). Far from aligned with Tennesseans, NetChoice's biggest members have been sued by Tennessee. *Tennessee v. Meta Platforms*, No. 23-1364-IV (Tenn. Ch. Davidson Cnty.).

NetChoice cannot get around these problems by invoking First Amendment overbreadth. Any relaxation of the standing rules for over-breadth claims doesn't apply to the requirements "mandated by Article III itself, such as the injury-in-fact requirement." *Phillips v. DeWine*, 841 F.3d 405, 417 (6th Cir. 2016). And even for prudential limitations,

overbreadth does not relax the rule that conflicts of interest defeat third-party standing. *See Munson*, 467 U.S. at 956.

NetChoice's novel theory of fourth-party injury also dooms their ability to evade General Skrmetti's sovereign immunity.[8] True, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a "narrow exception" to sovereign immunity "grounded in traditional equity practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). But the equitable forbearer of *Ex parte Young*, the "antisuit injunction," only acted *in personam*. *Trump v. CASA*, 606 U.S. 831, 847 n.9 (2025). NetChoice has certainly not made a "clear showing" that *Ex parte Young* allows antisuit injunctions issued to mystery fourth parties. *L.W.*, 83 F.4th at 471.

**b. *No likelihood of success*.** Setting aside standing, NetChoice makes no clear likelihood-of-success showing—for adults or minors.

For adults, the merits analysis mirrors *Paxton*. "[A]dults have no First Amendment right to avoid age verification." *Paxton*, 145 S.Ct. at 2309. "Any burden experienced by adults is therefore only incidental to

---

[8] "[A] sovereign-immunity defense may be asserted for the first time on appeal." *WCI v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 514 n.3 (6th Cir. 2021) (quotations omitted).

58

the statute's regulation of activity that is not protected by the First Amendment." *Id.* That means intermediate scrutiny applies. *Id.* And the Act satisfies intermediate scrutiny. *See supra* 45-51. That's unsurprising. If an adult can be required to confirm their age on pornography websites (where the desire for anonymity is at its zenith), then surely an adult can be required to confirm their age on social media.

For minors, the Act implicates no free-speech right. The Act restricts minors' ability *to contract* with social-media companies; it doesn't "restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Again, nothing stops social-media companies from disseminating their content—all of it—to minors. *Supra* 39-40. They'd just prefer to distribute it to minors only after they've created an account—i.e., entered a contract that forfeits their privacy rights, data, and more. Tennessee's law doesn't become unconstitutional because *the platforms* place restrictions on users without accounts.

NetChoice's brief highlights the point. NetChoice claims that "the Act would require minors to secure parental consent to watch documentaries on YouTube." NetChoice Br. 57. That's absolutely false. Nothing in §5703(a)(1)-(2) prohibits minors from accessing documentaries on

YouTube. And many documentaries on YouTube can, in fact, be viewed without an account. To the extent YouTube limits other documentaries to users with accounts, that's a *private* restriction on access—not a state restriction.

That makes this case very different from *Brown*. In *Brown*, the State sought to wield "a free-floating power to restrict the ideas to which children may be exposed." 564 U.S. at 794. That's not what's happening here. The Act imposes no restriction on the content to which kids may be exposed. Nor is Tennessee seeking to "create[ a] new categor[y] of unprotected speech." *Id.* at 792. It is regulating companies' ability to contract with minors—a restriction that, unlike in *Brown*, has "a longstanding tradition in this country." *Id.* at 795; *see supra* 40.

To the extent any user's speech is burdened by the Act, that burden is incidental to the conduct-based regulation of contracting with children. NetChoice equates (at 50-53) a *Brown*-style ban on speech with a conduct-based regulation that incidentally burdens speech. The difference between a ban and a burden may not matter for the *direct* regulation of speech. But *Paxton* and *O'Brien* make clear that the difference matters when conduct-based regulations cause incidental burdens. *Paxton*, 145

60

S.Ct. at 2315-16; *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  As

discussed, nearly every law incidentally burdens speech somehow.  To

subject *all of them* to strict scrutiny would explode the traditional limits

of the First Amendment and swallow the State's police power whole.

So if the Act did implicate minors' free-speech rights, it would face

intermediate scrutiny at most.  And the Act easily satisfies intermediate

scrutiny.  *Supra* 45-54.  NetChoice also comes nowhere close to analyzing

"how [the] law works in all of its applications," or showing that "the law's

unconstitutional applications substantially outweigh its constitutional

ones."  *Moody*, 603 U.S. at 724, 744.

## B.    Parental supervision (§5704)

NetChoice develops no argument against the parental-supervision

provision, referring to it only *once* in its nearly-50-page argument section.

That "perfunctory" treatment means NetChoice has forfeited any chal-

lenge to this provision.  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th

Cir. 2013).  Forfeiture aside, this Court is in no position to address—

much less enjoin—this provision.  In nearly every way, this provision de-

mands a different analysis.

The standing analysis differs.  Standing is provision-specific, *Prime Media v. Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007), but NetChoice makes no provision-specific showing.  It claims (at 15) that the parental-supervision provision injures its members because it will be too "costly to implement."  But it offers no proof tying costs to *the parental-supervision* provision.  Worse, it concedes that "many" members already employ the same or similar "parental controls."  NetChoice Br. 9; *see* Cleland Decl., R.8-2, 62-66.  That concession complicates NetChoice's costs claim—and creates traceability problems to boot—requiring detailed evidence that NetChoice has never submitted.  *Buchholz v. Meyer Njus Tanick*, 946 F.3d 855, 866 (6th Cir. 2020).

The merits differ too.  While NetChoice describes the parental-supervision provision as a "speech regulation[]," NetChoice Br. 14-15, it never explains how parental-supervision tools limit *its members'* speech, or even regulate the speech of *adult* users.  It claims no First Amendment right to hide "privacy settings," and even if it did, disclosure requirements receive "deferential review."  *NIFLA*, 585 U.S. at 768.  Nor does NetChoice claim that its members or their users have a right to override parent-imposed "time restrictions" or "breaks."  Tenn. Code Ann. §47-18-

5704.  Rightly so, since "these provisions likely primarily regulate con-

duct."  *CCIA v. Paxton*, 747 F.Supp.3d 1011, 1035-36 (W.D. Tex. 2024).

And importantly for the parental-supervision provision, "[t]he State has

the power to *enforce* parental prohibitions," *Brown*, 564 U.S. at 795 n.3—

meaning that even under *Brown*, no child has a right to access social me-

dia against their parents' wishes.

The merits complications don't end there.  NetChoice suggests that

this provision demands heightened review, pointing to the Act's defini-

tion of social media and arguing that it's content based.  Again, that's

wrong.  *Supra* 41-44.  Whatever the standard, though, §5704's unique

requirements would require a separate analysis.  And NetChoice's blink-

and-you'll-miss-it reference to the parental-supervision provision comes

nowhere close to "canvass[ing] the full range of activities covered by the

law."  *Bonta*, 2025 WL 2600007, at *12 (cleaned up).

## III.  The Court Should Not Grant NetChoice Relief—And Certainly Not the Overbroad Relief Requested.

Even if this Court disagrees on irreparable harm and the merits, it

should reject NetChoice's invitation (at 73) to "direct[] the district court

to preliminarily enjoin" the Act.

## A.    The district court should balance the relevant injunction factors in the first instance.

This Court usually acts as "a court of review, not first view." *Taylor v. City of Saginaw*, 11 F.4th 483, 489 (6th Cir. 2021).  So the Court typically declines to "consider" issues that were not "passed on below," *St. Marys Foundry v. Emps. Ins.*, 332 F.3d 989, 995 (6th Cir. 2003), and instead "permit[s] the district court to [analyze and] balance the relevant injunction factors … in the first instance," *Nessel*, 117 F.4th at 857 (quotation omitted); *see Speech First v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019).

Whether to grant a preliminary injunction "rests within the equitable discretion of the district courts." *eBay v. MercExchange*, 547 U.S. 388, 394 (2006).  Even when "irreparable injury may otherwise result to the plaintiff," *Yakus v. United States*, 321 U.S. 414, 440 (1944), an "equitable remedy is never automatic: it always involves a district court's sound discretion," *Del. State*, 108 F.4th at 197.  When "the "plaintiff's alleged injury does not threaten to moot the case," "withhold[ing] th[at] extraordinary remedy ... is often, perhaps usually, the wiser course." *Id.* at 201.

64

## B. The remaining preliminary-injunction factors weigh in the State's favor.

If this Court chooses to act as a court of first view, equity cuts against preliminary relief. The balance-of-the-equities and public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). They weigh strongly against relief here. On the one hand, there are the theoretical First Amendment harms and unproven compliance costs for multi-billion-dollar corporations. On the other, there are permanent, lifelong impacts that jeopardize the "physical and psychological well-being" of a generation of Tennessee children. *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (quotations omitted). That balance isn't particularly close.

Social-media platforms "pose grave risks to children." *M.H. ex rel. C.H. v. Omegle.com*, 122 F.4th 1266, 1268 (11th Cir. 2024) (per curiam). Social media is destroying kids' developing brains—causing shortened attention spans, Kaliebe Decl., R.28, 228, worse academic performance, *id.*, lower quality sleep, *id.* at 238, increased depression, *id.* at 236-37, "drastic increase[s] in mental illness," *id.* at 236, and even self-harm and suicide, *id.* at 237. Study after study has confirmed that the link between

social media and these adverse mental-health outcomes is *causal*. *Id*. at 253-54.

Not only that, but these platforms provide child predators direct access to vulnerable children. That's not speculation; it's a fact. *E.g.*, *id*. at 241; Surgeon General Report, R.30-14, 457; LEO Decl., R.27, 213-16; FBI Public Service Announcement, R.30-6, 391.

It is always "in the public interest" to enforce a State's democratically enacted laws. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). And Tennessee's interest in "protect[ing] [its] children" from these "health risks weigh heavily in favor of the State[] at this juncture." *L.W.*, 83 F.4th at 491. To protect "federalism and the separation of powers," courts should "err on the side of respecting state sovereignty." *Del. State*, 108 F.4th at 205-06. The Court should deny preliminary relief on equitable grounds. *Fitch*, 145 S.Ct. at 2658 (Kavanaugh, J., concurring).

### C.    Any injunctive relief must be carefully tailored.

Finally, even if relief were warranted, the task of crafting relief within constitutional and statutory limits should remain with the district court "in the first instance." *CASA*, 606 U.S. at 854; *Speech First*, 939 F.3d at 770.

In an ordinary case involving multiple plaintiffs, that task would entail a careful analysis of each "plaintiff[] before the court." *CASA*, 606 U.S. at 852; *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). But here, where NetChoice sued on behalf of select members representing "many different facets" of the social-media landscape presenting a "diversity of circumstances," *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 422 (3d Cir. 2020), that task demands even more. That's to say nothing of whether, post *CASA*, relief could properly extend to NetChoice's members' *users*— a separate, complicated question that depends on the dubious "double stacking of ... standing exceptions." *AAPS*, 13 F.4th at 547 (cleaned up).

Nor do the complications end there. The Court would also need to tailor the injunction to cover only "the unconstitutional applications of the law while preserving the other valid applications." *Connection*, 557 F.3d at 342. And it would have to conduct a severability analysis. Tenn. Code Ann. §1-3-110. The State has strong arguments that, here, the legislature would have preferred severing any unconstitutional parts of the Act to "protec[t]" more children, Tenn. Code Ann. §47-18-5701, rather than leaving all children unprotected, *see Barr v. AAPC*, 591 U.S. 610, 632 (2020) (severing exceptions to expand scope of statute).

These questions should be dealt with by the district court on re-mand, with full briefing.

## CONCLUSION

This Court should affirm.

Dated: October 3, 2025

Thomas McCarthy
Cameron T. Norris
Tiffany H. Bates
Nicholas B. Venable
CONSOVOY MCCARTHY, PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

Adam K. Mortara
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/ J. Matthew Rice*
J. Matthew Rice
  *Solicitor General*

Harrison Gray Kilgore
  *Senior Assistant Attorney General*

Matthew D. Cloutier
  *Assistant Solicitor General*

Walker Anderson
  *Honors Fellow, Office of the Solicitor General*

OFFICE OF THE TENNESSEE ATTORNEY
GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
Matt.Rice@ag.tn.gov
(615) 532-6026
*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 12,991 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/ J. Matthew Rice*
J. Matthew Rice

# CERTIFICATE OF SERVICE

On October 3, 2025, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/J. Matthew Rice*
J. Matthew Rice

# Addendum

## DESIGNATION OF RELEVANT DOCUMENTS

The following record documents are relevant to this appeal:

| Document | R. | PageID# |
|---|---|---|
| Case No. 3:24-cv-01191 Complaint [Compl.] | 1 | 1-32 |
| NetChoice Motion for Preliminary Injunction | 8 | 51-52 |
| NetChoice Memorandum in Support of Motion for Preliminary Injunction | 9 | 100-130 |
| Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction | 26 | 177-210 |
| Declaration of Tennessee Law Enforcement Officers | 27 | 211-18 |
| Declaration of Kristopher E. Kaliebe, M.D. | 28 | 219-70 |
| Declaration of Tony Allen | 29 | 271-332 |
| Declaration of Thomas S. Vaseliou | 30 | 333-40 |
| FBI Public Service Announcement | 30-6 | 390-96 |
| Surgeon General Report | 30-14 | 448-473 |
| Haidt Excerpt | 30-15 | 474-509 |
| Post Article | 30-25 | 601-04 |
| X Terms of Service | 30-34 | 712-31 |
| NextDoor Member Agreement | 30-37 | 787-98 |
| Dreamwidth Terms of Service | 30-38 | 799-804 |
| NetChoice Veto Request | 30-40 | 827-33 |
| Declaration of Matthew D. Janssen | 31 | 866-77 |
| NetChoice's Reply in Support of Motion for Preliminary Injunction | 35 | 1776-97 |
| Defendant's Response to Plaintiff's Motion to Ascertain Status | 43 | 1855-57 |

| | | |
|---|---|---|
| Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order | 54 | 1960-74 |
| Memorandum Opinion | 78 | 2337-64 |
| Order Denying Preliminary Injunction | 79 | 2365 |
| Notice of Appeal | 83 | 2402-04 |