No. 25-5660

# In the United States Court of Appeals for the Sixth Circuit

―――――

NetChoice, LLC,

*Plaintiff-Appellant*,

v.

Jonathan Skrmetti,

*Defendant-Appellee.*

―――――

On Appeal from the United States District Court
for the Middle District of Tennessee, No. 3:24-cv-01191

―――――

## REPLY BRIEF OF APPELLANT NETCHOICE

―――――

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 693-8350

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Counsel for Plaintiff-Appellant NetChoice

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. ii

Introduction ........................................................................1

Argument ...........................................................................2

   I.   NetChoice has standing to raise the First Amendment rights and interests of both its regulated member websites and their users. ......................................................................2

  II.  The Act is currently imposing irreparable harm on NetChoice's members. .........................................................6

 III.  NetChoice is likely to succeed on the merits.......................14

     A.  The Act's age-verification and parental-consent requirements restrict accessing and disseminating protected speech, and thus do not regulate mere conduct. ...............................................................14

     B.  The Act's "social media company" coverage definition is content-based, which subjects the Act's speech regulations to strict scrutiny. ........................................22

     C.  The Act's speech restrictions fail heightened First Amendment scrutiny. ......................................................26

     D.  The Act's speech restrictions are both facially invalid and invalid as applied to the extent they regulate NetChoice's members. ......................................................30

  IV.  The remaining equitable factors support granting NetChoice a preliminary injunction. .......................................37

Conclusion.........................................................................39

Certificate of Compliance ...................................................40

Certificate of Service ..........................................................41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n,*
    389 F.3d 536 (6th Cir. 2004) ........................................................................2, 3

*Blick v. Ann Arbor Pub. Sch. Dist.,*
    105 F.4th 868 (6th Cir. 2024) ..........................................................................19

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................ 4, 15, 16, 21, 24, 26, 27, 28, 29, 31, 38

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ..................................................................................19, 20

*City of Austin v. Reagan Nat'l Advert. of Austin,*
    596 U.S. 61 (2022) ............................................................................................22

*City of L.A. v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ........................................................................................25

*City of L.A. v. Patel,*
    576 U.S. 409 (2015) ..................................................................................31, 35

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ........................................................................................17

*Commonwealth v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ............................................................................12

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    747 F. Supp. 3d 1011 (W.D. Tex. 2024) ..........................................................5

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
    2025 WL 1570007 (N.D. Fla. June 3, 2025) ........................................5, 14, 18

*Connection Distrib. Co. v. Reno*,
    154 F.3d 281 (6th Cir. 1998)................................................................10, 25, 38

*EOG Res., Inc. v. Lucky Land Mgmt., LLC*,
    134 F.4th 868 (6th Cir. 2025).........................................................................7, 11

*FEC v. Cruz*,
    596 U.S. 289 (2022).............................................................................................32

*Fischer v. Thomas*,
    78 F.4th 864 (6th Cir. 2023).............................................................................11

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025)................................................ 14, 16, 17, 18, 24, 25, 32, 33

*Indigo Room v. City of Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013).........................................................................17

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010).............................................................................................36

*Johnson v. Hopkins*,
    432 S.W.3d 840 (Tenn. 2013) ...........................................................................19

*Jones v. Caruso*,
    569 F.3d 258 (6th Cir. 2009).............................................................................13

*Keene Grp., Inc. v. City of Cincinnati*,
    998 F.3d 306 (6th Cir. 2021)...............................................................................3

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)...............................................................................................5

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965).............................................................................................35

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...............................................................................................2

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)..................................................................17, 29

*Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*,
    2025 WL 2599923 (6th Cir. Sept. 9, 2025) ......................................7, 8, 11, 12

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)................................................ 15, 21, 22, 23, 30, 31, 32, 36

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)..................................................................17

*Neighborhood Action Coal. v. City of Canton*,
    882 F.2d 1012 (6th Cir. 1989) ............................................................3

*NetChoice v. Carr*,
    2025 WL 1768621 (N.D. Ga. June 26, 2025)..............................5, 9, 14, 18, 20

*NetChoice, L.L.C. v. Fitch*,
    134 F.4th 799 (5th Cir. 2025)..............................................................5

*NetChoice, LLC v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025)..................................................10, 33

*NetChoice, LLC v. Fitch*,
    145 S.Ct. 2658 (2025)..............................................................15, 37

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ..............................5, 6, 15, 17

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025)..................................................14

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)..............................................14, 27, 28

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025)..............................................5, 14, 18, 34

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)........................................ 6, 15, 16, 21, 26, 27, 32, 33, 36, 38

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)...................................................................23, 24

*Reno v. ACLU,*
    521 U.S. 844 (1997)...........................................................................25

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.,*
    56 F.4th 400 (6th Cir. 2022)...............................................................10

*TikTok Inc. v. Garland,*
    604 U.S. 56 (2025)...............................................................18, 23, 34

*Trump v. Boyle,*
    145 S.Ct. 2653 (2025)........................................................................37

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
    517 U.S. 544 (1996)........................................... 3, 4, 16, 21, 29, 32, 33

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976)............................................................................3

*Van Buren v. United States,*
    593 U.S. 374 (2021)..........................................................................26

*Virginia v. Am. Booksellers Ass'n, Inc.,*
    484 U.S. 383 (1988)............................................................................5

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)..........................................................................28

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..............................................................................13

**Statutes**

15 U.S.C. §§ 6501-06 .................................................................35

Tenn. Code § 39-17-912.............................................................30

Tenn. Code § 47-18-108.............................................................7

Tenn. Code § 47-18-5702.................................................22, 23, 29, 33

Tenn. Code § 47-18-5703.............................................................19

**Other Authorities**

Appellee Br., *NetChoice, LLC v. Yost*,
    No. 25-3371 (6th Cir. Oct. 3, 2025) ....................................2, 3, 4, 18

## INTRODUCTION

Tennessee House Bill 1891 ("Act") restricts access to protected speech through parental-consent and age-verification requirements. Because the district court did not enjoin Defendant's enforcement of those unconstitutional requirements, two NetChoice members have stopped allowing Tennessee minors to create accounts on their websites. That alone demonstrates the irreparable harm the district court concluded was lacking. Defendant offers no persuasive reason that this Court should split with the decisions of seven federal district courts rejecting the arguments Defendant raises here. *See* NetChoice.Br.4-5.

This Court should reverse and direct the district court to preliminarily enjoin Defendant's enforcement of the Act against NetChoice's regulated members.

# ARGUMENT

## I. NetChoice has standing to raise the First Amendment rights and interests of both its regulated member websites and their users.

**A.** Defendant does not dispute NetChoice's associational standing to raise the rights of its regulated members. *See also* ECF 28, Appellee Br.20-22, *NetChoice, LLC v. Yost*, No. 25-3371 (6th Cir. Oct. 3, 2025) ("*Yost*.Br.") (explaining why NetChoice has associational standing in similar pending case).

First, NetChoice's "members would otherwise have standing to sue." *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004) (citation omitted). Regulated parties have standing to challenge laws that regulate them. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). Here, there is no dispute that multiple NetChoice members operate websites regulated by the Act. *E.g.*, Cleland Decl., R.8-2, PageID # 67.

Second, challenging the Act's restrictions on online speech is "germane to [NetChoice's] purpose." *Am. Canoe*, 389 F.3d at 540 (citation omitted). NetChoice seeks to "make the Internet safe for free enterprise and free expression." Cleland Decl., R.8-2, Page ID ## 60-61 (quotation marks omitted).

Third, "neither the claim asserted nor the relief requested require the participation of individual members." *Am. Canoe*, 389 F.3d at 540 (citation omitted). This third prong is "prudential." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 555 (1996) (citation omitted). Defendant forfeited any argument about this prong by not raising it in his brief. *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 317 (6th Cir. 2021). Regardless, NetChoice "seek[ing] injunctive relief" does "not require participation by the individual members." *Neighborhood Action Coal. v. City of Canton*, 882 F.2d 1012, 1017 (6th Cir. 1989).

**B.** Because NetChoice has associational standing, it is unnecessary for the Court to conclude that NetChoice can assert its members' *users'* rights as a matter of prudential standing. *See Yost*.Br.23-24.

In the First Amendment context, the rights of publishers and their audiences are intertwined. The constitutional "protection afforded is to the *communication*, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphasis added). When the government restricts *disseminating* "communication"

3

(affecting publishers) it simultaneously restricts *accessing* "communication" (affecting users). If any argument "blurs the distinction" between websites' and users' rights, AG.Br.34, that is because the First Amendment protects them both from governmental infringement.

When the State requires websites to obtain age verification or parental consent before a user can access speech, it simultaneously requires age verification or parental consent before websites can disseminate that speech to viewers. *Brown* and *Free Speech Coalition* are often framed in terms of the audience's First Amendment rights, even though "the associations asserted the rights of their actual members." AG.Br.56 n.7. *Brown* explained—in sustaining a challenge to a parental-consent requirement—that "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to" minors. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011) (citation omitted).

**C.** NetChoice has prudential standing to raise the rights of its members' users under binding Supreme Court precedent. *See Yost*.Br.25-29; *contra* AG.Br.34, 56-58; States.Br.22-24.

In the "First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (cleaned up). This analysis is "quite forgiving." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

Here, "it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least when the violation of those rights adversely affects the platform." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025); *accord NetChoice v. Carr*, 2025 WL 1768621, *6-7 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, *9 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 941-46 (S.D. Ohio 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1029-31 (W.D. Tex. 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *10-12 (W.D. Ark. Aug. 31, 2023) ("*Griffin I*").

Those courts have likewise rejected many of the arguments Defendant makes here. AG.Br.54-58. The kind of "close relationship" required by prudential standing in the First Amendment context is a shared interest in accessing protected speech. *E.g., Griffin I*, 2023 WL 5660155, at *12. Similarly, there is no conflict between covered websites and their users in a case about disseminating and accessing speech. *E.g., id.* And the fact that affected users might be "future users" does not matter. *E.g., id.*

Defendant's novel sovereign immunity theory also fails. AG.Br.58. NetChoice seeks an injunction for only its *regulated members*.

## II. The Act is currently imposing irreparable harm on NetChoice's members.

Tennessee enacted a law restricting its citizens' access to what the Supreme Court has called one of "the most important places . . . for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). In response to this law taking effect without an injunction, two NetChoice members stopped permitting Tennessee minors to access and engage in fully protected speech on their websites. Yet Defendant and the district court incorrectly conclude that this law imposes no irreparable harm.

6

**A.** Defendant ignores that NetChoice members Dreamwidth and Nextdoor have stopped allowing Tennessee minors to create accounts on their websites. NetChoice.Br.2, 16, 20, 26-27, 71-72. Given the Act's $1,000-per-violation penalties, § 47-18-108(b)(3), this speech-chilling effect is one of the Act's inevitable results. And this ongoing loss of First Amendment freedoms is precisely the "irreversible mischief" a preliminary injunction would have prevented. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 885 (6th Cir. 2025).

**B.** Defendant instead focuses largely on the threat of enforcement. But that threat is *entirely* within Defendant's control. And Defendant *still* does not disavow enforcement of the Act during this litigation.

NetChoice has proven Defendant's "refusal to disavow." AG.Br.28. NetChoice has repeatedly "ask[ed]" Defendant to "disavow enforcement" during this lawsuit, and Defendant still "refuse[s] to" disavow enforcement "*during the pendency of the litigation.*" *Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 2025 WL 2599923, at *7 (6th Cir. Sept. 9, 2025) (emphasis added); *see* NetChoice Br.16, 28-29.

Defendant's slim defense is that he "represent[ed] that there is 'zero' chance of enforcement *during the P.I. stage*," while responding months ago to NetChoice's motion for temporary restraining order. AG.Br.28 (emphasis added). This case is beyond the preliminary-injunction stage. And Defendant's brief confirms he has every intention to enforce this Act. He maintains that at least some NetChoice members are not complying with the Act. AG.Br.22-23. Plus, Defendant has made clear that he believes some websites are harmful. *E.g.*, AG.Br.5-9.

If Defendant wanted "to disavow enforcement," "during the pendency of the litigation," he just has to say so. *Moms for Liberty*, 2025 WL 2599923, at *7. His silence speaks for itself.

Defendant seems to agree that enforcement would constitute irreparable harm. But he says that harm is not "imminent" because Defendant must provide 10 days' notice under state law and, for the first time, "disavows any intention *of skipping the notice period*." AG.Br.19-20, 28-29 (emphasis added). This is not disavowing *enforcement*. Defendant cites nothing for the proposition that a risk of enforcement only becomes "imminent" when it is ten days

out. The Northern District of Georgia correctly rejected an argument that even a *90-day* notice period undermined irreparable harm. *Carr*, 2025 WL 1768621, at *21. Moreover, this would just burden the district court when its "docket" is "heavy." Opinion, R. 78, PageID # 2351 n.15.

Otherwise, Defendant endorses the district court's erroneous importation of the "*McKay* factors" for standing into the irreparable-harm analysis. AG.Br.20-21. NetChoice explained why that framework should not apply here and how the district court misapplied it. NetChoice.Br.38-42. Defendant repeats those errors. At bottom, neither Defendant nor the district court has explained why NetChoice satisfies the *McKay* factors for standing *but not* for irreparable harm.

Defendant also asks this Court to rule that NetChoice has not demonstrated sufficient "urgency" to secure preliminary injunctive relief. AG.Br.24. The district court properly rejected this argument. Opinion, R. 78, PageID # 2350-51. NetChoice did not wait until the "eleventh hour to seek a preliminary injunction." AG.Br.24. It moved for a preliminary injunction

nearly three months before the Act's effective date. NetChoice.Br.15-16.[1] Nor did NetChoice delay in seeking this appeal. AG.Br.14. As Defendant knows, the parties were negotiating a case management plan that could have avoided this appeal. When those negotiations were unsuccessful, NetChoice timely appealed. NetChoice.Br.19.

**C.** This Court's precedent holds that, for preliminary-injunctive relief here, "the key inquiry is . . . [w]ho is likely to prevail on the constitutional claim?" *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022). Defendant distinguishes some cases as not involving First Amendment issues. But he has no response to this Court's holding that "questions of harm . . . generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); NetChoice.Br.24, 30-33.

---

[1] In another case, the California Attorney General argued NetChoice's claims were not ripe, in part because NetChoice purportedly sued *too soon*. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1018 (9th Cir. 2025).

Instead, Defendant repeats arguments about the imminence of harm, ignoring that some NetChoice members stopped allowing Tennessee minors to access fully protected speech for *months*.

*Fischer v. Thomas*, 78 F.4th 864 (6th Cir. 2023), is inapposite. That case considered a First Amendment challenge to investigations of judicial candidates. *Id.* at 866-67. But after those candidates lost their elections, they no longer needed prospective relief: there was "no ongoing election, and the former candidates haven't indicated that there will be before the case reaches final judgment." *Id.* at 868. Here, Defendant can enforce the Act at any time.

In *EOG*, money damages would remedy any harm. Parties suffer "irreparable injury" when retrospective relief like "damages might be inadequate or particularly difficult to calculate"—such as for First Amendment violations. *EOG*, 134 F.4th at 884. In *EOG*'s mineral-lease dispute, "delaying the drilling would, at worst, lead to lost profits," which can be collected as damages. *Id.* at 855.

*Moms for Liberty* is even further afield, considering a "*rescinded*" policy that the governmental defendant disavowed "reinstitut[ing] . . . during the

pendency of th[at] litigation." 2025 WL 2599923, at *9 (emphasis added). In other words, that official made the kind of categorical disavowal of enforcement that Defendant refuses to make here.

**D.** The Act additionally requires covered websites to expend unrecoverable funds. NetChoice.Br.29, 45-48. Defendant implicitly concedes "unrecoverable compliance costs" constitute irreparable harm. *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

But Defendant wrongly contends there is insufficient evidence of such costs. AG.Br.30. Nextdoor, for instance, declared that "compliance costs . . . would dwarf our possible revenue per user in this market." Pai Decl., R.8-3, PageID ## 82-83. And *all* members would need to spend additional funds. Cleland Decl., R.8-2, PageID # 68. Defendant surmises that some funds may have already been expended to comply with other laws. AG.Br.30. But that conjecture must yield to the unrebutted record facts.

Defendant wrongly asserts that if a party cannot satisfy the qualified-immunity doctrine's "clearly established law" test, then it cannot make a "clear showing" of likelihood of success on the merits. AG.Br.31-32

(citation omitted). Defendant cites no case holding that a party's burden to demonstrate a likelihood of success on the merits for a preliminary injunction equals the qualified-immunity's "clearly established law" test.

This would be a sea change. A party seeking a preliminary injunction must show just a "likelihood" of success on the merits. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Whether a party can satisfy the qualified-immunity doctrine's "clearly established law" test is not necessary for the preliminary-injunction analysis.

Defendant can concede that compliance costs here are recoverable because this Act violates clearly established law. But that is the only way qualified-immunity doctrine has any bearing on this appeal.

\* \* \*

"[B]ecause the record in this case contains the facts necessary to decide whether [NetChoice's] claim warrants an injunction" this Court should "review the merits of" NetChoice's motion. *Jones v. Caruso*, 569 F.3d 258, 270 (6th Cir. 2009); *contra* AG.Br.64.

## III. NetChoice is likely to succeed on the merits.

### A. The Act's age-verification and parental-consent requirements restrict accessing and disseminating protected speech, and thus do not regulate mere conduct.

Supreme Court precedent holds that age-verification and parental-consent requirements for accessing or disseminating speech must satisfy heightened First Amendment scrutiny. *See* NetChoice.Br.50-63. Defendant responds that the Act regulates mere "conduct." AG.Br.35-38. That argument has been rejected by every court to resolve these arguments on the merits. *See Carr*, 2025 WL 1768621, at *13, *22; *Uthmeier*, 2025 WL 1570007, at *15, *21; *Yost*, 778 F. Supp. 3d at 954, 959; *NetChoice, LLC v. Griffin*, 2025 WL 978607, *8, *17 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1126 & n.135, 1134 (D. Utah 2024).[2]

**1.** This Act's age-verification and parental-consent requirements restrict fully protected speech. Along with multiple other courts, Justice Kavanaugh

---

[2] Even if these requirements were (erroneously) construed as contract regulations, their "incidental effect on protected speech[] mak[es them] subject to intermediate scrutiny." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 478 (2025) ("*FSC*") (cleaned up).

recognized that another State's similar requirements "would likely violate [NetChoice] members' First Amendment rights." *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in denial of application to vacate stay).

The Act uniquely targets websites that are (1) "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard"; and (2) among the "principal sources for knowing current events." *Packingham*, 582 U.S. at 107; *see* EFF.Br.4-10. The "primary purpose of a social media platform is to engage in speech." *Griffin I*, 2023 WL 5660155, at *16. So these websites disseminate a "staggering amount of content" across "billion[s]" of posts. *Moody v. NetChoice, LLC,* 603 U.S. 707, 719 (2024).

Accordingly, restrictions on accessing covered websites necessarily restrict both disseminating and viewing protected speech. Any laws restricting users' "access" to "social media" trigger heightened First Amendment scrutiny. *Packingham*, 582 U.S. at 108. More specifically, governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3; *see* NetChoice.Br.50-53. For

both minors and adults, "submitting to age verification is a burden on the exercise of" the First Amendment "right to access speech." *FSC*, 606 U.S. at 482-83; *see* NetChoice.Br.59-61. Unrebutted evidence illustrates as much: "[Nextdoor] do[es] not need my birthday and I will not give it to you." Pai Decl., R.8-3, PageID # 78 (italics omitted).

**2.** This Act directly regulates accessing and disseminating speech under *FSC, Packingham*, and *Brown*. This Court therefore does not have to address Defendant's novel taxonomy of laws regulating mere conduct. AG.Br.34-38.

Courts do not ask whether direct restrictions on accessing protected speech *further* affect some other "inherently expressive conduct," conduct with a "content-based burden," or conduct with a "non-content-based burden." AG.Br.35. These laws *restrict speech*, full stop. For instance, government cannot prohibit the "sale or rental" of speech under the guise of regulating conduct. *Brown*, 564 U.S. at 792 n.1.

The Act's speech restrictions therefore are unlike laws regulating non-expressive activities—like traffic laws, building-occupation limits, and sales taxes. *See* AG.Br.35, 60-61. The government's authority to wield even

those authorities cannot specifically target speech. Government "cannot do indirectly what [it] is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). For example, governments cannot levy taxes on only specific publishers. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983).

Covered websites are also unlike "saloon[s]." AG.Br.38-39 (citing *Indigo Room v. City of Fort Myers*, 710 F.3d 1294, 1299-1300 (11th Cir. 2013)). This "analogy is weak." *Griffin I*, 2023 WL 5660155, at *16. Covered websites "are in the business of expression, while [bars] are in the business of selling" alcohol. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 761 (1988).

*FSC* changed none of this. *Contra* AG.Br.58-59. It held that age verification for accessing speech "necessarily" burdens the "right to access" that speech. *FSC*, 606 U.S. at 495. It did not, as Defendant says, hold that "[a]ge verification is an 'activity that is not protected by the First Amendment.'" AG.Br.37 (quoting *FSC*, 606 U.S. at 483). Quite the opposite: the Supreme Court applied heightened First Amendment scrutiny. *FSC*, 606 U.S. at 495. The Court held that age-verification requirements to access "pornography"

17

"regulate[] only *speech* that is obscene to minors," because "pornography" is "unprotected to the extent the State seeks only to verify age." 606 U.S. at 482-83 (emphasis added). It is only in that unique context where adults have no "right to avoid age verification." *Id.* at 483; *see* NetChoice.Br.61.

The Act's broad and undifferentiated targeting of speech across countless websites and their users is nothing like the narrow national security issues in *TikTok Inc. v. Garland*, 604 U.S. 56 (2025); *contra* States.Br.15-17. The Supreme Court expressly limited *TikTok*'s holding to a single service posing unique national security concerns from "a *foreign adversary's control*." *TikTok*, 606 U.S. at 69 (emphasis added). *TikTok* repeatedly emphasized the narrowness of that holding. *E.g., id.* at 62, 67-73. The Act here is the kind of "law targeting any other speaker" that *TikTok* concluded "would by necessity entail a distinct inquiry." *Id.* at 73.

**3.** Nor does the Act regulate mere "contracts" or otherwise evade First Amendment scrutiny on that basis. *Contra* AG.Br.39-41, 59-60; *see Yost.*Br.33-38. Other courts have rejected similar arguments. *Carr*, 2025 WL 1768621, at *11; *Uthmeier*, 2025 WL 1570007, at *11; *Yost*, 778 F. Supp. 3d at 948-49.

18

Neither the Act's age-verification nor parental-consent requirements use the word "contract." Instead, the Act restricts "becoming an account holder" to engage with fully protected speech. § 47-18-5703(a). Under Tennessee law, "courts must be circumspect about adding words to a statute that the General Assembly did not place there." *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013) (citation omitted).

Even if the Act were atextually construed to target contracts, it still triggers First Amendment scrutiny. The "'freedom of speech' protects against [both] regulations that directly suppress speech [and] those that target activities useful for speaking." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 882 (6th Cir. 2024); *see Citizens United v. FEC*, 558 U.S. 310, 336 (2010) (similar). Creating accounts on covered websites is *necessary* to engage in the full range of speech activities on the websites. *See* NetChoice.Br.13. To publish users' posts, websites secure a license through users agreeing to terms of service. And those terms provide a contractual right for websites to remove such posts, including for violating the websites' policies. As a result, a high school

student seeking to speak about politics on X.com must have an account to do so.

Nor can Defendant's contract argument be limited to minors. Under Defendant's view, the State could prohibit *adults* from creating accounts on these websites under the guise of regulating contracts.

In addition, laws requiring minors to have parental consent before creating these accounts impose *governmental* burdens on speech, not "private burdens." *Contra* AG.Br.4, 59-60 (emphasis omitted).[3] Much like Defendant's general argument that the Act regulates only "conduct," this argument attempts to isolate a "different point[] in the speech process" to evade First Amendment scrutiny. *Citizens United*, 558 U.S. at 336. There are all sorts of "private" burdens on the dissemination of protected speech that government has no authority to regulate. For instance, the government cannot bar the *sale* of books by suggesting the company has made the "private" choice to sell books instead of giving them away.

---

[3] Websites getting rid of their terms of service risks being counterproductive to the State's goals of protecting minors. *Carr*, 2025 WL 1768621, at *17 n.16.

Accordingly, this case does not concern Tennessee's *general* authority to regulate contracts. AG.Br.40-41. State authority to regulate sales and rentals has "coexisted with the First Amendment" just like governmental authority to regulate contracts. AG.Br.40. But that historical coexistence does not immunize speech restrictions from scrutiny. *Brown* held the government could not "punish[] the sale or rental" of protected speech, because that did not implicate California's power to regulate sales. 564 U.S. at 793 n.1. It regulated speech—*without* historical "precedent." *Id.* at 795 n.3. The same is true here.

**4.** Laws can *restrict* speech even if they do not *compel* publishers to disseminate speech. *Contra* AG.Br.38-39. *Packingham* and *Brown* show that.

*Moody* did not hold that laws can *restrict* accessing or disseminating fully protected speech on websites lacking sufficient editorial curation. *See* 603 U.S. at 740; *contra* AG.Br.39. *Moody* addressed arguments about when governments can override websites' editorial discretion. 603 U.S. at 720. But *Packingham* held that "restricting" "access" to online speech triggers First Amendment protection. 582 U.S. at 108. That holding applies equally to social media websites engaging in extensive content moderation and to

21

message boards with relatively little curation. In any event, NetChoice's members engage in the precise activities *Moody* held were expressive. *See infra* p.32.

### B. The Act's "social media company" coverage definition is content-based, which subjects the Act's speech regulations to strict scrutiny.

All the Act's speech restrictions also trigger strict scrutiny because they rely on a content-based "social media company" coverage definition. § 47-18-5702(8); *see* NetChoice.Br.63-68.[4] Defendant erroneously says that the Act's coverage provisions are content-neutral. *See* AG.Br.41-45.

**1.** The Act's coverage provisions select websites for regulation based, in part, on the "topic discussed" on those websites. *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 73-74 (2022) (quotation marks omitted). Whether these provisions are content-based distinctions or speaker-based

---

[4] Defendant does not contest that, if the "Act's central coverage definition is facially content-based," that "render[s] all of the Act's operative provisions content-based." NetChoice.Br.64.

distinctions that "reflect[] a content preference," strict scrutiny applies all the same. *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) (citation omitted).

The Act's content-based nature is perhaps best illustrated by its content-based exceptions.[5] The Act excludes websites to the extent their users are "post[ing]" about "interactive gaming," "educational entertainment," "career development opportunities," and "reviewing products offered for sale." § 47-18-5702(2)(B), (9). Defendant does not address any of these exceptions, except for "career-development sites." AG.Br.43. Defendant's silence on exceptions such as "interactive gaming" and "educational entertainment" is telling. If covered websites "alter[ed] their speech" by disseminating *only* educational entertainment, they could "avoid or mitigate the effects of the Act." *TikTok*, 604 U.S. at 71 (cleaned up).

Defendant responds that "[m]any" of these exclusions "aren't exclusions at all; they just fall outside the definition of a social-media platform."

---

[5] Defendant contends that "Texas's law in *Moody* defined 'social media platform' similarly." AG.Br.42 n.5. *Moody* did not have to determine whether that coverage definition was content-based, because "Texas's law does not pass" even "intermediate scrutiny." 603 U.S. at 740.

AG.Br.42-43. That would impermissibly render these statutory terms super-fluous. Regardless, these exclusions further confirm a content-based "purpose" to exclude these types of content from the Act's restrictions. *Reed*, 576 U.S. at 170.

**2.** Defendant's other arguments fail in demonstrating the Act's speech restrictions should be subject to only intermediate scrutiny.

First, this Act does not target unprotected speech, so *FSC* does not hold that intermediate scrutiny applies. In *FSC*, the Texas law's coverage provisions imposed a "content-based" classification that "does not require strict scrutiny," targeting "pornography." 606 U.S. at 492. Pornography is a unique category of speech that is protected for adults and *un*protected for minors. *Id.* at 473-74. So any coverage provision targeting pornography "is content based in the same way that prohibitions of [unprotected] 'defama-tion,' 'fraud,' and 'incitement' are." *Id.* at 492. These are all "well-defined and narrowly limited classes of speech" with a "historical warrant" for differen-tial treatment. *Brown*, 564 U.S. at 791-92 (citation omitted). But when a law

"directly regulate[s]" access to "*fully protected* speech"—like the Act here—it triggers "strict scrutiny." *FSC*, 606 U.S. at 482 (emphasis added).

Second, the "secondary-effects" doctrine does not apply here. AG.Br.44-45. That doctrine applies only to physical "zoning ordinance[s]" regulating the *location* of businesses selling pornography, not statewide speech restrictions. *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (controlling op. of Kennedy, J., concurring in the judgment). States cannot "cyberzon[e]" the internet by imposing "restriction[s]" on access to fully protected speech. *Reno v. ACLU*, 521 U.S. 844, 868 (1997).[6] In addition, the "secondary effects" doctrine cannot apply here, as "statutes that single out speech for special treatment because of the effect its content will have on its audience amount to content-based restrictions subject to strict scrutiny." *Connection*, 557 F.3d at 328. The Act does just that.

Third, Defendant misapprehends why it is important that a minor "can view articles about a 'politician's posts' on CNN.com, but 'cannot access

---

[6] *Reno* remains good law, because the law in *Reno*—like this Act—"swept far beyond obscenity" "even as to minors." *FSC*, 606 U.S. at 475-76.

those same posts on X.'" AG.Br.42. This does not show that the Act's coverage definition is content neutral. Rather, this demonstrates a *tailoring* problem (underinclusiveness) arising from the law's other content-based distinctions. *See* NetChoice.Br.67.

## C. The Act's speech restrictions fail heightened First Amendment scrutiny.

Defendant does not argue that these speech restrictions satisfy strict scrutiny. Instead, Defendant relies solely on intermediate scrutiny. The Act's speech restrictions cannot meet "intermediate scrutiny" either, as they "burden substantially more speech than is necessary." *Packingham*, 582 U.S. at 105-06 (citation omitted).

First, the Act is both "seriously overinclusive" and "seriously underinclusive" as a purported regulation of contracts. *Brown*, 564 U.S. at 805; *contra* AG.Br.48-49. If Tennessee were concerned about specific contractual terms (*e.g.*, arbitration agreements), it could have regulated those contractual terms or relied on voidability of contracts by minors. *Cf.* States.Br.11-13; AG.Br.40.

In addition, the Act is far underinclusive as a regulation of contracts. Terms of service to access speech are ubiquitous online. *See Van Buren v.*

*United States*, 593 U.S. 374, 394 (2021) ("Many websites . . . authorize a user's access only upon his agreement to follow specified terms of service."). Yet this Act regulates only "social media" accounts, which are necessary to access "principal sources for . . . exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. This "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802.

Second, the Act is not properly tailored to furthering "the State's interest in protecting children from child predators" or "minors' mental health." AG.Br.49-50, 65-66. The materials Defendant cites do not justify the Act's regulatory breadth, either in the websites regulated or the array of fully protected speech the Act restricts. For instance, the Surgeon General's Advisory highlights potential "benefits of social media use among children and adolescents." Exhibit, R.30-14; PageID # 454; *see Reyes*, 748 F. Supp. 3d at 1125. And Dr. Kaliebe admits: "some reviews have found small, mixed, or no clear overall effects." Kaliebe Decl., R.28, PageID # 235.

Additionally, "nearly all of the research" cited by Defendant "is based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800 (cleaned up); *see Reyes*, 748 F. Supp. 3d at 1125-26. The Surgeon General notes: "[m]ore research is needed to fully understand the impact of social media," and "[m]ost prior research to date has been correlational." Exhibit, R.30-14; PageID ## 452, 459. Dr. Kaliebe's conclusions are supported by only speculative assertions. Kaliebe Decl., R.28, PageID ## 235-39, 243, 245, 253 ("appears"; "meta-correlation"; "connection"; "linked to"; "associated with"; "seem to"; "could be"; "positive associations"; "correlates"; "associations"; "[c]orrelational studies"). Even if this evidence established that the handful of websites the sources evaluate are harmful, it fails to show that even a significant fraction of regulated websites are harmful. Under intermediate scrutiny, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Defendant claims that the Act "govern[s] platforms with [] uniquely addictive features." AG.Br.50. But Defendant does not identify what "features"

28

he believes are addictive. Nor do they appear on the face of the law. The Act regulates a content-based subset of websites that "[e]nable[] an account holder to communicate with other[s] . . . through posts." § 47-18-5702(9)(A). That is, the Act targets websites where users interact. *Brown* rejected the argument that speech poses "special problems because [it is] 'interactive.'" 564 U.S. at 798.

It does not matter whether the Act "leav[es] ample avenues for compliance." AG.Br.51; *see generally* Age.Verifiers.Br. Speech restrictions do not become constitutional if there may be multiple ways to comply. Plus, websites' First Amendment rights do not hinge on whether any websites are able to "bear the burden" of compliance. *Minneapolis Star*, 460 U.S. at 591-92. Brick-and-mortar retailers could have cheaply requested identification proving age for people to buy "violent video games." *Brown*, 564 U.S. at 795. Parental-consent requirements to access this protected speech are unconstitutional all the same. *Id.* at 802.

**D. The Act's speech restrictions are both facially invalid and invalid as applied to the extent they regulate NetChoice's members.**

**1.** The Act's speech restrictions are facially invalid because their "unconstitutional applications substantially outweigh [their] constitutional ones." *Moody*, 603 U.S. at 723-24 (citation omitted).

NetChoice's opening brief (at 10-12) identified the covered "actors" (social media websites) and "activities" (account creation) regulated by the Act—the "first" step in *Moody*'s facial-challenge inquiry. *Id.* at 724. Defendant does not dispute that the Act targets the kinds of "social media" websites that "allow users to upload content . . . to share with others." *Id.* at 719. The Act also excludes other "kinds of websites" that *Moody* suggested might "fall on different sides of the constitutional line" when considering different theories. *Id.* at 718, 726.

Defendant's scant responses cannot defeat this facial challenge. Defendant says the "actors" might include websites dedicated to disseminating "pornographic content." AG.Br.53. But a *separate* Tennessee law outright prohibits such websites from disseminating pornography to minors. § 39-17-912(c). Unless Defendant says that minors can access such websites with

30

parental consent under this Act, then pornography websites are not "actual applications of the statute." *City of L.A. v. Patel*, 576 U.S. 409, 419 (2015).

It also does not matter that there might be some small amount of unprotected speech on covered websites. *Contra* AG.Br.53. To "provide breathing room for free expression," the First Amendment facial-challenge standard is "less demanding" than the no-set-of-circumstances test for facial challenges. *Moody*, 603 U.S. at 723 (cleaned up). Any bookstore, radio station, or video game could potentially have unprotected expression. Allowing the government to restrict speech because there might be an unprotected needle in the haystack would "vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials." *Brown*, 564 U.S. at 802 (cleaned up).

So the Act's unconstitutional applications restricting countless posts of fully protected speech "substantially outweigh" any possible constitutional applications to unprotected speech. *Moody*, 603 U.S. at 724. Covered websites disseminate a "staggering amount" of fully protected speech across "billions" of posts. *Id.* at 719, 734; *see* EFF.Br.10-13. Defendant does not grapple

with this immense amount of protected speech, ignoring *Moody*'s "substantially outweigh[s]" test. 603 U.S. at 724.

Defendant instead suggests that the First Amendment issues here turn on whether covered websites engage in "protected editorial discretion." AG.Br.53. The undisputed record evidence shows NetChoice members' websites (including "Facebook" and "YouTube") "engage[] in expression" by "mak[ing] choices about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716; *see* Cleland Decl., R.8-2, PageID ## 66-67.

Regardless, Defendant's focus on editorial discretion uses the wrong legal test. This case does not concern the issues from *Moody* about whether governments could compel websites to disseminate speech. 603 U.S. at 720. This case implicates the separate First Amendment doctrine prohibiting governments from *restricting* access to speech, addressed by *Packingham*, *Brown*, and *FSC*. *See supra* pp.14-16. And "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). *Packingham* did not ask about the content-moderation practices of differing websites like

"Amazon.com, Washingtonpost.com, and Webmd.com." 582 U.S. at 106. Neither *Packingham* nor *FSC* required a "'fact intensive' inquiry into how each platform operates," because this did not matter to the First Amendment merits. AG.Br.52. Nor did *Brown* require an analysis of every single video game or video game seller.

Thus Defendant's citations to *NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025), *pet. for reh'g filed* Sept. 23, *resp. filed* Oct. 21, are misplaced. AG.Br.50, 53-54, 63. Defendant tellingly does not cite the erroneous underlying First Amendment holding in *Bonta* because this case does not concern a similar direct regulation of "personalized feeds." 152 F.4th at 1010-11. Defendant does not argue this case presents similar First Amendment issues about regulating such feeds. This Tennessee Act imposes broad restrictions on threshold access to regulated websites. § 1752. And the Act's coverage provisions target websites that "[e]nable[] an account holder to communicate . . . through posts," § 47-18-5702(9)(A); they are not limited to websites with personalized feeds.

33

Defendant's view proves far too much. Defendant contends that First Amendment does not apply to the website Dreamwidth because it "does not engage in protected editorial expression itself." AG.Br.53 n.6. Under that view, every restriction on speech would require a threshold evaluation of whether the publisher engages in protected editorial discretion to the State's standards. That analysis would obfuscate the core First Amendment injury of restricting *access* to protected speech. Here, because the State seemingly thinks that Dreamwidth's enforcement of its own content-moderation policies is insufficient, Paolucci Decl., R.8-4, PageID # 84, the State could outright ban Dreamwidth. That is wrong. *Cf. Yost*, 778 F. Supp. 3d at 959 (granting permanent injunction in facial challenge to parental-consent requirements where Dreamwidth was a declarant).

Nor can this Act satisfy heightened scrutiny even if a few covered websites are "controlled by foreigners." AG.Br.53. Unlike the law in *TikTok*, this law does not target such websites. Instead, this Act targets Tennessee

residents' access to some of the internet's largest websites, run by American companies.[7]

Lastly, NetChoice did not "concede[]" "that the Act is constitutional for minors under the age of 13." AG.Br.53-54. NetChoice said the federal COPPA statute, 15 U.S.C. §§ 6501-6506, "is an entirely different privacy statute dealing with younger minors and does not categorically bar access to protected speech." PI Reply, R.35, PageID # 1793 n.10. Nor are minors younger than 13 relevant here. *Contra* States.Br.21. Websites regulated by the Act do not permit such minors to create accounts. *E.g.*, Cleland Decl., R.8-2, PageID # 66. Here, the "actual applications of the statute" are when this Act—not voluntarily adopted policies—would restrict users from creating accounts to access covered websites. *Patel*, 576 U.S. at 419.

**2.** At minimum, the Act's speech restrictions are unconstitutional as applied "to the extent" they regulate NetChoice members' covered

---

[7] Defendant cites no authority allowing Tennessee to prohibit its citizens from reading the British-controlled BBC without first verifying ages. Binding precedent says otherwise. *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965).

websites: (1) Discord;    (2) Dreamwidth;    (3) Facebook;    (4) Instagram; (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snapchat; (9) Threads; (10) Tumblr; (11) X; and (12) YouTube. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

These services are precisely the kinds of curated "social media" website feeds discussed by the Supreme Court in *Moody* and *Packingham*. In fact, multiple members' services have been discussed by the Court as examples of such services, including "Facebook," "Twitter" (now X), and "YouTube." *Moody*, 603 U.S. at 740; *Packingham*, 582 U.S. at 99.

Defendant erroneously states that NetChoice does not press its as-applied First Amendment claims on appeal. AG.Br.33 n.3. But nothing in NetChoice's opening brief limited the arguments to either NetChoice's facial or as-applied challenges. And *Moody* itself made as-applied rulings in the context of a lawsuit expressly limited to a facial challenge. 603 U.S. at 718.

## IV. The remaining equitable factors support granting NetChoice a preliminary injunction.

**A.** Defendant's lead argument invokes *Fitch*'s one-sentence order, but circumstances have changed since Justice Kavanaugh wrote that "the equities . . . *at this time*" did not warrant vacating a stay of a preliminary injunction. 145 S. Ct. at 2658 (emphasis added). Then, no covered websites in Mississippi had stopped serving minors. But since that law took effect without an injunction, multiple websites have stopped disseminating speech to users. *See* NetChoice.Br.72.

Here, NetChoice members Nextdoor and Dreamwidth have stopped allowing Tennessee minors to create accounts. *See* NetChoice.Br.71. That is not a "theoretical First Amendment harm[]." AG.Br.65.

*Fitch*'s one-sentence order does not override this Court's holding that likelihood of success on First Amendment claims creates a presumption of irreparable harm. And the changed circumstances—websites blocking users' access—means this is not a "like case" to the posture *Fitch* was in months ago. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

37

**B.** The balance of equities and public interest favor NetChoice. *Contra* AG.Br.65-66. On NetChoice's side, websites and users continue to suffer the loss of First Amendment freedoms and face unrecoverable compliance costs that exceed members' "available budget." Paolucci Decl., R.8-4, PageID # 98. On Tennessee's side is Defendant's interest in enforcing a likely unconstitutional law, after ten months have passed without Defendant filing any formal enforcement proceedings. Tennessee's concerns about children's wellbeing are legitimate, but they cannot justify poorly tailored speech restrictions. *Brown*, 564 U.S. at 799.

Preventing First Amendment violations "is always in the public interest." *Connection*, 154 F.3d at 288. The Act threatens to balkanize the internet, where Tennessee citizens have less access to protected speech than their neighbors. Preserving nationwide access to these "principal sources for knowing current events . . . and otherwise exploring the vast realms of human thought and knowledge" serves the public interest. *Packingham*, 582 U.S. at 107.

## CONCLUSION

This Court should reverse the district court's judgment and direct the district court to preliminarily enjoin Defendant's enforcement of the Act against NetChoice's covered members.

Dated: October 24, 2025

Respectfully submitted,

*/s/ Scott A. Keller*

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 693-8350

Counsel for Plaintiff-Appellant NetChoice

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(g) because it contains 6,500 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

/s/ Scott A. Keller
Scott A. Keller

## CERTIFICATE OF SERVICE

I certify that on October 24, 2025, this brief was served via CM/ECF on

all registered counsel and transmitted to the Clerk of the Court.

/s/ *Scott A. Keller*
Scott A. Keller